# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | MDL Docket No. 4:03CV1507-WRW |
| | : | 4:05CV00163 |
| PREMPRO PRODUCTS LIABILITY | : | |
| LITIGATION | : | |
| | : | |
| LINDA REEVES | : | PLAINTIFF |
| | : | |
| v. | : | |
| | : | |
| WYETH | : | DEFENDANT |

## ORDER

Pending are Defendant's Motion to Exclude Expert Testimony of Dr. Fugh-Berman (Doc. No. 77), Motion to Exclude Expert Testimony of Dr. Bundred (Doc. No. 88), Motion to Exclude Expert Testimony of Dr. Colditz (Doc. No. 94), Defendant's Motion to Exclude Expert Testimony of Mr. Maloney (Doc. No. 96), and Motion to Compel the Production of Annotated Document Prepared by Plaintiff's Regulatory Expert, Dr. John Gueriguian (Doc. No. 124). Also pending is Plaintiff's Motion to Exclude the Testimony of Leon Speroff (Doc. No. 117).

Based on the findings of fact and conclusions of law, as well as statements of counsel, made at the hearings held on July 13-14, 2006, I rule as follows:

1.    Defendant's Motion to Exclude Expert Testimony of Dr. Fugh-Berman (Doc. No. 77) is DENIED AS MOOT.

2.    Defendant's Motion to Exclude Expert Testimony of Dr. Bundred (Doc. No. 88) is DENIED AS MOOT.

3.    Defendant's Motion to Compel the Production of Annotated Document Prepared by Plaintiff's Regulatory Expert, Dr. John Gueriguian (Doc. No. 124) is DENIED AS MOOT.

4.      Defendant's Motion to Exclude Expert Testimony of Dr. Colditz (Doc. No. 94) is DENIED.  However, Dr. Colditz's testimony will be limited to general causation and identifying the resources available to make the risk/benefit analysis of HRT.  At this point, Dr. Colditz will not be permitted to testify that the risks of HRT outweigh the benefits.

5.      Defendant's Motion to Exclude Expert Testimony of Mr. Maloney (Doc. No. 96) is DENIED AS MOOT.  As I recall, the necessity for this witness is obviated by the $12 billion net worth stipulation.

6.      Plaintiff's Motion to Exclude the Testimony of Leon Speroff (Doc. No. 117) is GRANTED IN PART and DENIED IN PART.  To the extent that Plaintiff requests that Defendant be precluded from referring to Dr. Speroff's deposition testimony at trial, the motion is DENIED.  To the extent that Plaintiff requests to conduct a supplemental deposition of Dr. Speroff, the motion is GRANTED.

7.      As was discussed at the July 14, 2006 hearing, this case is CONTINUED.  Accordingly, the trial will commence at 9 a.m., Monday, August 21, 2006.


IT IS SO ORDERED this 18th day of July, 2006.


/s/ Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | MDL Docket No. 4:03CV1507-WRW |
| | : | 4:05CV00497 |
| PREMPRO PRODUCTS LIABILITY | : | |
| LITIGATION | : | |
| | : | |
| | : | |
| HELENE RUSH | : | PLAINTIFF |
| | : | |
| v. | : | |
| | : | |
| WYETH | : | DEFENDANT |

## ORDER

Pending are several *Daubert* motions:  Defendant's Motion to Exclude Expert Testimony of Drs. Klimberg and Waldron as to Specific Causation (Doc. No. 136); Defendant's Motion to Exclude Expert Testimony of Dr. Hollon (Doc. No. 140); Defendant's Motion to Exclude Testimony of Dr. Gueriguian (Doc. No. 142); Defendant's Motion to Exclude Expert Testimony of Dr. Sackett (Doc. No. 144); and Defendant's Motion to Exclude Expert Testimony of Dr. Austin (Doc. No. 148).[1]  Also pending are Plaintiff's Motion to Preclude Defendant's Experts from Testifying That There is No Reliable Scientific Evidence that Combination Hormone Therapy Can Cause Breast Cancer (Doc. No. 193)[2] and Defendant's Motion for Summary Judgment Re: Specific Causation (Doc. No. 87).[3]  Oral argument was heard on July 13-14, 2006 and again on July 31, 2006.

---

[1]Plaintiff has responded to each motion (Doc. Nos. 211, 215, 213, 203).

[2]Defendant has responded (Doc. No. 225).

[3]Plaintiff has responded (Doc. No. 111) and Defendant has replied (Doc. No. 175).

1

## I.   STANDARD

### A.   Burden of Proof

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[4]

When a party proffers an expert witness, deciding whether Rule 702 is satisfied is a preliminary issue governed by Federal Rule of Evidence 104(a).[5]  Rule 104(a) requires the proponent of evidence to establish its admissibility by a preponderance of the evidence.[6]  In determining admissibility, the court is not bound by any of the rules of evidence, except with regard to privilege.[7]

### B.   Legal Standard for Admissibility

The central inquiry under Rule 702 is whether the proffered expert's testimony is sufficiently reliable.[8]  The trial court serves a gatekeeping function, ensuring that any expert testimony is reliable and relevant.[9]

---

[4] Fed. R. Evid. 702.

[5] *U.S. v. Martinez*, 3 F.3d 1191, 1196 n.10 (8th Cir. 1993).

[6] *Bourjaily v. U.S.*, 483 U.S. 171 (1987).

[7] Fed. R. Evid. 104(a).

[8] *First Nat'l Bank v. Benham*, 423 F.3d 855, 861 (8th Cir. 2005).

[9] *Id.*

2

To be admissible, expert testimony must satisfy the two prongs of Rule 702.[10] First, it must be based on scientific, technical, or other specialized knowledge.[11] If the testimony is scientific, it must be grounded in the methods and procedures of science.[12] Likewise, "knowledge" requires more than a subjective belief or an unsupported speculation, requiring instead an appropriate level of validation.[13] Second, the testimony must be relevant, in that it must help the trier of fact either understand the evidence or determine a fact in issue.[14] The burden of establishing relevancy and reliability rests on the proponent of the expert testimony.[15]

Courts have used a variety of factors to determine the reliability of proffered expert testimony. The most frequently discussed factors are those derived from the Supreme Court's opinion in *Daubert*, where the Court established that the trial court may consider:

> (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community.[16]

Because the inquiry is "flexible and fact-specific, a court should use, adapt, or reject *Daubert* factors" as needed based on the facts of a particular case.[17]

---

[10]*U.S. v. Cawthorn*, 429 F.3d 793, 799 (8th Cir. 2005).

[11]*Id.*

[12]*Id.*

[13]*Id.* at 799-800 (*quoting Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 (1993)).

[14]*Id.* at 799.

[15]*Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278-78 (5th Cir. 1998).

[16]*Benham*, 423 F.3d at 861 (*citing Daubert*, 509 U.S. at 593-94).

[17]*Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).

3

The most recent amendments to Rule 702 added three general standards for courts to use in determining the reliability and relevance of proffered expert testimony. First, the proffered testimony must be based on sufficient facts or data.[18] Second, it must be the product of reliable principles and methods.[19] Third, the expert must have applied those principles and methods reliably to the facts of the case.[20]

The focus is not on the expert's conclusion, but on the methodology.[21] The proponent of the testimony "need not prove . . . that the expert's testimony is correct, but . . . must prove by a preponderance of the evidence that the testimony is reliable."[22] Determining the validity of an expert's conclusions is the duty of the finder of fact.

## II.   ANALYSIS

### A.   Defendant's Motion to Exclude Expert Testimony of Drs. Klimberg and Waldron as to Specific Causation (Doc. No. 136)

Drs. Suzanne Klimberg and James A. Waldron were retained by Plaintiff to testify on both the general and specific causation of Plaintiff's breast cancer.

Defendant asserts several reasons for excluding the expert testimony of Drs. Klimberg and Waldron: (1) the opinions were created exclusively for this litigation; (2) the opinions are not based on sufficient facts or data;[23] (3) differential diagnosis is not reliable to determine the

---

[18]Fed. R. Evid. 702(1).

[19]Fed. R. Evid. 702(2).

[20]Fed. R. Evid. 702(3).

[21]*Moore*, 151 F.3d at 275-76.

[22]*Id* at 276.

[23]Specifically Defendant claims that the opinions lack support because: (1) scientists do not know what causes breast cancer in an individual woman; (2) there is no test to identify the

4

cause of breast cancer; (4) and the "Gail Model" is not reliable to determine the cause of breast cancer.[24]   Defendant also contends that Drs. Klimberg and Waldron are not qualified to testify because Dr. Klimberg has "never published -- or even presented -- the opinions regarding the cause of breast cancer" and Dr. Waldron's "previous experience with breast cancer was limited to analyzing breast biopsies and determining whether the tissue was cancerous, not identifying the cause of cancer."[25]

Plaintiff counters that Drs. Klimberg's and Waldron's opinions are based on scientifically reliable evidence.  Additionally, Plaintiff claims that as a surgical oncologist and director of the breast cancer program at the Arkansas Cancer Research Center at UAMS[26] (Dr. Klimberg) and a diagnostic surgical pathologist and professor of pathology at UAMS (Dr. Waldron), both experts are qualified to testify as experts regarding causation.

Defendant's attacks on Drs. Klimberg's and Waldron's qualifications do not pass muster.  Both experts have experience and understanding regarding breast cancer and their opinions are bottomed upon scientifically reliable information.

In formulating their opinions, Drs. Klimberg and Waldron relied on their training, knowledge, and experience as a surgical oncologist and pathologist, respectively.  They reviewed and relied on numerous published, peer-reviewed medical literature and studies.  While

---

cause of breast cancer; (3) there is no physical characteristic that distinguishes breast cancers based on their cause; and (4) there is no way to separate the effect of naturally-occurring hormones and hormone therapy.  *See* Doc. No. 137.

[24]Doc. No. 137.

[25]Doc. No. 137.

[26]University of Arkansas for Medical Sciences.

both reports are primarily conclusive, rather than explanatory, I don't believe that either expert

used improper methodology. Dr. Klimberg's report on general causation reads:

> To make a causal assessment in an individual case, one would need to consider the totality of evidence, including statistical association, details about generally recognized and statistically significant risk factors, physiological response to the drugs, such as radiological evidence of changes in breast density before, during, and after hormone therapy use, pathological biomarkers in the breast tissue samples during biopsy and surgery, as well as duration of use of the hormone therapy drugs.[27]

Defendant faults the experts for using differential analysis. However, reliance on

differential analysis is not fatal when epidemiological studies also support the expert's

conclusions.[28] Raising significant questions about the experts' analysis and conclusions is

something Defendant can do for the jury.

Also, Defendant claims that, since scientists don't know what causes breast cancer,

Plaintiff's experts cannot opine that Plaintiff's breast cancer was caused by HRT. Defendant's

focus is too narrow. Plaintiff's experts need not conclude that HRT definitively caused

Plaintiff's cancer; they must only establish that it was more likely than not a cause -- or that it

promoted her cancer. That said, Plaintiff's experts' conclusions that HRT was "a substantial

contributing factor"[29] in the development or promotion of Plaintiff's breast cancer chins the pole.

Again, while both reports are somewhat conclusive, rather than explanatory, I cannot say

that either expert used improper methodology. In sum, both experts are qualified to testify that

---

[27]Doc. No. 157, Ex. 20.

[28]*See Ambrosini v. Labarraque*, 101 F.3d 129, 140-41 (D.C. Cir. 1996) (holding that expert testimony which relied, in part, on a differential analysis ruling out alternative sources of plaintiff's injury, was admissible, where epidemiological studies also indicated causal nexus).

[29]Doc. No. 157, Exs. 21, 29.

HRT more likely than not caused or promoted Plaintiff's breast cancer. Their conclusions can be tested during cross-examination.

### B. Defendant's Motion to Exclude the Expert Testimony of Dr. Austin (Doc. No. 148)

Dr. Donald Austin will testify that, with proper monitoring, Wyeth could have and should have detected a signal in the 1980s that HRT may have been causing a disproportionate increase in certain types of breast cancer. Dr. Austin focused his report on "whether routine monitoring of breast cancer incidence from a publicly available source of such data of [sic] could have identified an anomalous increase in the incidence of invasive lobular carcinoma ["ILC"] in the U.S. during the period 1980-2000."[30]

Defendant contends that Dr. Austin's expert testimony should be excluded because: (1) it is unreliable since it was "developed solely for litigation," has not been tested, and has not been peer-reviewed or published;[31] (2) it does not "fit"[32] in the facts of this case because Ms. Rush did not have ILC; (3) none of Dr. Austin's findings can be used as evidence that HRT increased the risk of breast cancer of any type; and (4) there is no evidence that information about increased risk of particular breast cancer cell types would have affected a physician's decisions to prescribe HRT.[33]

---

[30]Doc. No. 157, Ex. 1.

[31]Doc. No. 149.

[32]See Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir. 2000) (recognizing that "[i]n recent years the Supreme Court has put renewed emphasis on the importance of the 'fit' of an expert's opinion to the data or facts in the case").

[33]Doc. No. 149.

     **1. Unreliable --** Wyeth's arguments on this point are standard *Daubert*

challenges. However, these challenges are insufficient, even when considered cumulatively.

First, "the fact of publication (or lack thereof) in a peer reviewed journal [is] . . . a relevant,

though not dispositive, consideration."[34]  Second, the fact that this research was conducted solely

for this litigation, while noteworthy, is not fatal.  When an expert develops opinions "expressly

for the purposes of testifying," the proponent is required to "come forward with other objective,

verifiable evidence that the testimony is based on 'scientifically valid principles.'"[35]  Here, Dr.

Austin's objective evidence is the SEER database he reviewed when compiling the data

regarding the number of breast cancer incidences.  As far as I can tell, Dr. Austin researched the

database looking for a trend and reported the information that he discovered.  Additionally, I

don't find anything scientifically infirm about compiling data.  It appears to me that the

conclusions he makes are based on a review of the objective evidence in the database.

     **2. "Fit"--** Defendant also contends that Dr. Austin's findings are not relevant to

this case because Plaintiff was diagnosed with ductal breast cancer, and Dr. Austin's findings

refer to lobular breast cancer.  Specifically, Dr. Austin concludes that his findings "represent a

real and statistically significant increase in the proportions of ILC and Mixed Ductal/Lobular

cancer relative to all invasive breast carcinoma."[36]  Relying on Dr. Austin's report, Plaintiff

contends that had Wyeth been keeping track of the information in the SEER database, it would

have noticed "a surge in lobular breast cancer that mirrored the rise in the sale of E+P."[37]

---

[34]*Daubert*, 509 U.S. at 593.

[35]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317-18 (9th Cir. 1995)
(*quoting Daubert*, 509 U.S. at 597).

[36]Doc. No. 157, Ex. 2.

[37]*Reeves v. Wyeth*, 4:05-CV-00163 (E.D. Ark.), Doc. No. 266.

Plaintiff further contends that this "knowledge would have caused a reasonably prudent manufacturer to conduct further studies on all hormone positive breast cancers," probably resulting in the issuance of an adequate label before Plaintiff's ductal cancer was caused or promoted.[38]

While I have some doubt about Dr. Austin's analysis, "doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility."[39]

3. **Causation** -- Plaintiff and Dr. Austin both concede that he could not comment on causation.[40] Accordingly, Dr. Austin will not be permitted to testify regarding causation.

4. **Irrelevant to Prescribing Decision** -- Defendant also contends that Dr. Austin's testimony is irrelevant because "there is no evidence that information about risk of particular breast cancer cell types -- as opposed to the overall risk of breast cancer -- would matter to doctors in prescribing hormone therapy."[41] Since Plaintiff is presenting Dr. Austin's testimony to establish "what *defendants* should have done with the information, not what physicians would have done,"[42] Defendant is off the mark. Plaintiff's position is well-taken.

C.    **Defendant's Motion to Exclude the Expert Testimony of Dr. Hollon (Doc. No. 140).**

Dr. Matthew Hollon plans to testify that Wyeth failed to meet the reasonable standard for care for drug promotion.  He contends that Wyeth used promotional techniques irresponsibly and

---

[38]*Id.*

[39]*Clark by and through Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998).

[40]Doc. No. 157, Ex. 1 and Doc. No. 285.

[41]Doc. No. 232.

[42]Doc. No. 203 (emphasis in original).

9

excessively, which directly influence physicians' prescribing practices.[43]  Plaintiff asserts that Dr. Hollon should be permitted to testify that "Wyeth engaged in longstanding manipulation of conventional wisdom on hormone therapy . . . [and] that physicians are influenced by marketing, notwithstanding their denials."[44]

Dr. Hollon is a practicing physician in internal medicine, with a Masters in Public Health, who has published several articles on pharmaceutical advertising.[45]  He also teaches at the University of Washington in Seattle, and "has conducted independent social science research and written evidenced-based reviews and editorials" on pharmaceutical marketing.[46]

Defendant points out that although Dr. Hollon has published several pieces on pharmaceutical advertising, they were all editorials.[47]  As stated above, Wyeth contends that Dr. Hollon should be prevented from testifying because his positions are not scientific, but personal opinions.  Dr. Hollon's testimony need not be scientific.  Rule 702 permits a witness to testify in the form of an opinion when that expert possesses scientific, technical, or other specialized knowledge that will assist the trier of fact.  Clearly, Dr. Hollon has a knowledge of pharmaceutical marketing that is beyond a juror's common understanding.  Although Defendant challenges the basis for his opinions, such challenges are issues for cross-examination.

However, Dr. Hollon's testimony about Wyeth's marketing will be limited to the issues in this case.  For example, Plaintiff's position that "Dr. Hollon's expertise transcends the

---

[43]Doc. No. 157, Ex. 16.

[44]Doc. No. 209.

[45]Doc. No. 157, Ex. 16.

[46]Doc. No. 209.

[47]*Reeves v. Wyeth*, 4:05-CV-00163 (E.D. Ark.), July 31, 2006, Tr. at 141-142.

individual transaction to examine the general influence of promotional activities that violate public health principles" and "that given the extent of the promotional campaign, [Wyeth] certainly had undue influence on prescribing practices within this country" is too broad.[48] The United States Supreme Court has held that, even at the punitive damages stage of a trial, evidence of tortious conduct "must have a nexus to the specific harm suffered by the plaintiff . . . A defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business."[49]

It seems to me that any evidence of Defendant's "badness" during the punitive damage portion of the trial (if there is one) must be connected to Ms. Rush's injury. However, the nexus between Plaintiff and the advertisements need not be as strong as the causation requirements during the liability stage of the trial.[50] Dr. Hollon can testify regarding advertisements -- however, those advertisements must pertain to issues that are directly linked to Plaintiff, e.g. cardiac benefit, breast cancer, etc. Dr. Hollon will not be permitted to testify regarding general badness or badness in the specific areas which is not connected to Ms. Rush's injury.

**D.    Defendant's Motion to Exclude the Expert Testimony of Dr. John Gueriguian (Doc. No. 142)**

In a July 24, 2006 letter, I requested that Plaintiff submit, as she suggested in the July 13-14, 2006 hearing, a short summary of Dr. Gueriguian's testimony.[51] In her July 27,

---

[48]Doc. No. 141.

[49]*State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003).

[50]I previously held that Plaintiff would not be permitted to discuss advertisements that neither she nor her physician saw. However, at the punitive damages stage, the "nexus" can be a bit more attenuated.

[51]*Reeves v. Wyeth*, 4:05-CV-00163 (E.D. Ark.), Doc. No. 280.

11

2006 response letter, Plaintiff asserted that Dr. Gueriguian would present testimony regarding: (1) the United States Food and Drug Administration's ("FDA") role and authority; (2) the use and purpose of labels/warnings in communicating risk information to physicians and patients; (3) the history of Wyeth's HRT drugs; (4) breast cancer signals and Wyeth's failure to test for a connection between breast cancer and HRT; (5) purported cardiac and cognitive benefits of HRT and Wyeth's failure to test for such benefits; (6) assessment of the risks and benefits of a prescription drug; and (7) the differences between "estrogen alone, Old E+P, and New Prempro."[52]  In sum, Dr. Gueriguian will testify about the history of the development of HRT and that Wyeth had a duty to WHI-type randomized controlled trial in 1980s, because that is what a reasonably prudent pharmaceutical company would do.[53]

Wyeth contends that Dr. Gueriguian's testimony should be excluded because: (1) his opinions will not assist the jury; (2) he lacks expertise to testify about Wyeth's marketing practices or FDA's review of promotional pieces; (3) he knows nothing about this specific case; and (4) he does not employ a reliable methodology.[54]

Dr. Gueriguian is a physician with specialty training in internal medicine, endocrinology, and pharmacology.[55]  From 1978 to 1998 he worked at the FDA in the Division of Endocrine and Metabolic Drug Products.  While at the FDA, Dr. Gueriguian reviewed drugs for safety and

---

[52]*Reeves v. Wyeth*, 4:05-CV-00163 (E.D. Ark.), Doc. No. 289.  *See also* Doc. No. 215.

[53]*Reeves v. Wyeth*, 4:05-CV-00163 (E.D. Ark.), July 13, 2006, Tr. at 130.

[54]Doc. No. 143.

[55]Doc. No. 215.

efficacy; applied FDA regulations regarding labeling, post-marketing surveillance, and approval of drugs; and was involved in the drafting of those regulations.[56]

    **1. FDA** -- Plaintiff's assertion that "Wyeth has specifically stated that it has no challenge to this testimony"[57] appears to be premature if I correctly read paragraph 1 of Defendant's response letter of July 28, 2006.[58]  I hold, in general, that Dr. Gueriguian's testimony on the points in the letter regarding the FDA are admissible.[59]  I reserve the right, of course, to exclude specific testimony at the trial.  This means that Plaintiff must pare Dr. Gueriguian's testimony on this point, as well as others, to the essentials.

    **2. Label/Warnings** -- I will permit Dr. Gueriguian to relate a brief history (assuming it is based upon adequate data).  Distilling voluminous documents is proper.  While it is true that jurors can read documents, the trial would last months if they were required to read every admissible document.  Further, I will permit Dr. Gueriguian to testify how he thinks Wyeth should have responded, but not how they would have.

    **3. History of Premarin and Prempro** -- a short history will be permitted.  See the next preceding paragraph.

    **4. Breast Cancer Signals** -- Dr. Gueriguian will be permitted to testify that the recognition of signals should (not would) have led to studies and different warnings.

---

[56]*Id.*

[57]*Reeves v. Wyeth*, 4:05-CV-00163 (E.D. Ark.), Doc. No. 289.

[58]*Reeves v. Wyeth*, 4:05-CV-00163 (E.D. Ark.), Doc. No. 297.

[59]*See In re Diet Drugs*, 2001 WL 454586, *24 (E.D. Pa. Feb. 1, 2001) (holding that "(a) Dr. Gueriguian's expert testimony about the standard of care in the pharmaceutical industry regarding the manner in which certain information should be communicated to the FDA; and (b) what FDA officials would have done with certain additional information such as particular adverse event reports" was admissible).

5. **Cardiac Benefits** -- Since Ms. Reeves was prescribed HRT based on the alleged cardiac benefit, Dr. Gueriguian's testimony regarding this issue is relevant.

6. **Risk vs. Benefit** -- this will be permitted, in general. In other words, he can testify about the risk/benefit considerations with respect to prescription drugs in general as well as this particular drug.

7. **"New Prempro"** -- After reading Plaintiff's Supplemental Filing Re: Wyeth's Motion in Limine No. 16 to Exclude Reference to "Low Dose" Prempro[60] and considering argument heard during the August 15, 2006 hearing, I believe Dr. Gueriguian should be permitted to refer to "Low-Dose" Prempro. (Since the drafting of this order, Defendant has filed a new motion regarding "Low-Dose" Prempro. This motion will be dealt with later today or tomorrow.)

Incidentally, I note that in paragraph 7 of Defendant's letter of July 28 (re: The Scope of Dr. Gueriguian's Testimony) states, "that is why this is a failure to warn, not a design defect case." I realize that this is Wyeth's position, but I have previously ruled that it is a design defect case too.

8. **Reasonable Drug Company** -- The last paragraph of Defendant's letter refers to Dr. Gueriguian's proposed testimony about "a reasonable drug company." Arkansas Code Annotated § 16-116-104 provides:

> (a)(1) In determining the liability of the manufacturer, the state of scientific and technological knowledge available to the manufacturer or supplier at the time the product was placed on the market, rather than at the time of the injury, may be considered as evidence.

---

[60]*Reeves v. Wyeth*, 4:05-CV-00163 (E.D. Ark.), Doc. No. 291.

(2) Consideration may also be given to the customary designs, methods, standards, and techniques of manufacturing, inspecting, and testing by other manufacturers or sellers of similar products.[61]

So, if Dr. Gueriguian has sufficient information, he can testify about the customs in the drug manufacturing world.

E.      Defendant's Motion to Exclude the Expert Testimony of Dr. David Sackett (Doc. No. 144)

Dr. Sackett is prepared to testify that (1) Wyeth violated the principles of evidence-based medicine by failing to conduct a WHI-type study in the 1970s, and (2) that Wyeth intended to promote HRT for its potential cardiac benefits.  Plaintiff contends that Dr. Sackett's testimony supports her negligence claim.[62]

Defendant contends that Dr. Sackett's testimony regarding the duty to perform a large, randomized study will be duplicative of Dr. Gueriguian's testimony.  Defendant asserts that Dr. Sackett can't say what kind of study Wyeth should have conducted, and he doesn't follow a methodology, rely on any regulatory requirements, nor does he rely on any industry standards.[63]

Dr. Sackett is "a 40-year-veteran in the fields of internal medicine and clinical epidemiology, with particular interest in the principles and practices of evidence-based medicine."[64]  He has also been the chair of several different randomized drug trials.[65]  With these

---

[61]For a good summary of the law pertaining to "custom" *see* PROSSER AND KEETON ON THE LAW OF TORTS § 33 (5th Ed. 1984); *See also*, RESTATEMENT (THIRD) OF TORTS § 13 (2005).

[62]Doc. No. 213.

[63]*Reeves v. Wyeth*, 4:05-CV-00163 (E.D. Ark.), July 14, 2006 Tr. at 169-70.

[64]Doc. No. 213.

[65]*Id.*

credentials, he is clearly qualified to testify about evidence-based medicine and the necessity of large randomized clinical trials to determine the risks and benefits of drugs.

**1. Duplicity** -- Defendant's position on duplicity is not convincing.  First Dr. Sackett suggests the study should have been done in the 1970s and Dr. Gueriguian says it should have been done in the 1980s.  Second, Plaintiff claims that although the testimony of Dr. Sackett and Dr. Gueriguian overlap, they both have their specialties and their opinions must be viewed together.  Third, Plaintiff contends that she does not intend to ask them the same questions.  If the testimony is too duplicative, I will intervene and encourage leaner presentations.

**2. Type of Study** -- Contrary to Defendant's position that Dr. Sackett didn't explain what type of study should have been conducted, Dr. Sackett contends that a WHI-type study was necessary and would have put Defendant on notice regarding the alleged lack of cardiac benefits.[66]  I agree with Defendant that Dr. Sackett's opinion regarding the specifics of the study is vague.  However, it seems to me that Dr. Sackett's vagueness goes to the weight of his testimony rather than its admissibility.

**3. "Fit"** -- Defendant's argument regarding "fit" lacks merit.  Because evidence regarding cardiac benefits is relevant to this case, Dr. Sackett's testimony regarding testing for a cardiac benefit is admissible.

Obviously, Dr. Sackett is not qualified to testify about FDA standards, but Plaintiff concedes that he's not going to talk about that.  Nor will Dr. Sackett be permitted to testify as to what Wyeth should have or could have done to be a leader in the industry.

---

[66]*Id.*

16

F.     **Plaintiff's Motion to Preclude Defendant's Experts from Testifying That There is No Reliable Scientific Evidence that Combination Hormone Therapy Can Cause Breast Cancer (Doc. No. 193)**

As with Defendant's objections to Plaintiff's causation experts, each argument appears to go to credibility, not admissibility, and can be raised on cross-examination.

G.     **Defendant's Motion for Summary Judgment Re: Specific Causation (Doc. No. 87)**

Since Defendant's Motion to Exclude Expert Testimony of Drs. Klimberg and Waldron as to Specific Causation was denied, material facts remain in dispute as to causation.

## CONCLUSION

Based on the findings of fact and conclusions of law made during the hearings and above:

1.     Defendant's Motion to Exclude Expert Testimony of Drs. Klimberg and Waldron as to Specific Causation (Doc. No. 136) is DENIED.

2.     Defendant's Motion to Exclude Expert Testimony of Dr. Hollon (Doc. No. 140) is DENIED, except as to the limitations mentioned above.

3.     Defendant's Motion to Exclude Testimony of Dr. Gueriguian (Doc. No. 142) is DENIED, except as to the limitations mentioned above.

4.     Defendant's Motion to Exclude Expert Testimony of Dr. Sackett (Doc. No. 144) is GRANTED regarding testimony about FDA standards and what Defendant could do to be a leader in the industry. The motion is DENIED regarding the remaining points.

5.     Defendant's Motion to Exclude Expert Testimony of Dr. Austin (Doc. No. 148) is GRANTED as it concerns testimony regarding causation and DENIED as to the remaining points.

6.     Plaintiff's Motion to Preclude Defendant's Experts from Testifying That There is No Reliable Scientific Evidence that Combination Hormone Therapy Can Cause Breast Cancer (Doc. No. 193) is DENIED.

7.     Defendant's Motion for Summary Judgment Re: Specific Causation (Doc. No. 87) is DENIED.

Most of the arguments regarding exclusions of experts overlapped with the issues in *Reeves v. Wyeth* -- as evidenced by the fact that Ms. Rush filed identical responses to the motions to exclude as Ms. Reeves.  For that reason, in this case, I have considered the positions that were argued by Ms. Reeves's counsel in subsequent oral argument and letter exchanges. However, if there are any *Daubert* issues that are unique to Ms. Rush, which are not addressed in this order, the parties should file the appropriate motion no later than 5 p.m., Thursday September 21, 2006.

IT IS SO ORDERED this 13th day of September, 2006.

/s/ Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | MDL Docket No. 4:03CV1507-WRW |
| | : | 4:04CV01169 |
| PREMPRO PRODUCTS LIABILITY | : | |
| LITIGATION | : | |
| | : | |
| | : | |
| DONNA SCROGGIN | : | PLAINTIFF |
| | : | |
| v. | : | |
| | : | |
| WYETH, et. al. | : | DEFENDANTS |

ORDER

**Motion in Limine to Exclude Evidence of Wyeth's Net Worth** (Doc. No. 571) -- is GRANTED --because I believe Professor Brill's analysis is correct. No evidence of net worth will be admissible.

**Plaintiff's Objection to Evidence of General Goodness** (Doc. No. 590). I will rule on this after opening statements. If the issue is not raised in opening statement, I'll rule at the close of Defendants' case as to whether Plaintiff can submit rebuttal evidence.

**Defendants' Motions Exclude Testimony Re Total Excess Breast Cancer In Punitive Damages Stage** (Doc. Nos. 569, 579) are DENIED. However, the parties should submit a limiting instruction per *Philip Morris*.

**Defendant's Motion to Exclude Testimony of Dr. Matthew Hollon in Punitive Damages Phase** (Doc. No. 567) is GRANTED.

**Wyeth's Objection to Certain Designations by Plaintiff of Dr. Colditz's Testimony (Unrelated to Excess Breast Cancer)** (Doc. No. 581) -- the rulings by Judge Jones on deposition designations for Colditz stand.

IT IS SO ORDERED this 3rd day of March, 2008.

/s/ Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

1

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

In re:                              :      MDL Docket No. 4:03CV1507-WRW
                                    :              4:04CV01169
PREMPRO PRODUCTS LIABILITY          :
LITIGATION                          :
                                    :
                                    :
DONNA SCROGGIN                      :                      PLAINTIFF
                                    :
v.                                  :
                                    :
WYETH, et. al.                      :                      DEFENDANTS

<u>ORDER</u>

Pending are Defendants' Motion to Exclude Expert Testimony of Dr. Robert Fincher (Doc. No. 105), Motion to Exclude Expert Testimony of Dr. Elizabeth Naftalis (Doc. No. 113), and Motion to Exclude Expert Testimony of Dr. Matthew Hollon (Doc. No. 109). Oral argument was heard on November 5-6, 2007, and the parties filed supplemental briefs and responses on November 9 and 11.[1]

Also at issue is Dr. Austin's testimony on the development of breast cancer at the cellular level, since Plaintiff filed a supplemental brief (Doc. No. 352).

I.     STANDARD

       A.     Burden of Proof

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which reads:

---

[1]Doc. Nos. 342-345, 347.

1

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[2]

When a party proffers an expert witness, deciding whether Rule 702 is satisfied is a preliminary issue governed by Federal Rule of Evidence 104(a).[3] Rule 104(a) requires the proponent of evidence to establish its admissibility by a preponderance of the evidence.[4] In determining admissibility, the court is not bound by any of the rules of evidence, except with regard to privilege.[5]

## B.    Legal Standard for Admissibility

The central inquiry under Rule 702 is whether the proffered expert's testimony is sufficiently reliable.[6] The trial court serves a gatekeeping function, ensuring that any expert testimony is reliable and relevant.[7]

To be admissible, expert testimony must satisfy the two prongs of Rule 702.[8] First, it must be based on scientific, technical, or other specialized knowledge.[9] If the testimony is

---

[2] Fed. R. Evid. 702.

[3] *U.S. v. Martinez*, 3 F.3d 1191, 1196 n.10 (8th Cir. 1993).

[4] *Bourjaily v. U.S.*, 483 U.S. 171 (1987).

[5] Fed. R. Evid. 104(a).

[6] *First Nat'l Bank v. Benham*, 423 F.3d 855, 861 (8th Cir. 2005).

[7] *Id.*

[8] *U.S. v. Cawthorn*, 429 F.3d 793, 799 (8th Cir. 2005).

[9] *Id.*

2

scientific, it must be grounded in the methods and procedures of science.[10]   Likewise,

"knowledge" requires more than a subjective belief or an unsupported speculation, requiring

instead an appropriate level of validation.[11]   Second, the testimony must be relevant, in that it

must help the trier of fact either understand the evidence or determine a fact in issue.[12]   The

burden of establishing relevancy and reliability rests on the proponent of the expert testimony.[13]

Courts have used a variety of factors to determine the reliability of proffered expert

testimony.  The most frequently discussed factors are those derived from the Supreme Court's

opinion in *Daubert*, where the Court established that the trial court may consider:

> (1) whether the theory or technique can be or has been tested; (2) whether the theory
> or technique has been subjected to peer review and publication; (3) whether the
> theory or technique has a known or potential error rate and standards controlling the
> technique's operation; and (4) whether the theory or technique is generally accepted
> in the scientific community.[14]

Because the inquiry is "flexible and fact-specific, a court should use, adapt, or reject *Daubert*

factors" as needed based on the facts of a particular case.[15]

The most recent amendments to Rule 702 added three general standards for courts to use

in determining the reliability and relevance of proffered expert testimony.  First, the proffered

testimony must be based on sufficient facts or data.[16]   Second, it must be the product of reliable

---

[10]*Id.*

[11]*Id.* at 799-800 (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 (1993)).

[12]*Id.* at 799.

[13]*Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278-78 (5th Cir. 1998).

[14]*Benham*, 423 F.3d at 861 (citing *Daubert*, 509 U.S. at 593-94).

[15]*Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005).

[16]Fed. R. Evid. 702(1).

principles and methods.[17]  Third, the expert must have applied those principles and methods reliably to the facts of the case.[18]

The focus is not on the expert's conclusion, but on the methodology.[19]  The proponent of the testimony "need not prove . . . that the expert's testimony is correct, but . . . must prove by a preponderance of the evidence that the testimony is reliable."[20]  Determining the validity of an expert's conclusions is the duty of the finder of fact.

## II.  ANALYSIS

### A.  Defendants' Motion to Exclude Expert Testimony of Dr. Robert Fincher (Doc. No. 105)

Dr. Fincher is Plaintiff's radiology/mammography expert.  Plaintiff asked Dr. Fincher to review mammograms and determine whether "to a reasonable degree of medical probability, E+P had an effect on the density of Plaintiffs' breasts as measured by mammogram."[21]  He also was asked to determine whether "based on the mammographic findings, E+P contributed to the development" of Plaintiff's breast cancer.[22]

Defendants contend that Dr. Fincher's opinions are not supported by reliable scientific evidence, are speculative, and are incomplete.[23]

---

[17]Fed. R. Evid. 702(2).

[18]Fed. R. Evid. 702(3).

[19]*Moore*, 151 F.3d at 275-76.

[20]*Id* at 276.

[21]Doc. No. 177.

[22]*Id.*

[23]Doc. No. 106.

4

The motion is GRANTED in PART and DENIED in PART.

Dr. Fincher can testify generally about changes in breast density and the relationship, if any, between breast density and breast cancer risk. However, Dr. Fincher has not established, on this record, that changes in this Plaintiff's breast density, as related to HRT use, caused her cancer. Dr. Fincher's conclusions regarding any increase in Plaintiff's breast density after taking HRT lack reliability, because Dr. Fincher did not observe Plaintiff's pre-HRT mammograms. Even he concedes this point: "What I don't know is did it actually increase the degree of her breast density when she started taking the hormones, because there are no pre-hormone replacement therapy mammograms to compare."[24]

### B. Defendants' Motion to Exclude Expert Testimony of Dr. Elizabeth Naftalis (Doc. No. 113)

Dr. Elizabeth Naftalis is Plaintiff's specific causation expert, who will testify that Plaintiff's ingestion of HRT was a substantial contributing factor in Plaintiff's development of hormone dependant breast cancer.[25]

Defendants assert that Dr. Naftalis's testimony should be excluded, because differential diagnosis is not a reliable method to determine the cause of Plaintiff's breast cancer, and Dr. Naftalis does not reliably apply her methodology to the facts of this case.[26]

I believe that Judge Wilson's rulings in the previous bellwether trials are on point, and I adopt them here. To paraphrase: while the report is somewhat conclusive, rather than

---

[24]Fincher Dep., July 20, 2007 Tr. at 41, lines 9-13.

[25]Doc. No. 183, Ex. 1.

[26]Doc. No. 114.

explanatory, I cannot say that Dr. Naftalis used improper methodology. She is qualified to testify that HRT more likely than not promoted Plaintiff's breast cancer. Her conclusions can be tested during cross-examination.[27]

Accordingly, Defendants' Motion to Exclude Expert Testimony of Dr. Elizabeth Naftalis (Doc. No. 113) is DENIED.

### C. Defendants' Motion to Exclude Expert Testimony of Dr. Matthew Hollon (Doc. No. 109)

Dr. Hollon is Plaintiff's marketing expert. Plaintiff asserts that Dr. Hollon will testify regarding "pharmaceutical marketing and its impact on the medical community . . . ."[28] Plaintiff contends that Dr. Hollon will "educate the jury on marketing strategies, effectiveness and how Wyeth used the loopholes in the FDA regulations . . . to influence and persuade physicians about the safety and effectiveness of E+P drugs."[29]

#### 1. Liability Stage

As mentioned in Section I of this Order, the testimony must be relevant, in that it must help the trier of fact either understand the evidence or determine a fact in issue.[30] The burden of establishing relevancy, reliability, and necessity of Dr. Hollon's testimony rests on Plaintiff.[31]

---

[27]See *In re Prempro, Reeves v. Wyeth*, No. 4:05-CV-00163, 2006 WL 2314062, at *3 (E.D. Ark. August 21, 2006) (citations omitted).

[28]Doc. No. 174.

[29]*Id.*

[30]*U.S. v. Cawthorn*, 429 F.3d at 799.

[31]*Moore v. Ashland Chem., Inc.*, 151 F.3d at 278-78.

Here, Plaintiff asserts that if, during trial, Judge Wilson admits evidence that shows reliance on certain marketing materials, Dr. Hollon's testimony *may* become relevant. At this point, Plaintiff is unable to show whether Dr. Hollon's testimony is relevant or aids the trier of fact in understanding the evidence. Dr. Hollon appears to be qualified as an expert in pharmaceutical marketing, in general, but whether he can render an opinion on specific marketing is tied to what evidence is introduced at trial.

At this stage, Dr. Hollon must have examined the evidence necessary to form his expert opinion. Also, Plaintiff should be able to identify the marketing or promotional materials they believe would be admissible under Judge Wilson's previous rulings regarding reliance and marketing evidence. Instead, Plaintiff attempts to condition Dr. Hollon's opinions on evidence that *may* become available at trial.

Plaintiff concedes Dr. Hollon's opinions are based on what may become available during trial. Without the specific fact, data, or other evidence necessary for Dr. Hollon's opinion, I must GRANT Defendants' Motion to Exclude Expert Testimony of Dr. Matthew Hollon (Doc. No. 109), at this time.

### 2.    Punitive Damages Stage

Judge Wilson previously addressed the issue of the admissibility of Dr. Hollon's testimony at the punitive damages stage, if there is one:

> It seems to me that any evidence of Defendant's "badness" during the punitive damage portion of the trial (if there is one) must be connected to Ms. Reeves's injury. However, the nexus between Plaintiff and the advertisements need not be as strong as the causation requirements during the liability stage of the trial. Dr. Hollon can testify regarding advertisements -- however, those advertisements must pertain to issues that are directly linked to Plaintiff, e.g., cardiac benefit, breast cancer, etc.

7

Dr. Hollon will not be permitted to testify regarding general badness or badness in the specific areas which are not connected to Ms. Reeves's injury.[32]

The Supreme Court held that:

Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible-although counsel may argue in a particular case that conduct resulting in no harm to others nonetheless posed a grave risk to the public, or the converse. Yet for the reasons given above, a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties.

*Philip Morris U.S.A. v. Williams*, 127 S. Ct. 1057, 1064 (2007).

Judge Wilson's ruling is still appropriate.

### D.    Dr. Austin Cellular Testimony

The November 9, 2007 Order noted that I could find nothing in the record regarding Dr. Austin's testimony on the development of breast cancer at the cellular level. Plaintiff supplemented the record on November 13, 2007. Based on this supplement, I am convinced that Dr. Austin can testify on this issue. The November 9, 2007 Order is VACATED to the extent that it granted Defendants' motion to exclude Dr. Austin's testimony regarding development of breast cancer at the cellular level. Accordingly, the motion is DENIED on this point.

IT IS SO ORDERED this 15th day of November, 2007.

*Henry L. Jones, Jr.*
UNITED STATES MAGISTRATE JUDGE

---

[32]*In re Prempro, Reeves v. Wyeth*, No. 4:05-CV-00163, 2006 WL 2314062, at *5 (E.D. Ark. August 21, 2006) (citations omitted).

8

# EXHIBIT 5

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA
CIRCUIT CIVIL NO. 05-1606-CI-13

RECEIVED

APR 15 2010

CARLTON FIELDS

PETER ESPOSITIO, individually and as
Personal Representative of the Estate of
LORETTA ESPOSITO,

      Plaintiff,

Vs.

WYETH, INC., and WYETH
PHARMACEUTICALS, INC., and
ESI LEDERLE; CAROL BANKS;
and MARY TATE,

      Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION IN LIMINE TO BAR THE MARKETING PRACTICES TESTIMONY OF DR. MATTHEW HOLLON

      THIS CAUSE came before the court upon Defendants' Motion in Limine to Bar the Marketing Practices Testimony of Dr. Matthew Hollon, the court having heard argument of counsel and being otherwise fully advised in the premises, it is thereupon

      ORDERED AND ADJUDGED that said motion be and the same is hereby granted.

      DONE AND ORDERED in Chambers at St. Petersburg, Pinellas County, Florida, this _____ day of April, 2010.

                          _____
                          ANTHONY RONDOLINO, Circuit Judge

**TRUE COPY**
Original Signed
APR 14 2010

_Anthony Rondolino_

Copy furnished to:
Edward W. Gerecke, Esq.
James D. Clark, Esq.
Tobias Millrood, Esq.
Chen-Sen Wu, Esq.
Rebecca Moos, Esq.
George E. McDavid, Esq.
Robert K. Jenner, Esq.
James F. Szaller, Esq.

# EXHIBIT 6

1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

GEORGIA TORKIE-TORK,                )
                                    )
                Plaintiff,          )
                                    )
v.                                  )    CIVIL ACTION
                                    )
WYETH,                              )    1:04-cv-945
                                    )
                Defendant.          )
                                    )

REPORTER'S TRANSCRIPT

MOTIONS HEARING

Monday, November 15, 2010

———

BEFORE:     THE HONORABLE T.S. ELLIS, III
            Presiding


APPEARANCES:  LITTLEPAGE BOOTH
              BY:  ZOE LITTLEPAGE, ESQ.
                   RAYMOND BOOTH, ESQ.
              2043A W. Main St.
              Houston, TX 77098

              KOPSTEIN & PERILMAN
              BY:  PHILIP KULJURGIS, ESQ.
              8633 Cross Chase Ct.
              Fairfax Station, VA 22039

                For the Plaintiff

———

MICHAEL A. RODRIQUEZ, RPR/CM/RMR
Official Court Reporter
USDC, Eastern District of Virginia
Alexandria Division


MICHAEL A. RODRIQUEZ, RPR/CM/RMR

2

1    APPEARANCES (Continued):

2

3         PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
          BY:  BETH WILKINSON, ESQ.
4              BRIAN STEKLOFF, ESQ.
          2001 K Street, NW
5         Washington, DC 20006-1047

6         WILLIAMS & CONNOLLY, LLP
          BY:  RYAN SCARBOROUGH, ESQ.
7         725 12th St NW
          Washington, DC 20005

8
              For the Defendant
9

10                    ----

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

3

1                         INDEX

2

3    RECITATION OF AGENDA                              4

4    RE:  MOTIONS IN LIMINE                            7

5    RE:  PROPOSED PRELIMINARY SUBSTANTIVE JURY INSTRUCTION   59

6    RE:  DAUBERT MOTIONS                             74

7    FURTHER MATTERS                                 113

8

          (Court recessed)
9

10                         ----

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHAEL A. RODRIQUEZ,  RPR/CM/RMR

100

1          ATTORNEY WILKINSON:  Your Honor, I believe you

2    were asking us about whether you ruled on all the Daubert,

3    and that is what I was trying to address.  I'm sorry to

4    re-raise Dr. Michaels.

5          THE COURT:  Yes.

6          ATTORNEY WILKINSON:  Dr. Blume and

7    Dr. Parisian, I don't think you gave us a ruling on.  And

8    there are some others.

9          THE COURT:  And then what?

10          ATTORNEY WILKINSON:  There are a few others.

11    Dr. Bollon and -- oh, they had had a motion to exclude

12    Dr. Acs.

13          And we have a motion to exclude Dr. Patton,

14    their radiologist.

15          THE COURT:  Holton, or is it Hollon?

16          ATTORNEY LITTLEPAGE:  Hollon.

17          THE COURT:  Hollon intends to testify that

18    Wyeth's marketing practices were misleading and he will

19    compare branded and unbranded ads.

20          Of course he can't testify to Wyeth's intent.

21    That would be inadmissible, speculative.

22          As far as him testifying about branded and

23    unbranded ads, Ms. Littlepage, you may certainly put on --

24    introduce the branded and unbranded ads, but I don't think

25    this is a 702 matter.


MICHAEL A. RODRIQUEZ, RPR/CM/RMR

1          Experts don't need to be adduced to show that

2     the typeface is the same or the colors are the same or to

3     make arguments from them.  This is typical of a situation

4     where an expert is used to confer on evidence that a jury

5     can understand.  Greater dignity.  And I don't think it's

6     warranted.

7          So, I don't think this is methodology that

8     warrants being assessed.  There is no methodology looking at

9     two ads, branded and unbranded ads.  And the unbranded ads

10    discuss adverse cardiac and neurological symptoms of

11    menopause without mentioning Prempro.

12          Then in a separate branded ad, Wyeth discusses

13    how Prempro alleviates menopausal symptoms.  They have

14    similar colors, layouts, styles.

15          And so Hollon says that Wyeth hopes readers

16    will connect the branded and unbranded ads to conclude

17    Prempro cures the relevant symptoms.  I will exclude that

18    testimony.

19          That doesn't mean you can't use the ads that

20    you want to in some way, but it's not worthy of an expert.

21          Then we come to Randall Patton.  This one is a

22    live witness, isn't he, Ms. Littlepage?

23          ATTORNEY LITTLEPAGE:  Yes, sir.

24          THE COURT:  All right.  Let's find a time --

25    let me review his, because there may be one or two things I

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# EXHIBIT 7

1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| GEORGIA TORKIE-TORK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| WYETH, | ) | 1:04-cv-945 |
| | ) | |
| Defendant. | ) | |
| | ) | |

REPORTER'S TRANSCRIPT

JURY TRIAL

VOLUME 1

Tuesday, November 16, 2010

----

BEFORE:        THE HONORABLE T.S. ELLIS, III
               Presiding


APPEARANCES:  LITTLEPAGE BOOTH
              BY:  ZOE LITTLEPAGE, ESQ.
                   RAYMOND BOOTH, ESQ.
              2043A W. Main St.
              Houston, TX 77098

              KOPSTEIN & PERILMAN
              BY:  PHILIP KULJURGIS, ESQ.
              8633 Cross Chase Ct.
              Fairfax Station, VA 22039

                   For the Plaintiff

                      ----

              MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                   Official Court Reporter
              USDC, Eastern District of Virginia
                   Alexandria Division




              MICHAEL A. RODRIQUEZ, RPR/CM/RMR

2

```
 1    APPEARANCES (Continued):

 2

 3              PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
                BY:  BETH WILKINSON, ESQ.
 4                   BRIAN STEKLOFF, ESQ.
                2001 K Street, NW
 5              Washington, DC 20006-1047

 6              WILLIAMS & CONNOLLY, LLP
                BY:  RYAN SCARBOROUGH, ESQ.
 7              725 12th St NW
                Washington, DC 20005
 8
                     For the Defendant
 9

10                        ----

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                              INDEX

2

3    PRELIMINARY MATTERS                                    4

4    JURY VOIR DIRE / JURY SELECTION                       21

5    PRELIMINARY JURY INSTRUCTIONS BY THE COURT           225

6    OPENING STATEMENT BY THE PLAINTIFF                   238

7    OPENING STATEMENT BY THE DEFENDANT                   271

8    WITNESS (Plaintiff)    DIRECT   CROSS   REDIRECT   RECROSS

9    Frederick Smith          293     314      331        ----

10   FURTHER MATTERS                                      336

11

12        (Court recessed)

13                            ---

14

15

16

17

18

19

20

21

22

23

24

25

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

206

1      prescribing doctors relied on it.  I think that's right.  If

2      they actually relied on certain marketing materials, the

3      prescribing doctors, then it would be relevant and

4      admissible.

5              But the plaintiff must demonstrate actual

6      reliance for it to be relevant.  If plaintiff's doctors say

7      that they usually or sometimes read marketing material and

8      rely on it, then the probative value of that evidence is

9      substantially outweighed by the danger of unfair prejudice,

10     confusion, and a waste of time.

11             If their testimony is that they always read all

12     marketing material and relied on it, then possibly that

13     evidence might may have some probative value.  But it may

14     still be cumulative for a number of reasons.

15             At least one of the plaintiff's doctors states

16     that he relied on the label.  If statements in the marketing

17     material add nothing to the statements already made on the

18     Prempro label, then the introduction of the marketing

19     material is cumulative and not admissible.

20             If the marketing material adds new information,

21     then only if that new information must take off-label

22     benefits, for example, if that was relied on by the

23     prescribing doctors, then that may be admissible.

24             Let's take, for example, off-label benefits of

25     heart or cardiovascular benefits that are reflected in

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

# EXHIBIT 8

## Report of Matthew F. Hollon, MD MPH

**Summary of Professional Background**

My name is Matthew Hollon. I am a board certified physician of Internal Medicine at the University of Washington in Seattle (UW). I was graduated from the UW School of Medicine (1994). Following my graduation, I completed my residency (1997) and fellowship in Internal Medicine (1999), also at UW. While completing my fellowship, I simultaneously attended the UW School of Public Health and Community Medicine where I received a Masters of Public Health (1999).

I currently am Director of Evidence-Based Medicine for the Internal Medicine Residency Program at the UW Department of Medicine and an Assistant Professor in the Division of General Internal Medicine.

Nationally I have been an active member in professional organizations including The Society of General Internal Medicine and The American College of Physicians. Internationally, I have served as a Member of an Expert Advisory Panel on the Assessment of the Health System Impacts of Direct-To-Consumer Advertising of Prescription Medicines – a Report to Health Canada.

I have conducted independent social science research and written evidenced-based reviews and editorials as a part of my responsibilities at UW. Some of my publications which have particular relevance to the topic of pharmaceutical advertising of hormone therapy, the matter which I will address below, include:

1. Hollon MF. Direct-to-consumer advertising - A haphazard approach to health promotion. JAMA. 2005;293(16):2030-3.
2. Hollon MF. Direct-to-consumer marketing of prescription drugs: A current perspective for neurologists and psychiatrists. CNS Drugs. 2004;18(2):69-77.
3. Hollon MF, Larson EB, Koepsell TD, Downer A. Direct-to-consumer marketing of

osteoporosis drugs and bone densitometry. Annals of Pharmacotherapy. 2003;37(7/8):976-981.

4. Hollon MF. Direct-to-consumer marketing of prescription drugs: Creating consumer demand. JAMA. 1998;281(4):382-384.

5. Hollon MF. Treatment Basics. In OsteoEd (Osteoporosis Education). Laya M, Migeon M, eds. Available at http://www.osteoed.org.

6. Hollon MF. Selective Estrogen Receptor Modulators in Osteoporosis. In OsteoEd (Osteoporosis Education). Laya M, Migeon M, eds. Available at http://www.osteoed.org.

I lecture on areas of my expertise. Some relevant lecture topics include:

1. Wong CJ, Hollon MF, Teraski G. Evidence Based Medicine Seminar for Internal Medicine Residents. Abstract for Society for General Internal Medicine's 28th Annual Meeting. New Orleans, LA. May 2005.

2. Wong CJ, Hollon MF, Teraski G. Evidence Based Medicine Seminar for Internal Medicine Residents. Plenary Session Presentation for Society for General Internal Medicine's Northwest Regional Meeting. Vancouver, WA March 11, 2005.

3. Hollon MF. Direct-to-consumer marketing of prescription drugs and health service utilization. Presented at The 22nd Annual Meeting of The Society of General Internal Medicine. San Francisco, CA. April 29 – May 1, 1999.

Among my current research projects include participation in a submitted grant from UW School of Pharmacy to fund a Regional Center to evaluate, in part, the ongoing impact of Direct to Consumer (DTC) marketing of prescription drugs.

My fee for consultation and preparation of reports is $300 per hour. My fee for travel time, depositions, and trial testimony is $350 per hour.

I have not served as an expert witness within the past five years and, thus, have given no depositions or sworn trial testimony.

**Summary of Opinions**

In my professional opinion, drawing on my background, training, education and experience generally, and in particular my work as Director of Evidenced-Based Medicine for an Internal Medicine residency program, and, last but not least, a practicing primary care physician committed first and foremost to the welfare of my patients, based on the case below, I come to the following conclusions. Wyeth-Ayerst Laboratories:

1. In the words of CEO Bob Essner, led "a crusade more than a typical pharmaceutical effort"[1] in making the Premarin family of drugs a $2 billion per year commodity for a condition, menopause, that was not undertreated.

2. Accomplished this first and foremost by expert marketing relying on expanding the perception that hormone therapy is appropriate for every menopausal woman and utilizing aggressive integrated marking tactics targeting physicians and patients together as the "consumer" such that physicians would prescribe hormone supplementation in the face of patient requests.

3. Persuaded the medical community and the public that healthy, asymptomatic menopausal women should take hormones for an ever expanding list of symptoms by manufacturing data, purchasing professional opinions, and utilizing the entire catalogue of possible promotional activities based on often misleading and unbalanced marketing schemes that over zealously relied on purported but often unfounded benefits.

4. Started inappropriately and continued over several decades a "start her on, keep her on" marketing strategy without scientific support for long-term use eventually ignoring sound epidemiologic principles by unreasonably pushing hormone supplementation for population prevention (in the face of reasonable alternative therapies) in all menopausal women beginning early in menopause when these women, on average, were more likely to suffer harm than realize the minimal benefit.

5. Systematically ignored or minimized unfavorable scientific evidence and, thus, failed to adequately warn physicians and patients of the risks of hormone supplementation.

6. Eroded the traditional role of the physician as a "learned intermediary" by marketing efforts that knew "no boundaries, no limits."[2]

7. Nearly seamlessly, from a historical perspective, transitioned women from an early strategy of unopposed estrogen to combination estrogen and progestin supplementation for women who had not had a hysterectomy (the largest percentage of menopausal women) eventually "cannibalizing Premarin with the continuous HRT regimen, Prempro".[3]

---

[1] 4/4 10AM. Bob Essner. Day 3 Close.
[2] 4/4 10AM. Bob Essner. Day 3 Close.
[3] LUDMG002-001710.

3

8. Should have reserved hormone supplementation for short-term use or for those women at the highest risk of suffering a fracture as a consequence of osteoporosis, specifically much older women or women with multiple risk factors for developing the disease, and tailored their marketing campaign accordingly.

**Method To Evaluate Reasonable Promotion**

Do the benefits of an integrated promotional campaign outweigh the danger that consumers will demand and take medicines inappropriately? Three factors determine the health impact of promotional campaigns for any given drug: 1) the current prevalence of under-treatment; 2) the amount of inappropriate prescribing stimulated by promotional efforts; and 3) the degree of harm accruing to under-treated compared with over-treated patients.[4] The fulcrum of this equilibrium largely rests on the quality of the information provided by the promotional material about the drug and the characteristics of the population targeted for receiving the drug. Furthermore, the accelerated use of the marketing strategies targeting physicians and patients together exposes a large number of patients to medications whose harms may only emerge after long induction periods. This fact, in and of itself, means a pharmaceutical company must be exceedingly cautious in selling its drug products (particularly when those drug products are known carcinogens) prior to an adequately completed research agenda when the likely benefit to any individual patient is small.

As I will analyze and conclude below, Wyeth irresponsibly failed to meet a reasonable standard of care for drug promotion, utilizing in excess the full catalogue of promotional strategies and activities to sell its menopausal hormonal supplementation program over several decades to all menopausal women, some of whom were harmed as a direct result.

---

[4] Hollon MF. *Direct-to-consumer marketing of prescription drugs: A current perspective for neurologists and psychiatrists.* CNS Drugs 2004;18(2):69-77.

4

In summary, compelling evidence suggests that there are only three clinically significant consequences of menopause that should drive therapeutic considerations. These are hot flashes, vaginal dryness, and loss of bone mass in elderly women at high risk of fracture.

## Historical Usage of Hormones in Menopause

As a physician who has researched, published and lectured on the topic of pharmaceutical advertising, my opinions about Wyeth's improper promotion of hormone therapy and their success in manufacturing a conventional wisdom about menopausal hormone supplementation must be understood in the context of the historical underpinnings that gave rise to their comprehensive marketing scheme. Understanding the historical framework of hormone therapy's development is critical to understanding how these pharmaceutical companies created consumer demand. Indeed, Wyeth ultimately used the historical context of menopause and hormone therapy to its advantage in marketing the Premarin family to physicians and patients.

Significant commercial use of hormones in menopause began with the discovery and production of sex hormones in the 1930's.[22] Looking for a reasonably potent, low cost source of estrogens, Ayerst Laboratories settled on extracting the chemical from pregnant mares' urine and eventually dubbed the product Premarin.[23] On January 17, 1939, the first gallon of this water-soluble estrogenic complex was processed at the Ayerst Laboratories.[24] Investigations revealed that a stable, active preparation of estrogenic conjugates could indeed be made and that the material showed high oral activity. After two years of work, Premarin was ready to be marketed

---

[22] Krieger N, Lowy I, Aronowitz R, et al. *Hormone replacement therapy, cancer, controversies, and women's health: historical, epidemiological, biological, clinical, and advocacy perspectives.* J Epidemiol Community Health. 2005;59(9):740-8.
[23] BURRG002-000050 (10/31/94)
[24] Anonymous. *Premarin: Discovery of First Orally Active Estrogen.* Canada's Digital Collections, Heirloom Series, Vol. 6. Available at http://collections.ic.gc.ca/heirloom_series/volume6/290-291.htm. Accessed January 23, 2006.

## Promotion to health care providers

Traditionally, drug companies have promoted their products directly to health care providers. The foundation of marketing strategies have centered on company representatives or "detail persons" who visit individual physicians and provide promotional information on products. In 2001, this sales force numbered nearly 90,000 in the US – approximately 1 salesperson for every 5 physicians.[56] Studies suggest that over 80% of doctors see these drug company representatives on average once per week and that prescribing habits are less appropriate as a result.[57,58] While industry proponents assert that detailing raises awareness of products that benefit patients, Katz et al counter that there is no published evidence to support this claim.[59] Katz et al go on to write, "In contrast, research suggests that physicians rely heavily on detailers for information and that the more doctors rely on commercial sources of information the less likely they are to prescribe drugs in a manner consistent with patient needs."[60]

Other overt promotional strategies have included advertising directly to providers in medical journals, sponsoring scientific symposia and continuing medical education (CME), direct-mailing of promotional materials, and providing free samples of medication.[61,62,63,64]

---

[56] Blumenthal D. *Doctors and Drug Companies*. N Engl J Med 2004;351:1885-90.
[57] Moynihan R. *Who pays for the pizza? Redefining the relationships between doctors and drug companies. 1:Entanglement*. BMJ 2003;326:1189-92. Moynihan notes that there is evidence that the information drug representatives present is "overly positive".
[58] Wazana A. *Physicians and the pharmaceutical industry. Is a gift ever just a gift?* JAMA 2000;283(3):373-80.
[59] Katz D, Caplan AL, Merz JF. *All gifts large and small. Toward an understanding of the ethics of pharmaceutical industry gift giving*. Am J Bioeth 2003;3(3):39-46.
[60] Ibid. Further substantiating Moynihan's position about the quality of the information drug representatives provide, Katz et al cite three studies noting that information provided by detailers if often biased and sometimes dangerously misleading.
[61] Kessler DA, Pines WL, op cite.
[62] Palmlund I. *The marketing of estrogens for menopausal and postmenopausal women*. J Psychosom Obstet Gynecol 1997;18:158-64.
[63] Groves KE, Sketris I, Tett SE. *Prescription drug samples--does this marketing strategy counteract policies for quality use of medicines?* J Clin Pharm Ther. 2003;28(4):259-71. This comprehensive review concludes that more research into the effect of prescription drug samples on prescribing is needed but it does draw out the negative impact of prescription drug sampling on a number of factors.

Indeed, CME courses sponsored by the pharmaceutical industry are now one of the most frequent ways the industry interacts with and influences practicing physicians.[65]   In 2000, for example, the industry sponsored 314,000 events specifically for physicians.[66]  As of 2003, according to Dr. Murray Kopelow, president of the Accreditation Council for Continuing Medical Education, pharmaceutical companies were providing about $900 million of the $1 billion spent annually on CME in the United States.[67]

Studies of medical journal advertisements directed at physicians have revealed that claims made in these advertisements are based on poorly substantiated evidence.  In one study, Wade et al asked pharmaceutical companies to supply their best evidence in support of marketing claims.[68]  Of 67 references cited, only 31 contained relevant original data and only 13 were controlled trials.  These investigators concluded, "Standards of evidence used to justify advertising claims are inadequate."  A recent study reviewed 438 unique ads from the 1999 issues of 10 American medical journals and a random sample of 400 references in medical research articles selected from the same journals.  The authors summarize their findings, "Many pharmaceutical ads contain no references for medical claims.  The majority of unpublished data-on-file references were not available and the majority of original research cited to substantiate claims in the pharmaceutical ads was funded by or had authors affiliated with the product's manufacturer."[69]  Furthermore, the educational content of advertisement directed at providers is

[64] Adair RF, Holmgren LR. *Do drug samples influence resident prescribing behavior? A randomized trial.* Am J Med. 2005;118(8):881-4. This randomized study of access to drug samples in clinic found that it influences resident prescribing decisions.
[65] Blumenthal D, op cite.
[66] Brennan TA, Rothman DJ, Blank L, et al. *Health industry practices that create conflicts of interest: a policy proposal for academic medical centers.* JAMA. 2006;295(4):429-33
[67] Blumenthal D, op cite.
[68] Wade VA, Mansfield PR, McDonald PJ. *Drug companies' evidence to justify advertising.* Lancet. 1989;2(8674):1261-3
[69] Cooper RJ, Schriger DL. *The availability of references and the sponsorship of original research cited in pharmaceutical advertisements.* CMAJ. 2005;172(4):487-91.

generally poor. [70,71,72]  In general, the pharmaceutical industry designs these advertisements to trigger decision making shortcuts such as "newer is better" or "popular is better" that often enable busy doctors to reach quick but potentially erroneous conclusions.

The full catalogue of promotional activities that the industry uses to educate and influence health care providers, however, is much broader.  It includes the offering of a vast array of gifts from token items to travel and more, the sponsoring of dinners and social events, the sponsoring of primary research, direct funding for academic chairs and lecture halls, the subsidizing of professional societies and associations, sponsoring and advising disease foundations or patients' groups, developing or supporting the development of clinical guidelines, providing membership to company advisory boards then paying these consultants as "thought leaders", soliciting "ghostwritten" scientific articles, and sponsoring medical journal supplements. [73,74]  A substantial body of theoretical and empirical literature suggests that these promotional efforts by drug companies affect prescribing behavior as well. [75]

Gifts, used by the pharmaceutical industry for almost a century to promote specific products and establish brand recognition, may powerfully influence physician prescribing

---

[70] Herxheimer A, Lundborg CS, Westerholm B. *Advertisements for medicines in leading medical journals in 18 countries: a 12-month survey of information content and standards*. Int J Health Serv 1993;23(1):161-72. In a study of advertising in the leading medical journals in 18 countries, Herxheimer et al reported that important warnings and precautions were missing in half of the 6700 advertisements surveyed.
[71] Stryer D, Bero LA. Characteristics of materials distributed by drug companies. An evaluation of appropriateness. J Gen Intern Med. 1996;11(10):575-83. Stryer and Bero concluded that advertisement contained a higher proportion of promotional material than educational material and little of this material contained information about important therapeutic breakthroughs.
[72] Wilkes MS, Doblin BH, Shapiro MF. *Pharmaceutical advertisements in leading medical journals: experts' assessments*. Ann Intern Med. 1992;116(11):912-9. In 1992, Wilkes et al evaluated 109 pharmaceutical advertisements and found that 57% of these advertisements had little or no educational value.
[73] Moynihan R, op cite. As Moynihan notes, "According to an article on the 'tricks of the trade', the advisory process is one of the most powerful means of getting close to [providers] and influencing them.
[74] Blumenthal D, op cite. Blumenthal notes, "As many as 59% of the authors of clinical guidelines endorsed by many professional associations have had financial relationships with companies whose drugs might be affected by those guidelines."
[75] Ibid.

16

behavior.[76] Every year, doctors receive multiple gifts, both large and small, from drug companies and most doctors deny their influence despite considerable evidence to the contrary.[77] Blumenthal highlights, "The idea that small gifts may be as influential as large gifts seems counterintuitive but is supported by substantial research in social science."[78] Katz et al explain this, noting, "The social rule of reciprocity imposes on the recipient an obligation to repay for favors, gifts, invitations, and the like. . . If physicians are to reciprocate for small gifts, they cannot do so in any form they please. They are essentially compelled to reciprocate by supporting their benefactor's products."[79]

A comprehensive summary by Wazana published in 2000 in the *Journal of the American Medical Association* reviews studies of a broad array of pharmaceutical industry-physician interactions.[80] Consistently across these studies interactions were associated with changes in physicians' use of medications. In general, industry interactions correlate with doctors' preferences for new products that hold no demonstrated advantage over existing ones, with a decrease in the prescribing of generics, and with a rise in both prescription expenditures and irrational, incautious prescribing.[81]

Over the last decade, there has been growing skepticism about the positive impacts of promotion of prescription drugs to health care providers resulting in substantial efforts to counteract the industry's access and messages to health care providers. Growing professional discomfort with the nature, extent, and potential consequences of interactions between physicians and pharmaceutical companies has led several professional societies to develop

---

[76] Katz D, Caplan AL, Merz JF, op cite.
[77] Moynihan R, op cite.
[78] Blumenthal D, op cite.
[79] Katz D, Caplan AL, Merz JF, op cite.
[80] Wazana A, op cite.
[81] Moynihan R, op cite.

It is my opinion, to a reasonable degree of professional certainty, that Wyeth-Ayerst

failed to meet usual standards of promotion and was directed to do so at the highest level of the

organization when the CEO spoke of a "crusade" its sales force should embark on with "no

boundaries, no limits."[152]  The standards of reasonable and responsible promotion to which

Wyeth failed to adhere included but were not limited to:

1. Grants . . . are not used to influence a physician or other health care provider in his or her prescribing habits or be based on the physician's prescribing practices e.g. to reward a high volume prescriber or product advocate;[153]

2. Continuing education is an independent non-promotional educational program;[154]

3. Visiting Speaker Programs use company-approved professional speakers to deliver Company Directed Educational Programs that are within product labeling.[155]

4. Drug promotion should not be false or misleading.

5. Promotional campaigns target only those for whom benefits of therapy clearly outweigh the harm, particularly when promoting a drug for prevention.

6. Promotional campaigns are based on scientific information of the highest standards.

7. Information is presented in a way that achieves fair balance between benefits and risks, adhering to standards to adequately disseminate and share information specifically about risk that would fairly balance discussions that patients had with their physicians.

This failure to comply with this last standard did not occur for a lack of a standard, but rather as

a choice to systematically ignore or dismiss unfavorable science.  Victoria Kusiak, Vice

President, Global Medical Affairs, Wyeth-Ayerst agreed in her sworn testimony that it was a top

objective of Wyeth to get women and physicians the information they need to make informed

choices about all of its products, including the women's health care products.[156]  I agree with Dr.

---

[152] 4/4 10AM. Bob Essner. Day 3 Close. Plaintiff's exhibit 40.
[153] GOLDG001-001438 at page 1440.
[154] GOLDG001-001438 at page 1441.
[155] GOLDG001-001438 at page 1442
[156] Kusiak deposition 0196 6-18.

Kusiak's assessment of the appropriate obligation of a pharmaceutical company. This is the appropriate standard by which Wyeth should be evaluated.

The obligation to only target promotional campaigns at patients who can be certain of receiving more benefit than harm can be found in a number of Wyeth documents, including a letter from Wyeth-Ayerst North American President, Joe Mahady. In this letter he recognizes that Wyeth had a "special responsibility based on the nature of the products we sell and the patients who take them."[157] Pharmaceuticals have both the power to help, if used appropriately, and harm, if not. Based on this "special responsibility," Mahady directed his sales force to, "maintain the highest standards of compliance with respect to issues of product safety, medical education, use of approved materials and our promotion practices."[158] I agree with his declaration that drug companies have a special responsibility. Indeed, the medical community has urged companies to provide honest, accurate, and complete information about the benefits and risks in drug advertisements as it is necessary to serve the interests of physicians and the public.[159] Yet, this was not the directive the company followed, rather Wyeth-Ayerst modeled its marketing efforts on "a crusade more than a typical pharmaceutical effort."[160]

Again, Wyeth understands what the obligations of a reasonable pharmaceutical company were, as they sought to have those obligation enforced on competitors. A correspondence from 1989 highlights that Wyeth-Ayerst considered regulatory action against Mead Johnson on its Estrace promotion, lipids and lipoproteins. However, as "the promotion of the cardiovascular effects of Premarin is of critical importance to Wyeth-Ayerst and our approaches to date . . . do indeed push the edge of the envelope," the company concluded that they would have "more to

---

[157] DEYMI015-000644. Joseph Mahady Letter January 2001.
[158] DEYMI015-000644.
[159] Woloshin S, Schwartz LM, Tremmel J, Welch HG. *Direct-to-consumer advertisements for prescription drugs: What are Americans being sold?* Op cite.
[160] 4/4 10AM. Bob Essner. Day 3 Close. Plaintiff's exhibit 40.

31

lose if our ability to discuss cardiovascular issues is limited than we have to gain from stopping the use of this particular Estrace promotion."[161,162]  Wyeth clearly recognized the irresponsibility of promoting cardiovascular benefit in the absence of such an indication.  It is my opinion that such promotion was not "pushing the envelope" as stated by Wyeth, but rather was violating reasonable and accepted standards of care owed to the consumer of hormone therapy.

Based on my professional expertise as clinician as well as my background, training, and education, and the available evidence-base which I reviewed, responsible promotion of hormone replacement should have included marketing the therapy to selected minority of women suffering moderate to severe vasomotor symptoms and then only for short-term use.[163]  Reasonable promotion adhering to an acceptable standard of care should also have: 1) highlighted the risk of developing postmenopausal osteoporosis; 2) advocated for early primary prevention strategies such as regular exercise, calcium supplementation, and vitamin D supplementation and; 3) targteted hormone supplementation only to those with accelerating osteopenia (based on bone density testing) or otherwise at risk of developing clinically significant osteoporosis.  Simply, Wyeth should have promoted hormone supplementation in the fraction of the older post-menopausal population at significant risk for hip fracture.  Reasonable promotion would have adhered to the 1995 Wyeth Premarin Product Training Program manual recommending, "[hormone therapy] should be used where beneficial in the lowest effective therapeutic dose for the shortest period of time that satisfies the therapeutic

---

[161] CONNS005000396

[162] In the wake of WHI, Wyeth-Ayerst no longer felt restrained in pursuing regulatory action against other manufacturers of menopausal hormone therapy including the so called "bio-identical hormone replacement". For good examples of the "pot calling the kettle black" see KUSIV009-009208 and Botha Sarah E. *Submission of Citizen Petition on Behalf of Wyeth*. Wiley, Rein, & Fielding. October 6, 2005.  The standards Wyeth-Ayerst sets out in these documents are reasonable standards yet the irony is the Wyeth-Ayerst failed to adhere to them even though they were aware of them.

[163] Atrophic vaginitis and associated vaginal dryness are best treated with local rather than systemic therapy.

32

need."[164] Wyeth failed to follow these standards despite admonishment from the FDA, and instead, as mentioned above, at the directive of Bob Essner, pursued marketing campaigns that knew, "no boundaries, no limits".[165]

Wyeth knew that reasonable standards of promotion existed for the development of DTC material as well. The FDA had set out such expectations in correspondence with Wyeth. Examples of FDA admonishments that, in general, Wyeth ignored include a letter from February 1991. David Banks of the FDA writes, "The statement 'Keep your life after menopause as vital and healthy as ever. . .' Among the inferences to be derived from this claim is that ERT is essential to health and vitality. This is an inference with which we disagree."[166] Notably, in 2000, using celebrity spokesperson Lauren Hutton, Wyeth ran a DTC marketing scheme called the "Vitality" campaign.[167]

Later in February 1991, the FDA also took issue with promotional aspects of the *Seasons* magazine.[168] The FDA clearly laid out the rationale for considering the magazine promotional material then notes that, "the presentation of the magazine itself is misleading in that the sponsorship is not clearly stated."[169] The FDA goes to address specific content issues, among others:[170,171]

> . . . Clearly, Wyeth-Ayerst is not an unbiased independent source of information about its products. . .
>
> The discussion of menopause predisposing a woman to irritability and moodiness might mislead the reader to assume that if the 'hormonal upheaval' is treat with

---

[164] W-MDL04782-00047468 at page 47492.
[165] 4/4 10AM. Bob Essner. Day 3 Close. Plaintiff's exhibit 40.
[166] W-MDL04782-00150936. Other admonishments include promoting unfound psychiatric benefits which Wyeth subsequently ignored in promotional campaigns that advertise emotional labiality as a symptom of menopause.
[167] SINAM001-000085 at page 93.
[168] W-MDL04782-000002391.
[169] W-MDL04782-000002391.
[170] W-MDL04782-000002391.
[171] W-MDL04782-00035765. Wyeth responded to the FDA in a letter making changes to bring this promotional material into line with rules and regulations but in subsequent marketing campaigns promoted psychiatric and cardiovascular benefits despite having already been admonished by the FDA.

33

Premarin, the irritability and moodiness will be treated as well. This is not an approved indication.

The fourth letter discussed cholesterol, fats, etc. We have concern that the issue of the magazine in which this letter would appear would discuss or imply the use of Premarin to decrease cardiovascular events in postmenopausal women. Since this type of indication is not an approved indication for the product, this would potentially cause Premarin to be misbranded.

Of course, in subsequent years, the promotion by Wyeth of the cardiovascular benefits of the Premarin family of drugs would continue unabated.

Just over one year later, the FDA again takes issue with Wyeth's attempts to expand the perceived benefits noting, "the chart shows part of the effects of the climacteric as skin atrophy and atherosclerosis. While these may be seen as outcomes of the climacteric, they are misleading when used in the context of a Premarin advertisement."[172] The letter continues, "The language sheets discuss changes in cholesterol levels which occur in the menopause. . . implying that estrogen TREATS cholesterol changes. In addition, there is a further implication that there is cardiovascular benefit with Premarin use inherent in such a discussion."[173]

Another letter from July 1992 finds Wyeth-Ayerst continuing to push the cardiovascular benefit, "the information in the booklet regarding estrogen and cholesterol may misleadingly imply that there is proven benefit of Premarin in regard to risk of coronary heart disease."[174] In March 1995 the Division of Drug Marketing, Advertising, and Communications (DDMAC) at the FDA provided a long letter of revisions to proposed launch materials specifically, the patient care brochure "Hormone Replacement Therapy and Your Health." It included the following noteworthy comment, "DDMAC suggests revising this section [A Commitment to Your Future] . . . DDMAC suggests deleting the last sentence because Prempro is not indicated for all

---

[172] W-MDL04782-00141574.
[173] W-MDL04782-00141574.
[174] ROSSC005-000092.

34

women."[175] Despite this admonishment, Wyeth-Ayerst's efforts to promote hormone supplementation to all menopausal women only intensified in the ensuing years.

In May 1998, Wyeth-Ayerst was instructed by the DDMAC to cease airing the Premarin TV advertisement immediately, "because it is misleading in that it provides an inadequate presentation of the risk information."[176] The communication also noted that, once again, Wyeth-Ayerst's promotion of the benefits of Premarin implied "broader use for Premarin than what appears in the package insert."[177,178] Early the next year DDMAC responded to Wyeth's request for a meeting to discuss lipid claims. The DDMAC noted that Wyeth had failed to address new information available and that, "Unless Wyeth considers this concern and is prepared to discuss its effect on promotion, claims that relate or imply a favorable . . . effect of Prempro on lipid changes may be considered false or misleading."[179]

Following this Agency letter, Wyeth met with officials at the FDA and reviewed the HERS data and Wyeth's insidious marketing techniques. In the Meeting's minutes of February 22, 1999, the FDA's instructions could not be any clearer, "Until further notice, promotional materials should not contain any claims regarding lipid or cardiovascular benefits."[180] Despite repeated FDA admonitions, purported cardiovascular benefit and therapy for all menopausal women continued to be used as marketing tools. Despite the good advice of Wyeth's marketing partner, Ketchum to "Report the Science, Not the Possibilities" and "Don't Suggest Broader Patient Population," [181] Wyeth continued to look for ways to avoid principles of sound and responsible advertising and marketing.

---

[175] ROSSC006-001408.
[176] W-MDL04782-00095370.
[177] W-MDL04782-00095371.
[178] W-MDL04782-00095382.
[179] W-MDL04782-00039730.
[180] DUROJ015-000540
[181] HENRL008-000300 at page 0306.

35

underlying physiologic process being targeted. When targeting for intervention anyone other than those at highest risk, the number of patients needed to treat rises substantially. In the face of these diminishing returns, the impact of adverse events climbs steadily. This was first elegantly described in a seminal article written by Geoffrey Rose and published in the *International Journal of Epidemiology* in 1985.[195] As Douglas Weed subsequently wrote, "[Rose's] ideas have served us well and will continue to do so long into the future."[196]

The core concept that Rose put forward was that there are two types of primary prevention of disease. The first preventive strategy seeks to identify high-risk susceptible individuals and to offer them some individual protection. In contrast, the 'population strategy' seeks to control the determinants of incidence of disease in the population as a whole. Rose noted, "the 'high-risk' strategy seeks to achieve something like a truncation of the risk distribution." Its advantages include that the intervention (e.g. hormone supplementation) is appropriate to the individual and the benefit to risk ratio is favorable. As an example, we do not advise all patients to take cholesterol medication without first testing cholesterol levels.

The 'population strategy' involves mass control methods. Rose writes:

> In mass prevention each individual has usually only a small expectation of benefit, and this small benefit can easily be outweighed by a small risk. Such low-order risks, which can be vitally important to the balance sheet of mass preventive plans, may be hard or impossible to detect. This makes it important to distinguish two approaches. The first is the restoration of biological normality by the removal of an abnormal exposure (e.g. stopping smoking); here there can be some presumption of safety. This is not true for the other kind of preventive approach, which leaves intact the underlying causes of incidence and seeks instead to

---

[195] Rose G. *Sick individuals and sick populations.* Int J Epidemiol 2001;14:32-38. That the journal republished this article in 2001 with invited commentary is testimony to the critical influence and importance the Rose's paper had on the public health community.
[196] Weed DL. *Commentary: A radical future for pubic health.* Int J Epidemiol 2001;30:440-1.

interpose some new supposedly protective intervention (e.g. drugs). Here
the onus is on the activists to produce adequate evidence of safety.[197]

That is, the bar is higher when demonstrating benefits for an intervention focusing on a
population strategy of prevention. Wyeth-Ayerst did not clear this bar prior to selling hormone
supplementation as the panacea to the real and perceived ills of menopause. Long-term hormone
supplementation should have been reserved for those at highest risk of the single best supported
use of the drug treatment – advanced osteopenia with other associated risk factors for fracture or
established osteoporosis – until the industry or the government produced adequate evidence of
safety from large scale randomized controlled trials. Instead, Wyeth's promotional campaign, as
described below, increasingly focused on a population strategy of primary prevention targeting
all menopausal women.

### Detailed Chronological Summary of Promotional Campaign

### Promotional campaign through the 1970's – Menopause is a disease.

Internal Wyeth-Ayerst documents highlight that the promotional machine was put in gear
beginning in the 1950's. Beginning a long-standing malapropism where promotion is labeled
"education", the company instituted, "a massive program to educate physicians and patients
about menopause, vasomotor symptoms, atrophic vaginitis, and the use of Premarin."[198] The
company's goal was to foster a, "new understanding of the menopause".[199] The understanding
was predicated on the idea that menopause was a deficient state for which the medical
establishment had discovered a cure – "replace the missing estrogen".[200] As described above, the
book *Feminine Forever* further advanced the medicalization of menopause by describing it as the

---

[197] Rose G, op cite.
[198] BURRG002-000050 ("History of Premarin" 10/31/94). The tone of documents describing this early campaign
reflects the decidedly paternalistic stand the company took – the marketing campaign presumed women had no
knowledge of menopause and needed "education" about a biological event that has been part of the female
experience forever.
[199] YAVUE006-001704 (Premarin Family Training Program 1995).
[200] Ibid.

42

"horror of living decay". Thus, as described in a Wyeth-Ayerst training document, at the beginning of the 1970's the Premarin family was, "poised for unsurpassed new prescriptions and sales volume."[201]

Representative advertisements from 1970 used unfounded statements to change general attitudes about menopause and to make hormone supplementation acceptable and even necessary.[202] These advertisements directed at physicians played on the profession's integrity and pride to not miss the diagnosis of "underlying estrogen deficiency" by attributing symptoms of nervousness, headaches, or sleep disturbance to anxiety and mistakenly administer "a mild sedative or tranquilizer".[203] The ads advised physicians that "to distinguish those [emotional] symptoms that will respond to estrogen replacement therapy from those that may require other approaches to treatment, institute a *therapeutic trial* with Premarin."[204] Note that the recommendation is to begin with a trial of Premarin rather than vice versa.

By 1972, Ayerst advanced the concept of menopause as a disease by equating it with the insulin deficiency disease of type I diabetes mellitus claiming erroneously, in my opinion as an expert clinician who treats both post-menopausal patients and patients with diabetes, that, "It makes as little sense for a menopausal woman to suffer the effects of her estrogen deficiency as it does for diabetic to suffer from his hormone deficiency."[205] The campaign goes on to suggest that when emotional distress stems from loss of estrogen, as in menopause, there is Premarin. And presumably because the ovaries will not resume making estrogen after menopause, despite the lack of long-term studies, for the first time as seen in Contemporary OB/GYN in July 1973,

---

[201] RYANJ002-000475 at 000501.
[202] W-MDL04782-00064017. Hormone supplementation will help with the physical symptoms of menopause, primarily hot flashes, but it is erroneous to claim that sex hormones are essential for physical well-being. See also W-MDL04782-00064019, 20, 21, 22.
[203] W-MDL04782-00064019 (8/75).
[204] W-MDL04782-00064021 (8/75).
[205] RYANJ002-000473 (undated).

43

Meeting,[303] and a comprehensive 49 page Medical Education and Communications Plan.[304] The goal of the National Consensus Meeting was, "to overcome physician/patient misunderstandings in the management of patients suffering from the complications of menopause."[305] DesignWrite anticipated convening multidisciplinary experts, to among other things, "define the serious nature of menopause-related illness . . . and recommend regimens and duration of therapy associated with HRT."[306] The meeting would realize the following marketing objectives: 1) establish a greater need among primary care physicians to treat non-hysterectomized, post-menopausal patients with hormone replacement therapy; 2) overcome the lingering doubts associated with using hormone replacement therapy in post-menopausal patients; 3) develop a strong core of peer-sanctioned scientific information that can be disseminated to physicians, pharmacists and other healthcare personnel through promotion.[307]

   The objectives of the Speaker's Bureau Meeting included developing a core national speaker faculty that will influence primary care physicians to institute hormone supplementation more often and earlier.[308] The objectives also included integrating marketing positioning and message strategy into speakers' bureau educational content and materials[309] in a program that amounted to deception – that is, planted positive messages from Wyeth-Ayerst about the benefits of prescribing the Premarin family. The program also sought to build and maintain rapport with physicians who have the ability to positively influence the sales of Premarin.[310] Participants in

---

[303] DWRITE 065814.
[304] DWRITE 065764.
[305] DWRITE 065826. It is important to mention that only a small percentage of women ever "suffer from the complications of menopause."
[306] Ibid.
[307] Ibid. Note that this peer-sanctioned scientific information would rely on hand selected multidisciplinary experts who had a favorable view toward menopausal hormone supplementation.
[308] DWRITE 065816.
[309] Ibid.
[310] Ibid.

63

the Speaker's Bureau meeting included eight to ten faculty members and about 300 physicians already identified from Wyeth-Ayerst's current speaker list.

The stated goals of the Medical Education and Communications Plan included the integration of medical and scientific knowledge of a multi-component, multi-faceted communications and education program. This goal would be accomplished by developing a journal publication plan wherein DesignWrite would write articles favorable to the Premarin family and then see to it that those articles, using the names of recruited "authors" (not the medical writers), got published. Specifically, "content for the publication plan would consist of a mix of peer-reviewed primary research articles, opinion leader-endorsed review articles, journal supplements, letters to the editor, and scientific poster sessions."

According to Jeff Solomon of Wyeth marketing, "One of the rationales for the publication program was the recognition of high clinician reliance on medical articles or journal articles for credible product information. . ."[311] He testified further that Wyeth would create the outline for the expert as a "starting point for a review article."[312] DesignWrite thanked Jeff Solomon for awarding it the Publication Plan "in support of the brand and in defense of the Raloxifene competitive threat…"[313]

DesignWrite assisted Wyeth-Ayerst in controlling and influencing the published scientific information about hormone supplementation that most clinicians ultimately relied on to make their best possible decisions. Controlling this information such that it was favorable to the Premarin family and menopausal hormone supplementation in general would prime health care providers to be receptive to the demand generated by patients influenced by the company's DTC marketing schemes. To execute the publication plan, DesignWrite, working closely with Wyeth-

---

[311] J. Solomon Deposition at 355-56
[312] J. Solomon Deposition at 317-318.
[313] DWRITE 065950

aging.[409.] Notably, while Wyeth had apparently become enamored with promoting hormone supplementation as "a hormonal fountain of youth" just as it had been promoted in the 1960s, medical science was moving forward.

Significantly, in the face of further damaging information regarding the risk of breast cancer with combined hormone supplementation, Wyeth set forth in a "Justification Document" the rationale for changing the breast cancer warning on labeling but remarked that definitive conclusions cannot be stated without randomized, controlled clinical trials.[410] That Wyeth now turned to evidence-based medicine further flew in the face of Wyeth's previous reliance on, "the heritage/trust and confidence of a product that has been used for 60 years . . . can infer an implied "safer" drug in a category where patients are fearful of future cancer risks."[411]

The remainder of 2001 and 2002 up until the publication of WHI (at which time the company was finally forced to rethink and review the science on which their promotional schemes had rested) mimicked the intense marketing efforts of the previous years. DesignWrite highlighted Premarin family 2001 accomplishments.[412] Activities included taking advantage of established relationships with opinion leaders favorable to Wyeth and managing these relationships with the assistance of the marketing agency Ketchum.[413] Additional promotional activities included Wyeth's participation in a patient adherence program,[414] ongoing direct funding of more than 20 studies many of them conducted to delineate additional estrogen

---

[409] DWRITE 066317.
[410] ZUCAV008-005665
[411] PANAA004-000607.
[412] DWRITE 026892. Accomplishments included 16 articles, 20 abstracts/posters, breast health and sexuality expert forums, breast health supplement, 3 national symposia, 15th annual estrogen deprivation meeting, slide kits, and sales force support.
[413] See DEVAN001-000350 and CONTA020-000012. The first is a letter written to Reuters Health from Dr. Michelle Warren and faxed by Ketchum explaining that the benefits of HRT have been proven in 60 years of continued use. The second is a letter written to *Harvard Women's Health Watch* from Dr. William Andrews and also faxed by Ketchum explaining that competing hormone replacement therapies do not have an osteoporosis indication.
[414] SOLOJ012-001132.

81

benefits,[415,416] continued DTCA, Internet initiatives at CBS Healthwatch and RealAge.com,

medical education mostly through the National Hormone Council, sales force promotion,

providing samples, and the purchase of small gifts for physicians such as "sticky pads".[417,418]

The anticipated marketing budget in 2002 was $174,322,000 -- a 37% increase over 2001.[419]

The development of the National Hormone Council – eventually the Council on Hormone

Education – with the assistance of DesignWrite deserves special mention.  Wyeth sought to

position the Council as "**the** [their emphasis] source for information on menopause and HRT."[420]

The mission of the council was "advocating for HRT as essential therapy for postmenopausal

women."[421]  Selected national, and eventually international, opinion leaders would be

compensated for time and effort participating in Steering Committee and Working Group

meetings, delivering *Distinguished Professor* visits, and attending and presenting at *New Science*

meetings.[422]

In short, supported by $10,000,000 from Wyeth,[423] the carefully selected Executive

Committee of The Council worked to exert profound control over the dissemination of the entire

body of medical and scientific literature regarding menopausal hormone supplementation.

Further development saw additional planned activities including "Scientific Update on HRT"

slide kits, further distinguished professor visits, a *Journal of the Council on Hormone Education*,

a Council on Hormone Education website, reactive public relations activities, proactive public

---

[415] SOLOJ007-000053. Studies of additional estrogen benefits including: *Postmenopausal Therapy and Macular Degeneration, HRT and Risk of Uterine Fibroid Growth, Mechanism of Muscle Protein Loss in Menopause,* and *HRT for Prevention of Visceral Obesity in Postmenopausal Women.*
[416] DUROJ012-001110. Wyeth was providing direct funding for at least 5 epidemiologic studies.
[417] LAWT021-009874 at page 9907.
[418] HOLSN016-002298. Invoice for the purchase of $285,974.25 sticky pads printed with "Prempro".
[419] LAWT021-009874 at page 9911.
[420] DWRITE 026976.
[421] DWRITE 026976.
[422] DWRITE 027126.
[423] DWRITE 027055.

relations activities, journal articles in peer-reviewed publications with ongoing assistance from DesignWrite, and symposia.[424]  Published science in 2002 including WHI results tested the reactive public relations activities of the council.[425]

**Summary of promotional efforts by Wyeth and resulting growth in the Premarin family.**

Wyeth's promotional campaign began in the 1950's.  It accelerated through the 1960's and early 1970's focusing on redefining menopause as a disease.  By 1975, gross annual sales of the Premarin family totaled nearly $60 million.[426]  Published scientific evidence linking endometrial cancer to menopausal hormone supplementation prompted the company not so much to re-examine the science of hormone supplementation but to re-examine the marketing strategy. Relying more on these marketing skills (and a growing marketing budget) than science, the company developed a blueprint for marketing that sought to minimize the risks, expand the benefits, and focus on long-term use of hormone supplementation.  Using this blueprint, the company reinvigorated Premarin franchise sales.  By 1985, gross sales of the Premarin family totaled nearly $82 million annually.[427]

Through the end of the 1980s, by exaggerating the gravity of osteoporosis, Wyeth sought to create fear that would drive otherwise healthy, asymptomatic women to physicians to request hormone supplementation.  As discussed above, fear – fear of disease, in particular – undermines autonomy and is a strong driver of behavior.  Primed by increasingly intense efforts on the part of Wyeth to manufacture clinical data and scientific opinion, physicians responded to women's

---

[424] DWRITE 027078.
[425] CONTA025-02638.  An e-mail with the subject line "The Empire Strikes Back" called for identifying 5 or 6 people from the council to serve as coauthors and signatories for a letter to *JAMA* rebutting the unfavorable press regarding HRT.
[426] LAWT006-000913.
[427] LAWT006-000913.

requests for hormone supplementation.  By 1990, gross sales of the Premarin family totaled nearly $324 million annually.[428]

Confident about the marketing potential of the Premarin family in the 1990s because of the rapidly expanding menopausal population, Wyeth-Ayerst ignored sound epidemiologic principles and focused on selling hormone supplementation to all menopausal women as a general preventative treatment for long-term use.  Wyeth promoted the off-label use of hormones for cardiovascular prevention.  In addition, having discovered the power of DTC marketing, Wyeth successfully drove low-risk women to their physicians. By 1995, gross sales of the Premarin family totaled nearly $816 million annually.[429]

Over the next 7 years, in part driven by growing competition from appropriate therapeutic alternatives, Wyeth successfully consolidated its hold on the hormone supplementation market by expanding the marketing campaign on all fronts, utilizing the full catalog of promotional activities,[430] particularly DTCA,[431] and intensifying control over the medical and scientific literature.  Wyeth had achieved over 90% market share.  In 2001, more than 11 million women in the United States alone used a Premarin family product.[432]  Relying on marketing more than science, by 2001, gross sales of the Premarin family surpassed $2 billion annually.[433]

**Conclusion**

Do the benefits of an integrated promotional campaign outweigh the danger that consumers will demand and take medicines inappropriately?

---

[428] LAWT006-000913.
[429] LAWT006-000913.
[430] PANAA001-000019. In 2001, over $1 million for CME, over $3 million in targeted educational grants, over $10 million supporting visiting professor programs.
[431] SOLOJ010-001251.  By 2000, the Premarin family was responsible for 82% of total DTC promotional spending in the hormone supplementation category.
[432] W_ANNREP01-0012.
[433] LAWT006-000913.

84

To reiterate, three factors determine the health impact of promotional campaigns for any given drug: 1) the current prevalence of under-treatment; 2) the amount of inappropriate prescribing stimulated by promotional efforts; and 3) the degree of harm accruing to under-treated compared with over-treated patients.[434] For menopause, it is improbable that there was undertreatment, a large amount of inappropriate prescribing for prevention of disease was stimulated specifically by Wyeth's promotional efforts, and the harm accruing to over-treated patients was substantial.

This balance was tipped decidedly toward cumulative harm by a promotional "crusade" that irresponsibly provided misleading, unbalanced, and "pseudo-educational" information, utilized the full catalog of promotional activities including such deceptive activities as "ghost-writing" and targeted, inappropriately, women unlikely to realize at an individual level important benefits. Furthermore, Wyeth's promotional effort focusing on long-term treatment resulted in presumably millions of women exposed to a medication whose harms emerged after long induction periods. Wyeth undertook this as a "crusade" hammering home the theme "Get Her On, Keep Her On".[435]

Wyeth's promotional efforts occurred decades prior to an adequately completed research agenda. As the esteemed epidemiologist David Sackett writes, "But surely the fundamental promise we make when we actively solicit individuals and exhort them to accept preventive interventions must be that, on average, they will be the better for it. Accordingly, the *presumption* that justifies the *aggressive assertiveness* with which we go after the unsuspecting healthy must be based on the highest level of randomized evidence that our preventive maneuver

---

[434] Hollon MF. *Direct-to-consumer marketing of prescription drugs: A current perspective for neurologists and psychiatrists.* CNS Drugs 2004;18(2):69-77.
[435] Contemporary OB/GYN Vol. 1 No. 3, March 1973 and Vol. 2 No 1 July 1973.

will, in fact, do more good than harm."[436]  Wyeth did not wait for this randomized evidence that eventually emerged from WHI before pushing a known carcinogen to millions of women.

Returning to epidemiology, Rose posed a question that is an integral part of good doctoring, "Why did this happen and could it have been prevented?"

What were the factors that led to such a rapid and dramatic growth in the number of women taking hormone supplementation?  When the activities of many individuals within a group change, it is likely that social facts play a role.[437]  The question of why the proportion of women taking hormone supplementation increased dramatically points to potent group-level influences, specifically Wyeth-Ayerst's promotional efforts, that impacted the decisions women and their physicians made together.

Wyeth's sophisticated understanding of marketing and advertising, culminating in an overly aggressive promotional campaign encouraging over-ambitious and unnecessary efforts to prevent osteoporosis as well as unsubstantiated, presumptive cardiovascular benefit drove overuse of long-term hormone therapy in menopausal women.  Promotional campaigns drove perimenopausal women with no or few symptoms to seek therapy that promised well-being while campaigns creating fear of osteoporosis and heart disease kept these women on the medications for lengths of time that had never been determined to be safe.

In summary, Wyeth provided "pseudo-educational" information while targeting patients at low risk of fracture and thus, unlikely to realize the benefits of osteoporosis prevention with hormone supplementation.  Their efforts tipped the equilibrium decidedly toward net harm caused by the promotional campaign for a carcinogenic drug used to treat a condition that was not under-treated, for which there was ultimately inappropriate prescribing stimulated by the

---

[436] Sacket DL. *The arrogance of preventive medicine.* CMAJ 2002;167(4):363-4.
[437] Ebrahim S, Lau E. *Commentary: Sick populations and sick individuals.* International Journal of Epidemiology. 2001;30:433-34.

promotional efforts and the harm accruing to the over-treated patients in the form of breast cancer was substantially greater than the harm accruing to under-treated patients. This is particularly true in light of new developments in osteoporosis therapy.

In conclusion, many women who did not need hormone replacement were driven to seek prescriptions from health care providers who had been primed to respond to this consumer demand, and many women who needed it perhaps only for short-term relief were kept on it for years. Had the campaign emphasizing hormone therapy as the panacea for menopause and emphasizing long-term use not happened, physicians would not have been conditioned to prescribe this drug and most of these women would not have sought out this drug and many women would have avoided the harms attendant to hormone therapy, particularly combination hormone therapy.

To reiterate my opinions set forth above:

1. Wyeth, conducted "a crusade more than a typical pharmaceutical effort."[438]

2. Wyeth accomplished this by expert marketing relying on expanding the perception that hormone therapy is appropriate for every menopausal woman and using aggressive integrated marking tactics targeting physicians and patients together as the "consumer".

3. Wyeth persuaded the medical community and the public that healthy, asymptomatic menopausal women should take hormones for an ever expanding list of symptoms by manufacturing data, purchasing professional opinions, and utilizing the entire catalog of possible promotional activities based on often misleading and unbalanced marketing schemes.

4. Wyeth inappropriately initiated and continued over several decades a "start her on, keep her on" marketing strategy without scientific support for long-term use eventually ignoring sound epidemiologic principles by unreasonably pushing hormone supplementation for population prevention.

5. Wyeth systematically ignored or minimized unfavorable scientific evidence and, thus, failed to adequately warn physicians and patients of the risks of hormone supplementation.

---

[438] 4/4 10AM. Bob Essner. Day 3 Close. Plaintiff's exhibit 40.

87

6. Wyeth eroded the traditional role of the physician as a "learned intermediary" by marketing efforts that knew "no boundaries, no limits."[130]

7. Wyeth nearly seamlessly, from a historical perspective, transitioned women from an early strategy of unopposed estrogen to combination HRT.

8. Wyeth should have reserved hormone supplementation for short-term use and a limited population of consumers, tailoring their marketing campaign accordingly.

All of my opinions expressed in this report are given to a reasonable degree of professional certainty. I reserve the right to supplement my opinions with additional information as it is reviewed or received.

Matthew F. Hollon, M.D., MPH                    (Date)

2/15/06

---

[130] 4/4 10AM, Bob Essner, Day 3 Close, Plaintiff's exhibit 40.

# EXHIBIT 9

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

IN RE:                          : MDL DOCKET NO.
PREMPRO PRODUCTS                : 4:03CV1507 WRW
LIABILITY LITIGATION
-------------------------------------------------------
             IN THE COURT OF COMMON PLEAS
             PHILADELPHIA COUNTY, PENNSYLVANIA

IN RE:  HORMONE               : NOVEMBER TERM
THERAPY LITIGATION            : 2003
                              : NO.
-------------------------------------------------------
           CROSS NOTICED IN VARIOUS OTHER ACTIONS
-------------------------------------------------------

                        - - -
            C O N F I D E N T I A L
        SUBJECT TO PROTECTIVE ORDER
                        - - -
              March 27, 2006
                        - - -

         Videotape deposition of MATTHEW F.
HOLLON, M.D., held at The Watertown Hotel,
4242 Roosevelt Way NE, Seattle, Washington,
commencing at 8:38 a.m., on the above date,
before Cindy M. Koch, a Registered
Professional Reporter and Certified Court
Reporter.

         GOLKOW LITIGATION TECHNOLOGIES

              Four Penn Center

         1600 John F. Kennedy Boulevard

                 Suite 1210

         Philadelphia, Pennsylvania 19103

                877.DEPS.USA

## Page 2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

APPEARANCES:
Counsel for the Plaintiffs
JANET, JENNER & SUGGS, LLC
BY: ROBERT K. JENNER, ESQUIRE
Suite 320, Woodholme Center
1829 Reisterstown Road
Baltimore, Maryland 21208
(410) 653-3200

CLARK, THOMAS & WINTERS
BY: RANDALL L. CHRISTIAN, ESQUIRE
and
SHAVONNE HENDERSON, ESQUIRE
300 West Sixth Street
Suite 1500
Austin, Texas 78701
(512) 472-8800
Counsel for Wyeth

WILLIAMS & CONNOLLY, LLP
BY: JOHN W. VARDAMAN, ESQUIRE
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5081
Counsel for Wyeth

ULMER BERNE, LLP
BY: TRACI L. WALLACE, ESQUIRE
600 Vine Street
Suite 2800
Cincinnati, Ohio 45202-2409
(513) 698-5000
Counsel for Barr Laboratories,
Inc., Barr Research, Inc. and
Duramed Pharmaceuticals, Inc.

SIDLEY AUSTIN, LLP
BY: DEBRA B. POLE, ESQUIRE
555 West Fifth Street
Suite 4000
Los Angeles, CA 90013
(213) 896-6623
Counsel for Pfizer, Inc. and
Pharmacia & Upjohn

## Page 3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

APPEARANCES: (CONTINUED)

DINSMORE & SHOHL, LLP
BY: GABRIELLE M. HILS, ESQUIRE
1900 Chemed Center
255 East Fifth Street
Cincinnati, Ohio 45202
(513) 977-8200
Counsel for Aventis
Pharmaceuticals
and Watson Laboratories

BAKER STERCHI COWDEN & RICE, LLC
BY: PAUL S. PENTICUFF
500 Crown Center
2400 Pershing Road
Kansas City, Missouri 64108-2533
(816) 471-2121
Counsel for Novo Nordisk
Pharmaceuticals, Inc.

SEDGWICK, DETERT, MORAN & ARNOLD, LLP
BY: DAWN SHAWGER
1717 Main Street
Suite 5400
Dallas, Texas 75201-7367
(469) 227-8200
Counsel for Bristol-Myers
Squibb

Also present: Ed Burke, Videographer

## Page 4

* * *
I N D E X

WITNESS
MATTHEW F. HOLLON, M.D.
EXAMINATION BY:                          PAGE NO.
By Mr. Christian                              10

* * *
E X H I B I T S
EXHIBIT NO.    DESCRIPTION                PAGE NO.
Exhibit No. 1    Notice of intention to take    14
                the videotaped deposition of
                Matthew Hollon

Exhibit No. 2    2005 Curriculum vitae of      14
                Matthew Hollon

Exhibit No. 3    2006 Curriculum vitae of      15
                Matthew Hollon

Exhibit No. 4    Report of Matthew F. Hollon,  16
                MD, MPH

Exhibit No. 5    Letter and attachments to     17
                Dr. Hollon from Mr. Jenner
                dated 11/4/05

Exhibit No. 6    Letter and attachments to     17
                Mr. Millrood from Dr. Hollon
                dated 12/26/05

Exhibit No. 7    Agreement between Matthew      17
                Hollon, M.D. and Robert K.
                Jenner, representing the
                Plaintiff's Philadelphia
                Consortium

Exhibit No. 8    3-ring binder titled "Hollon  29
                Reference Materials, Medical
                Literature" (Original
                retained by witness for
                copying)

## Page 5

E X H I B I T S (Continuing)

EXHIBIT NO.    DESCRIPTION                PAGE NO.
Exhibit No. 9    3-ring binder titled "Hollon  37
                Reference Materials, Wyeth
                Documents, 1 of 2 (Original
                retained by witness for
                copying)

Exhibit No. 10   3-ring binder titled, "Hollon 38
                Reference Materials, Wyeth
                Documents, 2 of 2, Design
                Write Documents" (Original
                retained by witness for
                copying)

Exhibit No. 11   Article titled               94
                Direct-to-Consumer
                Advertising, A Haphazard
                Approach to Health Promotion

Exhibit No. 12   Article titled               95
                "Direct-To-Consumer Marketing
                of Prescription Drugs, A
                Current Perspective for
                Neurologists and
                Psychiatrists

Exhibit No. 13   Article titled               95
                "Direct-to-Consumer Marketing
                of Osteoporosis Drugs and
                Bone Densitometry

Exhibit No. 14   Article titled               95
                "Direct-to-Consumer Marketing
                of Prescription Drugs,
                Creating Consumer Demand

Exhibit No. 15   Document from OsteoEd titled  97
                "Treatment Basics"

Exhibit No. 16   Document from OsteoEd titled  98
                "Common Questions

Page 6

E X H I B I T S (Continuing)
EXHIBIT NO.   DESCRIPTION          PAGE NO.
Exhibit No. 17   Document Titled "Society of      98
                 General Internal Medicine,
                 28th Annual Meeting, New
                 Orleans, LA, May 11-14, 2005,
                 Out of Chaos: The Critical
                 Role of Generalists
Exhibit No. 18   Article from HealthLinks        110
                 titled "Basic Introduction to
                 Evidence-Based Practice
                 Resources
Exhibit No. 19   Article titled "Drug            201
                 Marketing"
Exhibit No. 20   Article titled "The             207
                 availability of references
                 and the sponsorship of
                 original research cited in
                 pharmaceutical advertisements
Exhibit No. 21   Article titled                  212
                 "Characteristics of Materials
                 Distributed by Drug
                 Companies"
Exhibit No. 22   U.S. General Accounting         216
                 Office Document "Prescription
                 Drugs, FDA Oversight of
                 Direct-to-Consumer
                 Advertising Has Limitations"
                 dated October 2002
Exhibit No. 23   Various letters                 225
Exhibit No. 24   Field Sales Promotional         240
                 Policy 511
Exhibit No. 25   Various advertisements          260

Page 7

E X H I B I T S (Continuing)
EXHIBIT NO.   DESCRIPTION          PAGE NO.
Exhibit No. 26   Article titled "The Canadian     297
                 Consensus on Menopause and
                 Osteoporosis (Part II),
                 Chapter 6, Hormone
                 Replacement Therapy and
                 Cancer (Part 1)
Exhibit No. 27   Advertisement titled "If your    300
                 menopausal patients have new
                 questions..."
Exhibit No. 28   PubMed Article titled "Serum     316
                 estradiol-binding profiles in
                 postmenopausal women..."
Exhibit No. 29   Article titled "Hot flushes"     344
Exhibit No. 30   Special Report, Sleep, health    352
                 and aging
Exhibit No. 31   Article titled "Effects of       370
                 Estrogen Plus Progestin on
                 Risk of Fracture and Bone
                 Mineral Density
Exhibit No. 32   Document titled "Materials       411
                 Not Provided
Exhibit No. 33   Handwritten notes                427

Page 8

THE VIDEOGRAPHER: We are now on the record. My name is Ed Burke, videographer for Byers & Anderson, Court Reporters & Video. We are located at 600 University Street, Suite 2300, Seattle, Washington 98101. Our telephone number is 1 (800) 649-2034.

Today is March 27th, 2006, and the time is now 8:38 a.m. This is the videotaped deposition of Matthew Hollon, M.D., being taken on behalf of the defense in the case of In Re: Prempro Products Liability Litigation, and the MDL docket number for that is 4:03CV1507 WRW. Also in the Court of Common Pleas, Philadelphia County, In Re: Hormone Therapy Case.

This deposition is being held at the Watertown Hotel at 4242 Roosevelt Way Northeast, Seattle, Washington. And will the attorneys please introduce

Page 9

themselves for the record. We'll start on my right and work around.

MR. JENNER: My name is Robert Jenner. I represent the plaintiffs.

MS. WALLACE: Tracy Wallace, for Barr.

MR. PENTICUFF: Paul Penticuff, for Novo Nordisk.

MS. POLE: Debra Pole, for Pfizer and Pharmacia and Upjohn.

MS. HENDERSON: Shavonne Henderson, for Wyeth.

MR. CHRISTIAN: Randall Christian, for Wyeth.

THE VIDEOGRAPHER: The court reporter today is Cindy Koch. Please swear in the witness and proceed with the deposition.

- - -

MATTHEW F. HOLLON, M.D., after having been duly sworn, was examined and testified as follows:

- - -

////

3 (Pages 6 to 9)

Page 58

1  intentions about anything. If I'm asked
2  to appear in trial to present a best
3  professional opinion, I presume that I'm
4  obligated to do so, but I have no
5  particular intentions of anything along
6  those lines.
7      Q.  But no discussion with you
8  and any of the counsel for Plaintiffs
9  about testifying at trial?
10     A.  Well, I would -- with
11  respect to trying to, you know, get my
12  schedule in place, which I have to do
13  months and months out because I have all
14  these different facets to my job, I have
15  gotten a general sense about what the
16  expectations of my time would be.
17     You know, family vacation
18  in -- in the summer and things like that,
19  and so I did ask, above and beyond
20  preparing this comprehensive summary of
21  my expert opinion, what the time
22  commitments would be subsequent to that.
23  And I was alerted to the possibility that
24  there would be these upcoming trials in
25  various portions of the country at

Page 59

1  various times.
2      So I'm aware that it's a
3  possibility that I would be asked to
4  testify in the trials in Little Rock, I
5  think as you said, and in Pennsylvania,
6  but -- but I wouldn't say it's my
7  intention at this point in time.
8  Intention doesn't represent --
9      Q.  You haven't made any --
10     A.  Plane reservations?
11     Q.  -- efforts to -- yeah, or
12  marked anything off on your calendar for
13  any particular dates?
14     A.  I haven't been able to at
15  this point in time because I haven't been
16  given any specific dates. Although if
17  there are dates that I need to know
18  about, I should know about them soon
19  because it's -- like I said, juggling all
20  the different responsibilities within my
21  job, the teaching responsibilities and
22  the clinical care responsibilities and my
23  ongoing writing responsibilities, I
24  really need to know about those things
25  far in advance.

Page 60

1      Q.  Okay. So you reviewed the
2  documents we've identified so far today,
3  and written your report in this case.
4      Did you do any type of
5  specific study relating to your opinions
6  in this case?
7      A.  Again -- the answer to that
8  is yes, although it's been some time.
9      Q.  Oh, the study that's been
10  published about osteoporosis and the
11  impact of DTC?
12     A.  Yes.
13     Q.  What about with respect
14  to -- since you were retained in this
15  case and reviewed the materials that you
16  reviewed in this case, including the
17  literature and the materials produced by
18  Wyeth, have you done a specific study
19  relating to the stuff you reviewed?
20     A.  Well, my study has involved
21  the skill set that I initially learned
22  pursuing a master's in public health
23  degree, and that's a study of -- that is
24  best summarized in terms of the
25  techniques we use in evidence-based

Page 61

1  medicine, and those are question framing.
2      In this case it's more a
3  question of, How did this happen that --
4  that -- that Premarin became a $2 billion
5  a year commodity? How did this happen
6  that this prescription drug was promoted
7  to all menopausal women, when their
8  chance of realizing the benefit of the
9  prescription drug was going to be really,
10  really, really tiny, and on balance the
11  potential risks of that medication were
12  likely to outweigh that benefit.
13     Q.  Did you do any --
14     THE VIDEOGRAPHER:  One
15  second. Can we take a five-second
16  break for the tape real quick?
17  One second.
18     Going off record. The time
19  is 9:38.
20     Okay. Just give me five
21  seconds. We'll come right back
22  up. We are back on record. The
23  time is 9:38.
24     Q.  (By Mr. Christian) Did you
25  do any surveys of physicians or of

16 (Pages 58 to 61)

Page 62

1  patients relating to your work in this
2  particular case?
3      A.  Well, I -- a survey is kind
4  of a limited instrument in terms of
5  providing a --
6      Q.  I'm just asking if you did
7  it or not.
8      A.  Well, I'm trying to answer
9  your question.
10     Q.  Well, did you do a survey
11 or not, related to your opinions in this
12 case?
13     A.  Well, it's a limited
14 utility in terms of answering the
15 questions that were posed to me, and thus
16 it wouldn't be helpful in -- nor would I
17 have had time.
18         Surveys take extended
19 periods of time to craft.  You have to
20 get human subjects' approval, which can
21 take months and months and months, so it
22 would have been unrealistic for me to
23 conduct a survey related to the opinions
24 that I render in a case.
25     MR. CHRISTIAN:  Objection.

Page 63

1         Nonresponsive.
2      Q.  (By Mr. Christian)  My
3  question is, did you do a survey related
4  to your opinions in this case?
5      A.  I'll just repeat the answer
6  that I provided to you, which was --
7      Q.  I've already heard that
8  answer.  I need to know -- answer whether
9  you actually did one or not.
10     MR. JENNER:  He answered
11 the question, Counsel.
12     MR. CHRISTIAN:  No, he
13 didn't.  He said --
14     Q.  (By Mr. Christian)  Did you
15 do a survey?
16     A.  Within the -- I'll answer
17 it again.  The -- my responsibility, as
18 an expert in this case, is to look at the
19 universe of -- of available facts that I
20 have here, and use the skill set --
21     Q.  Can you answer the
22 question?  Did you do a survey in the
23 case?
24     MR. JENNER:  Objection.
25     Q.  (By Mr. Christian)  Did you

Page 64

1  do a survey?
2      MR. JENNER:  Asked and
3  answered.
4      A.  To use the skill set that I
5  have --
6      Q.  (By Mr. Christian)  I'm not
7  asking you that question.  Did you do a
8  survey?
9      A.  To use the skill set that I
10 have to --
11     Q.  Can you not answer that
12 question, Dr. Hollon?
13     MR. JENNER:  Tell you what,
14 let's start -- let's ask him a new
15 question.  We'll start all over.
16     Q.  (By Mr. Christian)  All
17 right.  It's true, is it not, Doctor,
18 that you have not conducted a survey with
19 respect to your opinions in this
20 particular case?
21     A.  I have not conducted a
22 survey.
23     Q.  Okay.  And you have not
24 conducted any focus groups with respect
25 to your opinions in this particular case,

Page 65

1  correct?
2      A.  Focus groups, again, would
3  take -- it wouldn't be useful to this
4  case.
5      MR. CHRISTIAN:  Objection.
6         Nonresponsive.
7      Q.  (By Mr. Christian)  Did you
8  do a focus group with respect to your
9  opinions in this case?  Yes or no?  Did
10 you do one?
11     A.  The answer is the same I
12 would provide.  If I thought that a focus
13 group --
14     Q.  Did you do one, Dr. Hollon?
15     A.  If I thought that a focus
16 group was going to be helpful --
17     Q.  I'm not asking you whether
18 you thought about it or not.
19     MR. CHRISTIAN:  Objection.
20         Nonresponsive.
21     Q.  (By Mr. Christian)  Did you
22 do a focus group with respect to your
23 opinions in this case?
24     MR. JENNER:  Dr. Hollon,
25 you can answer it yes or no, and

Page 66

1  then give an answer as to what you
2  did, either way.
3  A.  Okay.  So I have not
4  conducted a survey because -- I have not
5  conducted a survey and I have not
6  conducted a focus group because the tools
7  or skill set that I would need to arrive
8  at to prepare this report are
9  fundamentally different from -- or were
10  useful in a different way than -- than
11  the -- than the -- than the skill set of
12  a -- or conducting a survey or conducting
13  a focus group.
14  Didn't have time to do one,
15  and it -- and it didn't directly --
16  wasn't directly necessary to prepare my
17  professional opinion.
18  MR. CHRISTIAN:  Objection.
19  Nonresponsive, everything from
20  "because" on to the end.
21  Q.  (By Mr. Christian) You're
22  aware, Doctor, that the universe of the
23  Wyeth documents that were sent to you are
24  documents that Plaintiffs' counsel
25  selected from a bigger universe that

Page 67

1  Wyeth produced to Plaintiffs in this
2  case?  Do you understand that?
3  MR. JENNER:  Objection.
4  A.  Well, the documents that
5  were sent to me were definitely sent by
6  the plaintiffs.  I recognize that.  I
7  also was sent a hard drive that included
8  documents that weren't there, and I don't
9  know, honestly, if that represents a
10  complete universe or not.
11  It's my responsibility, as
12  a researcher and scientist, to try and
13  triangulate and to review as much as I
14  can to form an opinion so that my opinion
15  is valid.
16  And to that extent, as I
17  mentioned before, I tried my best to just
18  randomly select documents from the hard
19  drive that would -- if I could find
20  something that would serve as a counter
21  to the opinions that I form in here, I
22  looked for those documents on the hard
23  drive, and then went back to look in the
24  medical literature, as well, and in the
25  popular literature, using like LexisNexis

Page 68

1  databases or things like that.
2  And surprisingly, I wasn't
3  able to find any compelling documents
4  that would counter the opinions -- the
5  professional opinions that are presented
6  in my report.
7  MR. CHRISTIAN:  Objection.
8  Nonresponsive.
9  Q.  (By Mr. Christian)  Did you
10  ever ask the plaintiffs' counsel for
11  additional Wyeth documents, other than
12  the ones that they had sent you?
13  A.  There was one occasion.
14  Q.  Okay.  And what was that?
15  A.  The occasion was around
16  sources of money that were being used to
17  fund a study that was going to be
18  favorable to the Premarin family of
19  products.  And so I had asked about
20  whether or not there was any
21  documentation -- concrete documentation
22  of Wyeth investing in a study to their
23  favor.
24  Q.  And did you receive a
25  response from Plaintiffs' counsel?

Page 69

1  A.  Yes.
2  Q.  And is that a document that
3  they responded?
4  A.  It was a document -- if I
5  remember correctly, it was actually a
6  check, or an invoice that showed "paid"
7  or something like that, from Wyeth to the
8  investigators.
9  Q.  And is that reflected in
10  Exhibits 9 and 10?
11  A.  I don't think so because
12  that specific detail in the end did not
13  have direct -- that little piece of the
14  puzzle did not have relevance to my
15  over- -- direct relevance to my overall
16  opinions, and so I don't think I included
17  it in there.
18  I'm not actually sure where
19  it is in all of that stuff.  I wouldn't
20  have printed it out, so I'm not sure it
21  exists anymore.
22  Q.  Okay.
23  A.  Or -- it exists somewhere,
24  but I just don't have it.
25  Q.  Did you review any medical

18  (Pages 66 to 69)

Page 70

1  records of any of the plaintiffs in this
2  case?
3     A.  No.
4     Q.  Did you review any
5  depositions of any of the plaintiffs or
6  any of the doctors taken in this case?
7     A.  Of the plaintiffs or the
8  doctors.  Which doctors are you talking
9  about?  Like Dr. Sackett, or --
10    Q.  The doctors that prescribed
11 the Premarin or Prempro to the plaintiffs
12 in this case, did you review any of those
13 depositions?
14    A.  No, I did not.
15    Q.  Did you review any
16 summaries of information regarding the
17 plaintiffs in this case, the specific
18 plaintiffs?
19    A.  No.  But I don't think that
20 affects my ability to judge the overall
21 impact of marketing or drug promotion of
22 the Premarin family on prescribing --
23    MR. JENNER:  Wait for the
24 next question.
25    MR. CHRISTIAN:  Objection.

Page 71

1     Nonresponsive from everything
2  starting with "but."
3     Q.  (By Mr. Christian) We've
4  marked as your report Exhibit No. 4,
5  correct?
6     A.  Yes.
7     Q.  And you prepared this
8  report?
9     A.  I did, yes.
10    Q.  And did you send a draft of
11 it to Mr. Jenner or any other Plaintiffs'
12 counsel before it was completed?
13    MR. JENNER:  Objection.
14 Asked and answered.
15    A.  As mentioned, oh, I don't
16 know actually if we -- I did send drafts.
17    Q.  (By Mr. Christian) Okay.
18 And did you receive any edits or comments
19 by Plaintiffs' counsel regarding your
20 draft report?
21    A.  They weren't edits about
22 content.  I was more -- I solicited
23 Mr. Jenner's opinions about structure,
24 but nothing specific about the content in
25 the report.  And by "structure," I mean

Page 72

1  organizational structure, and then topic
2  areas that were topic areas that needed
3  to be covered.
4     Q.  And does Exhibit 4 fairly
5  and accurately summarize your opinions
6  you intend to offer at trials in this
7  case?
8     MR. JENNER:  Objection.
9     A.  To the extent that I've
10 been able to review documents available
11 to me, it reflects my best professional
12 opinion or best -- yeah, best
13 professional opinion about the facts of
14 Wyeth's overpromotion of Premarin family
15 of products.
16    Q.  (By Mr. Christian) And did
17 you review all the references that are
18 contained in the report?
19    A.  Yes.
20    Q.  Do you strive to be
21 accurate in your characterization of
22 those references?
23    A.  Of course.
24    Q.  You weren't trying to put
25 your spin on any of the documents that

Page 73

1  you referred to, were you?
2     A.  No.  That's not my
3  responsibility.  My responsibility in --
4  as a physician, as a teacher, as a
5  researcher, is to be as accurate as
6  humanly possible.
7     Is there a possibility that
8  there are -- I know of one, where there's
9  actually something that -- that's listed
10 without a reference number in it in
11 there, and now I can't remember where it
12 is off the top of my head, but there may
13 be like a missed reference or something.
14    Q.  Did you only try to pull
15 things out of the references that
16 supported the plaintiffs' case?
17    MR. JENNER:  Objection.
18    A.  Oh, absolutely not.  As I
19 said to you before, I was skeptical -- I
20 was concerned about that --
21    Q.  (By Mr. Christian) That's --
22 you've answered my question, Doctor.
23    A.  Okay.
24    Q.  And do you -- I guess
25 you've revised and proofread Exhibit 4?

Page 102

1  teaching evidence-based medicine,
2  although certainly the trend in the
3  country is to teach these skills to
4  students as well as residents, and there
5  is a program at the University of
6  Washington.
7      Q.  On your -- your Web site
8  kind of breaks down the steps in
9  practicing evidence-based medicine, and
10 it says first that, convert the need for
11 information into an answerable question.
12     Does that sound accurate?
13     A.  Correct.
14     Q.  And then to track down the
15 best evidence for its validity, impact,
16 and applicability.
17     Does that sound accurate?
18     A.  Uh-huh.
19     Q.  Is that a yes?
20     A.  Sorry.  Yes.
21     Q.  And then it -- the next
22 step is to critically appraise the
23 evidence for its validity, impact, and
24 applicability.
25     A.  And that's often the most

Page 103

1  challenging part.  So for a lot of the
2  residents, we teach a simple set of rules
3  that aren't as comprehensive as the
4  skills that we learn in the school of
5  public health, as an example.
6      Q.  And are your residents at
7  University of Washington medical school
8  able to -- to learn how to correctly
9  appraise the evidence for its validity,
10 impact, and applicability?
11     A.  Say again?
12     MR. JENNER:  Objection.
13     Q.  (By Mr. Christian)  Are you
14 able to teach that to the residents?
15     A.  Say that again?
16     Q.  Are you able to teach your
17 residents to critically appraise the
18 evidence for its validity, impact, and
19 applicability to the patient?
20     A.  Of course.
21     Q.  That's one of the steps,
22 and that's what you're teaching the
23 students, right?
24     A.  Yes.  Correct.  And they're
25 not students, they're residents.  And we

Page 104

1  teach -- that's exactly what we teach
2  them, and we work together closely to
3  acquire those skills as -- as best as
4  they can in the time allotted.
5      I mean, residents are
6  really busy.  You know probably that
7  they, you know, have enormous clinical
8  responsibilities, and generally have
9  80-hour workweeks, and so this is
10 sandwiched into a small portion of their
11 overall training program.
12     Q.  Then the last step that you
13 list is, integrate the evidence with
14 clinical expertise and your patient's
15 characteristics and values.
16     Does that sound accurate?
17     A.  Sure.  If a patient, for
18 instance, refuses -- well, let's leave it
19 at that.
20     Q.  Okay.
21     A.  That's accurate.
22     Q.  And the patient's
23 characteristics are defined as the unique
24 preference, concerns, and expectations
25 each patient brings to a clinical

Page 105

1  encounter?
2      Does that sound accurate?
3      A.  Yeah.  Yeah.  What's
4  amazing now, in nowadays -- these days is
5  to think about all of the --
6      Q.  I was just asking if that's
7  accurate.
8      A.  Yeah.  It's great to think
9  about all of the various things that
10 influence.  That's partly, like, why I
11 initially got involved in this topic as a
12 fellow, is to stop and -- for a moment
13 and recognize, especially --
14     Q.  Doctor, I'm sorry.  We have
15 a limited time period today--
16     A.  No, no, no.  This is
17 important.
18     Q.  You're just telling me your
19 personal feelings about why --
20     A.  No, this is professional.
21 Actually, I'm sorry, this isn't personal.
22 This is --
23     Q.  But I didn't ask you that
24 question.  I only have a limited amount
25 of time today, and we have 500 references

Page 106

1 to go through, and so I need you to
2 answer the question I ask you.
3        MR. JENNER:  Just wait for
4    the next question, Dr. Hollon.
5    Q.  (By Mr. Christian)  Now,
6 only a doctor can integrate their
7 clinical expertise with the patient
8 characteristics; is that correct?
9        MR. JENNER:  Objection.
10    A.  Can you rephrase that
11 question?
12    Q.  (By Mr. Christian)  Sure.
13 A pharmaceutical company cannot be
14 involved with the patient
15 characteristics, their preferences,
16 concerns, and expectations; is that
17 correct?
18        MR. JENNER:  Objection.
19    A.  That's not correct.
20    Q.  (By Mr. Christian)  Of a
21 particular patient that comes in to see a
22 doctor.
23    A.  I think that's -- what
24 you're -- the way you're stating that is
25 inaccurate.  Actually, the pharmaceutical

Page 107

1 industry has a substantial influence in
2 this day and age, not only on healthcare
3 providers, but they have substantial
4 influence, as is evidenced by the -- all
5 of the documents that I have provided in
6 my report.
7        They have substantial
8 influence on beliefs and values and
9 choices that the patient provider team
10 makes together.
11    Q.  Okay.  Do you have any
12 evidence that Wyeth knows the unique
13 preference, concerns, or expectations of
14 any particular patient that's come in and
15 asked for Premarin or Prempro?
16        MR. JENNER:  Objection.
17    A.  Can you rephrase that
18 question, please?
19    Q.  (By Mr. Christian)  Do you
20 have any evidence that Wyeth knows unique
21 preferences, concerns, or expectations of
22 a particular patient that's asked for
23 Premarin and Prempro, to a doctor?
24        MR. JENNER:  Objection.
25    A.  I have a wealth of evidence

Page 108

1 that says that Wyeth sought to influence
2 those preferences.
3    Q.  (By Mr. Christian)  I'm
4 asking you --
5        MR. CHRISTIAN:  Nonresponsive --
6    objection.  Nonresponsive.
7    Q.  (By Mr. Christian)  I'm
8 asking you whether you have any
9 experience for a particular patient?
10        MR. JENNER:  Objection.
11    Asked and answered.
12    A.  I don't have evidence for a
13 particular patient, but what we would say
14 is --
15    Q.  (By Mr. Christian)  Okay.
16        MR. JENNER:  Let him finish
17    his answer.
18    A.  -- comprehensively, looking
19 at the big picture of this, is that
20 Premarin family became a $2 billion a
21 year commodity, and it's reasonable --
22 it's reasonable for all of us to stop and
23 say, Gosh, how did that happen?  And what
24 unequivocally --
25    Q.  (By Mr. Christian)  Doctor,

Page 109

1 you understand I have --
2        MR. JENNER:  Whoa, whoa,
3    whoa, whoa.
4    Q.  (By Mr. Christian)  -- the
5 ability to ask questions and ask about
6 your opinions today, right?
7    A.  And in -- my --
8    Q.  And you've mentioned this
9 $2 billion a year about ten times today.
10    A.  Uh-huh.
11    Q.  Okay.  Are you going to
12 allow me the opportunity to ask you
13 specific questions, and will you answer --
14 give me the courtesy of answering my
15 particular questions?
16        MR. JENNER:  Okay.
17    Objection.  Hold on.  Wait, wait,
18    wait.  He's doing his best --
19    first time deponent, to answer
20    your question the best he can.
21    Why don't you ask your next
22    question, and the doctor will do
23    his best to answer.
24    Q.  (By Mr. Christian)  The
25 basics of evidence-based medicines, you

Page 126

1   This is the end of Tape No. 1.
2   (Recess.)
3   THE VIDEOGRAPHER: We are
4   back on record. The time is
5   10:52. This is the beginning of
6   Tape No. 2.
7   Q.   (By Mr. Christian) Doctor,
8   are you ready to proceed?
9   A.   Yeah, I'm ready.
10   Q.   Do you know how many
11   meta-analyses were published in the 1990s
12   showing a cardiovascular benefit for
13   women taking hormone therapy?
14   MR. JENNER: Objection.
15   A.   The shortcomings of those
16   meta-analyses that I think you're
17   referring to --
18   Q.   (By Mr. Christian) Do you
19   know how many? That's my question, is,
20   do you know how many?
21   A.   Well, off the top of my
22   head, without going back and looking, I
23   don't have a sense of how many. But the
24   shortcomings of all of those
25   meta-analyses is that they were based on

Page 127

1   observational evidence, which we clearly
2   know has limitations and ought to be
3   recognized in the context of our
4   practices.
5   Q.   And you're not an
6   epidemiologist, are you, Doctor?
7   A.   I'm trained in the skills
8   of epidemiology, and I use those skills
9   that I've been trained in to be an expert
10   in evidence-based medicine.
11   I'm a -- my -- I have a
12   breadth of expertise across a range of
13   areas that include marketing, or the
14   promotion of prescription drugs, the
15   clinical practice related to osteoporosis
16   and osteoporosis prevention, and then
17   issues of population prevention of
18   conditions.
19   Q.   Do you have any particular
20   critiques of the meta-analyses that were
21   published in the 1990s showing a
22   cardiovascular benefit of women taking
23   hormone therapy?
24   MR. JENNER: Objection.
25   A.   Which meta-analyses are you

Page 128

1   referring to?
2   Q.   (By Mr. Christian) Well,
3   you haven't identified that you even know
4   what they are, so --
5   MR. JENNER: No, objection.
6   That wasn't the question.
7   A.   That's not true. You asked
8   me how many meta-analyses there were. I
9   can't explain to you how many meta -- I
10   can't tell you how many meta-analyses --
11   Q.   (By Mr. Christian) You
12   don't know?
13   A.   Huh?
14   Q.   You don't know?
15   A.   There were meta-analyses
16   done. It's not a --
17   Q.   You don't know how many,
18   though, right?
19   A.   I don't know how many. I
20   can tell you that there were
21   meta-analyses that were done that were
22   based on observational evidence that has
23   significant limitations, that were
24   eventually demonstrated by subsequent
25   large-scale, randomized control trials

Page 129

1   evaluating cardiovascular benefit.
2   Q.   Do you know how many
3   practice guidelines were available in the
4   1990s revealing a cardiovascular benefit
5   to women taking hormone therapy?
6   A.   Practice guidelines don't
7   reveal anything.
8   Q.   Okay. Do you know how many
9   practice guidelines existed in the 1990s
10   discussing cardiovascular benefit of
11   women taking hormone therapy?
12   MR. JENNER: Objection.
13   A.   I'm sure there were
14   several.
15   Q.   (By Mr. Christian) Did you
16   go back and look at any of those?
17   MR. JENNER: Dr. Hollon,
18   give me the opportunity to object,
19   and then you can answer the
20   question.
21   THE WITNESS: Oh, okay.
22   MR. JENNER: Objection.
23   Go ahead.
24   Q.   (By Mr. Christian) Did you
25   go back and look at any of those

33 (Pages 126 to 129)

Page 130

1  guidelines from the 1990s before offering
2  your opinions in this case?
3      MR. JENNER: Objection.
4      A.   I don't recall specifically
5  looking at clinical practice guidelines
6  because, as I said before, clinic -- or
7  tried to say before to you, the clinical
8  practice guidelines generally tend to
9  fall low on the evidence-based medicine
10 period -- pyramid.
11     They're not necessarily
12 considered best standards of evidence.
13 They can be a -- if they're done right,
14 they can be considered reasonable
15 standards of evidence, but they're not
16 the highest standard of evidence, like a
17 randomized control trial.
18     Q.   (By Mr. Christian) They
19 are in the group that's considered best
20 evidence for evidence-based medicine?
21     A.   They're --
22     MR. JENNER:  Objection.
23     THE WITNESS:  Excuse me.
24     MR. JENNER:  Go ahead.
25     A.   They are considered a

Page 131

1  potential source, depending on who does
2  them, how they're conducted.  There are
3  evidence-based clinical practice
4  guidelines, and there are some -- also --
5  you're lumping clinical practice
6  guidelines into this one big category.
7      And there are certain
8  organizations that conduct evidence-based
9  clinical practice guideline summaries,
10 and there are some that do not tend to
11 use the techniques of evidence-based
12 medicine to generate their clinical
13 practice guidelines.
14     And those guidelines are
15 oftentimes influenced by, you know,
16 other -- other sources of information
17 than simply best medical literature.
18     Q.   (By Mr. Christian) Can you
19 identify any guideline today that's been
20 influenced by other sources of
21 information for us?
22     A.   Well, I --
23     MR. JENNER: Objection.
24     THE WITNESS: Excuse me.
25     A.   Do you have a guideline

Page 132

1  that I could review for you?
2      Q.   (By Mr. Christian) I'm
3  just asking if -- if y'all -- as you sit
4  there today, can you name some guidelines
5  that did not use evidence-based medicine,
6  or the best evidence to support their
7  guidelines?
8      MR. JENNER: Objection.
9      A.   I can't name any
10 specifically for you. But you -- if you
11 want to provide me one -- with one, I'd
12 be happy to look at it.
13     Q.   (By Mr. Christian) You
14 didn't go back and do that for purposes
15 of this case, did you?
16     A.   Look at clinical practice
17 guidelines?
18     Q.   Right.
19     A.   I did not look at clinical
20 practice guidelines because, by and
21 large, they don't represent the highest
22 level of evidence.
23     Q.   Did you go and look at the
24 National Guideline Clearinghouse to see
25 if they had any information about hormone

Page 133

1  therapy use?
2      A.   Well, the National
3  Guideline Clearinghouse is just that.
4  It's a clearinghouse for guidelines of
5  all different flavors, and some of those
6  would be evidence-based guidelines and
7  others would be guidelines that don't use
8  the most rigorous methods of
9  evidence-based practice to generate their
10 guidelines.
11     So a clearinghouse is a
12 good starting place for trying to find
13 guidelines, but it doesn't necessarily
14 tell you whether or not the guideline
15 that you're looking at is -- really
16 represents the highest level of medical
17 evidence.
18     MR. CHRISTIAN: Objection.
19 Nonresponsive.
20     Q.   (By Mr. Christian) Did you
21 go look at the Cochran database of
22 systematic reviews to see what it had to
23 say about hormone therapy?
24     A.   I've looked at Cochran a
25 lot. I use Cochran frequently.  Did I

34  (Pages 130 to 133)

Page 146

1  condition of osteoporosis, as the FDA has
2  said, is undertreated?
3      MR. JENNER: Objection.
4      A.  I would agree with that,
5  that historically the condition of
6  osteoporosis, so that is the small
7  percent of women who have T scores of
8  minus 2.5 or greater or an established
9  fracture that we -- as a healthcare
10  society, we're not adequately identifying
11  those women and treating those women, but
12  that's changed -- when was that statement
13  made by the FDA?
14      Q.  (By Mr. Christian) It was
15  made in 2004.
16      A.  Yeah.  And so that's -- you
17  know, I think that that is changing, and
18  is probably changing as a consequence of
19  that -- in part, the FDA's statement, but
20  a lot of the other factors are
21  influencing how we address the public
22  health problem of osteoporosis, which
23  is --
24      Q.  So when you say it's
25  changing, it's becoming less undertreated

Page 147

1  since 2004?
2      A.  Yeah.
3      Q.  Okay.
4      A.  I think it's being less
5  under -- I don't even think since 2004,
6  the last -- really the last five year --
7  five to ten years the condition of
8  osteoporosis has become less
9  undertreated.
10      Q.  Now then, your second
11  factor, with respect to the doctors who
12  prescribed hormone therapy to the
13  plaintiffs in this case, you cannot say
14  whether or not that prescription was
15  inappropriately stimulated by promotional
16  efforts, can you?
17      MR. JENNER: Objection to
18      the form.
19      A.  I'm sorry.  Rephrase the
20  question.
21      Q.  (By Mr. Christian) With
22  respect to factor number two, you are
23  unable to say in this case whether or not
24  any particular plaintiff in this case
25  inappropriately was prescribed hormone

Page 148

1  therapy which was stimulated by
2  promotional efforts?
3      MR. JENNER: Objection.
4      A.  Actually, I think what we
5  can say is that the sum of the
6  promotional efforts by Wyeth clearly and
7  unequivocally influenced prescribing
8  practices in this country.
9      Q.  (By Mr. Christian) I
10  understand that that's your opinion
11  generally, that it had some influence.
12      A.  Uh-huh.
13      Q.  But with the particular
14  plaintiffs in this case, you cannot say a
15  single one of those plaintiffs in this
16  case was inappropriately prescribed
17  hormone therapy due to stimulation by
18  promotional efforts on behalf of Wyeth,
19  can you?
20      MR. JENNER: Objection.
21      A.  Well, I haven't met them.
22      Q.  (By Mr. Christian) Okay.
23  So you can't say that, right?
24      MR. JENNER: Objection.
25      A.  I can't say yes or no.

Page 149

1      Q.  (By Mr. Christian) Okay.
2  So you can't --
3      A.  I'm not given adequate
4  information at this point to answer your
5  question.
6      Q.  With the information that
7  you have now, you cannot say that any
8  plaintiff in this case was
9  inappropriately prescribed hormone
10  therapy, based upon promotional
11  activities?
12      MR. JENNER: Objection.
13      A.  I can, I think, with
14  certainty, based on looking at the
15  magnitude of promotional efforts that
16  were put in to getting all women on
17  hormone supplementation, women who had
18  very low risk of ever suffering the
19  consequences of osteoporosis, given the
20  magnitude of promotion, and the fact that
21  by, what, 2001 there were nearly a
22  billion prescriptions of -- in the
23  Premarin family that had been written,
24  that it's more likely than not that there
25  are physicians and patients out there who

Page 150

1  were un- -- in- -- unduly influenced by
2  the promotional efforts that subsequently
3  led to this harm.
4        MR. CHRISTIAN: Objection.
5  Nonresponsive.
6    Q.   (By Mr. Christian)
7  Identify a single plaintiff in this case
8  who was inappropriately prescribed
9  hormone therapy which was stimulated by
10 Wyeth promotional efforts.
11   A.   I haven't --
12       MR. JENNER: Objection.
13       THE WITNESS: I'm sorry.
14   A.   I haven't been given the
15 name of the plaintiffs.
16   Q.   (By Mr. Christian) So you
17 cannot do that?
18       MR. JENNER: Objection.
19   A.   Again, I cannot either do
20 it or not do it. All I can comment on is
21 the extent to which the promotional
22 efforts of -- of Wyeth influenced the
23 prescribing practices, the decisions that
24 patients and physicians made together,
25 about whether or not somebody would get

Page 151

1  what ultimately proved to be a
2  carcinogenic substance.
3    Q.   (By Mr. Christian) You
4  have not reviewed any information about
5  the plaintiffs in this case; is that
6  correct?
7    A.   That's correct.
8    Q.   Okay. You don't know why
9  any single plaintiff in this case took
10 hormone therapy, correct? You don't know
11 the reason why they took it?
12   A.   I don't know the reason why
13 a plaintiff took hormone therapy in this
14 case.
15   Q.   You don't know a reason why
16 any of the plaintiffs in this case went
17 to the doctor and was prescribed hormone
18 therapy, do you?
19   A.   I haven't had -- I can't --
20 again, I don't have the information to
21 answer that question, nor is it really --
22 would I at this point, I guess,
23 consider -- my responsibility is to use
24 my expertise on -- on marketing
25 promotion, on osteoporosis, and on public

Page 152

1  health prevention, which is something
2  that I practice day in and day out. I
3  have discussions about, how can I keep
4  you healthy? How can we keep you vital?
5        I rely on those expertise
6  to look at this information and -- and
7  come to the conclusion that the
8  comprehensive promotional efforts of
9  Wyeth, these integrated marketing
10 tactics, through all these different
11 channels, are beyond a reasonable doubt
12 to have had influence on prescribing --
13   Q.   Doctor --
14       MR. JENNER: Just let him
15 finish his answer.
16   A.   -- on prescribing practices
17 in this country.
18       MR. JENNER: Let him finish
19 his answer.
20   Q.   (By Mr. Christian) You've
21 been repeating the same thing over and
22 over.
23       MR. JENNER: Because you
24 ask him the question over and over
25 again.

Page 153

1    Q.   (By Mr. Christian) I
2  understand that you have opinions in this
3  case, and you're going to have ample
4  opportunity to give those opinions, if
5  the Court allows it.
6        But I'm entitled to ask a
7  question in this case and get an answer
8  to it.
9    A.   Uh-huh.
10   Q.   And the fact is, you don't
11 know whether any of the plaintiffs in
12 this case, what promotional materials
13 they may or may not have seen, do you?
14       MR. JENNER: Objection.
15   Q.   (By Mr. Christian) In this
16 case, you don't know?
17       MR. JENNER: Objection.
18   A.   I haven't been provided
19 with that information.
20   Q.   (By Mr. Christian) Okay.
21 Well, that's -- I'm just asking the
22 question --
23   A.   So I can't render an
24 opinion.
25   Q.   So you can say no, I don't

Page 154

1  know, right?
2      A.  So I --
3      Q.  I'm not asking for an
4  opinion. I'm asking whether or not you
5  know what promotional pieces, if any, any
6  of the plaintiffs in this case saw.
7      A.  Well, beyond a reasonable
8  doubt I can tell you that given the scope
9  of the marketing program, that most --
10     Q.  Doctor, we have a limited
11 time today, and you know the question --
12. the answer is, you don't know whether any
13 plaintiff in this case, what piece -- any
14 promotional piece that they saw?
15         MR. CHRISTIAN: All right.
16 Hold on. Stop.
17     Q.  (By Mr. Christian) You
18 don't know the answer to that question.
19         MR. JENNER: Stop, stop,
20 stop. We're not going to lose our
21 temper. We're not going to yell
22 at each other. We're going to ask
23 questions. I'm going to object or
24 not object. He's told you what
25 he's reviewed, what he's not

Page 155

1  reviewed. He's given his answer.
2  Ask your next question.
3      Q.  (By Mr. Christian) You
4  can't say what any plaintiff in this case
5  saw with respect to Wyeth promotional
6  pieces?
7          MR. JENNER: Objection.
8  Asked and answered.
9      A.  I can say that based on the
10 scope of the promotional efforts, that
11 more likely than not, okay, for the women
12 in this country, the impact of Wyeth's
13 promotional efforts through all of the
14 various channels that they used, direct-
15 to-physician advertising --
16     Q.  (By Mr. Christian) Let's
17 put it this way --
18         MR. JENNER: Let him
19 finish, please.
20         (Unintelligible crosstalk.)
21         THE COURT REPORTER: I'm
22 sorry; I need for everybody to
23 speak one at a time because we're
24 just getting crosstalk.
25     Q.  (By Mr. Christian) Let me

Page 156

1  go about it this way.
2          MR. JENNER: He's asked --
3  you've asked him six times whether
4  he's seen the medical records.
5  He's said he hasn't. So I don't
6  know what else you're going to ask
7  him. He's given his answer.
8      Q.  (By Mr. Christian) That
9  answer about whether or not what a
10 particular plaintiff saw in this case
11 with respect to promotional materials is
12 something that could be answered by
13 reviewing the depositions of the
14 plaintiffs in this case, correct?
15         MR. JENNER: Objection.
16     A.  It could possibly be
17 answered. Although a lot of times the
18 interesting thing about promotion is that
19 you may not be able to recall all of the
20 things that have influenced you in making
21 a decision about how you prescribe or
22 pursue a specific health issue.
23         So it may be that they --
24 that they were influenced by something,
25 but they don't specific -- they aren't

Page 157

1  specifically able to identify what that
2  thing was, so it could possibly help.
3      Q.  (By Mr. Christian) You
4  don't know the reasons why any of the
5  prescribing physicians in this doctor --
6  in this case prescribed hormone therapy
7  to the plaintiffs in this case, right?
8          MR. JENNER: Objection.
9      A.  Well, again, what I would
10 say there is that what I can -- the only
11 thing -- the only way I can answer that
12 is to say that based on the intensive
13 effort of Wyeth's promotional campaign,
14 that the decisions that physicians and
15 patients made together were unduly
16 influenced by what was an irresponsible
17 campaign that advocated population
18 prevention, okay, a population prevention
19 strategy for women at exceedingly low
20 risk of ever developing the consequences
21 or suffering the consequences of
22 osteoporosis.
23     Q.  (By Mr. Christian) Tell
24 the jury what promotional material
25 Ms. Reeves saw.

Page 158

1      MR. JENNER: Objection.
2      A.   I'm not sure that --
3   where -- which jury?
4      Q.   (By Mr. Christian) The
5   jury that may ultimately see this tape.
6      A.   I don't -- I mean, there's
7   no jury here.
8      Q.   I know, but this tape can
9   be played at trial. Did you -- were you
10  aware of that?
11     MR. JENNER: Objection.
12     A.   I'm -- again, I -- you
13  know, have -- I'm not, I guess, aware of
14  that.
15     Q.   (By Mr. Christian) Well,
16  just so you're aware, to the extent it's
17  admissible, this videotape may be used at
18  a trial in this case.
19     A.   Uh-huh.
20     Q.   So the jury may be watching
21  this.
22     A.   Uh-huh.
23     Q.   And I want you to tell the
24  jury what promotional piece Mrs. Reeves
25  saw?

Page 159

1      MR. JENNER: Objection.
2      A.   I can't tell you what
3   promotional piece Mrs. Reeves saw, but it
4   doesn't --
5      Q.   (By Mr. Christian) Can you
6   tell us --
7      A.   -- I think that doesn't
8   change the fact that what we know, or the
9   facts in this case reveal was that the --
10  given the extent of the promotional
11  campaign, that it certainly had undue
12  influence on prescribing practices within
13  this country.
14     MR. CHRISTIAN: Objection.
15  Nonresponsive, starting with the
16  word "but."
17     Q.   (By Mr. Christian) Tell
18  the jury what promotional material
19  Mrs. Rush saw.
20     MR. JENNER: Objection.
21     A.   Well, again, I can't do
22  that without having reviewed Mrs. Rush's
23  deposition, and then I would still have
24  concerns about whether or not she was
25  able to recall the specific influences

Page 160

1   that led her to make the decision they
2   did.
3      What we know is that
4   Wyeth's influences were pervasive and
5   really sought to be channeled through a
6   comprehensive set of mark- -- or
7   channeled through a comprehensive set of
8   marketing avenues, basically.
9      MR. CHRISTIAN: Objection.
10  Nonresponsive starting with the
11  word "but."
12     Q.   (By Mr. Christian) What
13  promotional material did Dr. Caldwell
14  see?
15     MR. JENNER: Objection.
16     A.   Who's Dr. Caldwell?
17     Q.   (By Mr. Christian) You
18  don't know who Dr. Caldwell is?
19     A.   (Witness shakes head.)
20     Q.   He's one of the physicians
21  that prescribed hormone therapy in this
22  case.
23     A.   Uh-huh.
24     MR. JENNER: Objection.
25     Q.   (By Mr. Christian) Can you

Page 161

1   tell us what promotional material
2   Dr. Caldwell saw?
3      MR. JENNER: Objection.
4      A.   Well, I can't tell you
5   specifically what Dr. Caldwell saw, but
6   based on the nature of the -- of Wyeth's
7   marketing campaign that's outlined in my
8   report here, I'd say beyond a reasonable
9   doubt physicians in this country were
10  unduly influenced by a -- by a
11  promotional campaign that went through a
12  host of different channels.
13     And what's interesting is
14  that physicians, unfortunately, are
15  notorious at denying the influence of
16  promotional material in their prescribing
17  practices.
18     So if you stood outside of
19  a hospital and said, Today in your
20  practice, is the person who walked --
21  every doctor comes and walks in, and you
22  say, Are you going to be -- you know,
23  does -- does the -- having seen a drug
24  rep for am- -- for Norvasc or amlodipine
25  influence your prescription of writing

Page 162

1 the prescription for Norvasc, doctors
2 will always say no.
3      But when you go back and
4 look at the primary literature, it's
5 clear that the increasing number of
6 interactions between healthcare providers
7 or physicians and the pharmaceutical
8 industry unduly influence its prescribing
9 habits, and did so in this case -- in the
10 case -- in the case of hormone
11 supplementation that we're looking at
12 here.
13      MR. CHRISTIAN: Objection.
14 Nonresponsive, everything after
15 the word "but."
16      Q.   (By Mr. Christian) How was
17 Dr. Caldwell unduly influenced in this
18 case?
19      MR. JENNER: Objection.
20      A.   Well, I've never met
21 Dr. Caldwell, so all I can speak to is
22 the channels, or the -- the -- the
23 factors that led to a promotional scheme
24 that said all women should be on hormone
25 supplementation, and all women should

Page 163

1 continue it for indefinite periods of
2 time, and they should start it as soon as
3 they begin menopause.
4      And my concern with that is
5 that that's a -- what's called a
6 population prevention strategy. Okay?
7 And when you're talking about -- when
8 you're talking about prescribing a
9 medication --
10      Q.   Doctor, I'm sorry, I --
11 we've got so much to cover here today.
12      A.   Uh-huh.
13      Q.   All I asked you is, what
14 ads or promotional material did
15 Dr. Frazier see, and you obviously don't
16 know the answer to that question.
17      A.   Caldwell, I thought you
18 asked.
19      Q.   No, I've moved on to
20 Dr. Frazier now.
21      A.   Okay. Uh-huh.
22      Q.   And I really -- you think
23 it's fair for Wyeth to be able to come in
24 and ask you specific questions and get
25 answers to those questions?

Page 164

1      MR. JENNER: Objection.
2 You don't need to answer
3 that.
4      Go on and ask your next
5 question.
6      Q.   (By Mr. Christian) You
7 think that's fair?
8      MR. JENNER: Objection. Go
9 ahead, ask your next substantive
10 question about his opinions. You
11 don't have to talk to him about
12 legal procedures.
13      Go ahead.
14      MR. CHRISTIAN: I'm just
15 talking about fairness.
16      MR. JENNER: All right.
17 Don't answer the question. Wait
18 until your next question.
19      Q.   (By Mr. Christian) Now
20 then, you also have your third factor is
21 looking at the harm accruing to
22 overtreated patients -- I'm sorry, the
23 degree of harm accruing to undertreated
24 compared with overtreated patients.
25      Now then, do you agree that

Page 165

1 the risk of long-term use of estrogen or
2 hormone therapy are small?
3      A.   One moment. Okay?
4      MR. JENNER: Objection.
5      A.   It's actually -- just give
6 me one second here. What I want to --
7 yes, the answer to your question is,
8 small risks are -- can be really, really
9 important.
10      Q.   (By Mr. Christian) Okay.
11 So you agree that the risks are small,
12 but may be important?
13      MR. JENNER: Objection.
14      Q.   (By Mr. Christian) Is
15 that --
16      A.   The risks are important
17 to -- the risk is not small to the person
18 who develops breast cancer. That risk is
19 real.
20      The measured estimates of
21 risk overall are not tremendous, but
22 they're important, especially when you
23 look at the balance sheet of risks and
24 benefits.
25      Q.   Let's go back and look at

Page 166

1    Exhibit No. 14.
2        A.   Which one is Exhibit 14?
3        Q.   It's the 1999.  Do you have
4    that?
5        A.   Yeah.
6        Q.   Exhibit 14?
7        A.   All of my notes here are
8    kind of messed up.  I'm going to pause
9    for a moment, if that's okay.
10           THE WITNESS:  Rob, is it
11   appropriate to ask you to put
12   these back --
13           MR. JENNER:  I can do it.
14           THE WITNESS:  -- in page
15   order?  Because I've got my pages
16   mixed up.
17           MR. JENNER:  Sure.
18       A.   Okay.  I'm ready.  Sorry
19   about that.
20       Q.   (By Mr. Christian)
21   Exhibit 14 in front of you, and this, as
22   you characterized yourself, was an
23   opinion piece, right?
24           MR. JENNER:  Objection.
25       A.   As I characterized earlier

Page 167

1    today, this is a piece that has opinions
2    within it that are formed on the basis of
3    an assessment of the available, but
4    limited literature on the potential
5    impact of direct-to-consumer marketing of
6    prescription drugs.
7        Q.   (By Mr. Christian)  Well,
8    Doctor, if you look at Exhibit No. 11,
9    it's another editorial that you wrote.
10   You say that you published -- you and
11   Dr. -- and Mr. Holmer published paired
12   opinion pieces.  That's what you wrote
13   about your 1999 article.
14       A.   So maybe we should -- maybe
15   we can clarify that, that -- and say that
16   maybe what exactly I should have wrote is
17   that we published paired pieces which
18   contained opinions.
19       Q.   Oh, okay.  That's what you
20   should have written there?
21       A.   Well, perhaps it more
22   accurately reflects.  But I mean, it's
23   also reasonable to summarize that because
24   this piece has opinions in it, it's an
25   opinion piece.  But it also contains what

Page 168

1    you're ignoring then, is you're ignoring
2    the comprehensive --
3        Q.   Well, I'm not ignoring --
4            MR. JENNER:  Let him finish
5    his answer, please.
6        A.   You're ignoring all of the
7    energy and work that I did into compiling
8    all of the available evidence on
9    direct-to-consumer marketing at that
10   time, which was a huge stack that
11   represented a tremendous amount of work
12   and skills -- expert skills to summarize.
13       Q.   (By Mr. Christian)  You
14   wrote Exhibit 11, correct?
15       A.   Yes.  I wrote this one, as
16   well.
17       Q.   Exhibit 14, going back to
18   your 1999 article, you did not have much
19   evidence to substantiate your arguments
20   back then, did you?
21           MR. JENNER:  Objection.
22       A.   There -- I -- what do you
23   mean by "much"?
24       Q.   (By Mr. Christian)  Well,
25   that's what you wrote.

Page 169

1        A.   Uh-huh.
2        Q.   What did you mean when you
3    wrote that you didn't have much evidence
4    to substantiate your argument?
5            MR. JENNER:  Objection.
6        A.   What I meant -- that's a
7    good question.  What I meant at that
8    point in time is that we didn't have any
9    kind of reasonable -- because direct-to-
10   consumer marketing was relatively new, we
11   didn't have -- not that this couldn't
12   conceivably be done, but we didn't have
13   like a large randomized trial.
14           So the professional
15   opinions that I eventually render in the
16   1999 article are based on what evidence I
17   could gather.  Some of that evidence
18   looked at direct-to-physician advertising
19   and the potential impacts and content of
20   direct-to-physician advertising, and then
21   there was some limited data, including
22   some data on stuff that wasn't in peer
23   reviews on the potential impact of
24   direct-to-consumer marketing, like the
25   Consumer Reports publication.

43 (Pages 166 to 169)

Page 170

1   Q.   Is that something you'd go
2   back and revise now, your statement that
3   you did not have much evidence to
4   substantiate your arguments?
5        MR. JENNER: Objection.
6   A.   I'm sorry. Say that again.
7   Q.   (By Mr. Christian) You're
8   the one that wrote that -- your 1999
9   article, you did not have much evidence
10  to substantiate your arguments?
11  A.   You're referring to what's
12  written in this one?
13  Q.   Right. Would that be
14  something you'd want to revise today,
15  to --
16       MR. JENNER: Objection.
17  Q.   (By Mr. Christian) -- change
18  that language?
19  A.   Change it to what?
20  A.   You're the one that seems
21  to --
22  A.   Oh, I'm sorry.
23  Q.   -- unfairly characterize --
24  A.   That was a rhetorical
25  question. I'm sorry. I was thinking

Page 171

1   about -- the -- would I revise that
2   statement? No. I would think that there
3   was -- at -- back in 19 -- so -- well, by
4   the time something gets published, you
5   know, oftentimes there's like -- I mean,
6   I think, you know, like about a six-month
7   delay between the initial writing of
8   this, so -- and then the literature, you
9   know, published up to that point in time
10  only takes us up to like 1997 maybe.
11       So up to that point, there
12  wasn't a tremendous amount of information
13  that allows you to make an estimate of
14  the -- of DTC.
15  Q.   Let's look at
16  Exhibit No. 12 that you authored, which
17  is the 2004 article from CNS Drugs, and
18  what section was this published in?
19  A.   This is published in the
20  current opinion section.
21  Q.   Okay. So this is --
22  A.   And this was a solicited
23  thing, so CNS Drugs said, Hey, look,
24  here's somebody who's written about --
25  knows the literature of the impact of

Page 172

1   direct-to-consumer marketing really,
2   really well, and we're specifically
3   interested in what would be the impact
4   related to neuropsychopharmacologic
5   substances, and let's have this person
6   comment on -- on the basis of his expert
7   knowledge of the literature on the
8   potential impact related to those kinds
9   of medications specifically.
10  Q.   They wanted you to express
11  your current opinion, right?
12       MR. JENNER: Objection.
13  A.   They wanted me to express
14  my -- the state of knowledge, okay, about
15  the impact of pharmaceutical marketing,
16  and then they asked me to make -- render
17  opinions about the nature of that impact.
18  Q.   (By Mr. Christian) Okay.
19  A.   Professional opinions based
20  on the cumulative evidence.
21  Q.   Okay. Cumulative evidence
22  up to that time of 2004, right?
23  A.   Yeah.
24  Q.   Okay.
25  A.   Well, you know, as I

Page 173

1   mentioned a minute ago, with -- given the
2   delays in tasks of writing, publication --
3   you know, the things -- times it takes to
4   get things to publication so, you know,
5   you've got to --
6   Q.   According to the best of
7   your ability and available knowledge?
8   A.   Yeah.
9   Q.   Turn to Page 71 of
10  Exhibit No. 12.
11  A.   We're on 12 now?
12  Q.   Yes.
13  A.   Uh-huh.
14  Q.   And if you look on the
15  right-hand column and go down to the last
16  full paragraph. Are you with me there?
17  A.   Uh-huh.
18  Q.   And you asked the same
19  question that we're talking about in your
20  report. Are there compelling data to
21  suggest whether, on balance, DTC
22  marketing leads to the right patients
23  getting the right treatments at the right
24  cost, or the wrong patients getting the
25  wrong treatments at the wrong cost.

Page 182

1  Q.   And -- I'm trying to see --
2  and what you say on Page 23 of your
3  report, Exhibit 4 -- do you have that?
4      A.   Hold on a second.  Page 23.
5  Q.   You see the paragraph
6  starting with "The Kravitz study"?
7      A.   Uh-huh.
8  Q.   You said it was a cleverly
9  designed randomized control study that
10  reveals the impact of this marketing
11  strategy; is that correct?
12      A.   Yes.
13  Q.   Okay.  And even though
14  Kravitz undertook this cleverly designed
15  randomized control study, he was -- the
16  study could not determine the extent to
17  which patient behavior is appropriately
18  or inappropriately influenced by
19  direct-to-consumer advertising; isn't
20  that correct?
21      A.   This study specifically
22  couldn't.
23  Q.   Okay.
24      A.   But we can use the sum of
25  available evidence on -- on prescriptions

Page 183

1  dispensed, and physician prescribing
2  behavior.
3          We can look at a host of
4  other different studies to make our best
5  professional judgment about the impact of
6  direct-to-consumer marketing on patient
7  behavior.  So --
8  Q.   Okay.  So what happened
9  with Kravitz is, he did this study to
10  look at the impact of marketing strategy
11  on a particular type of medication.
12      A.   Well, again, so he looked
13  at -- so what Kravitz did was, they --
14  Q.   Antidepressant medication,
15  right?
16      A.   -- examined what happens
17  when physicians in primary care clinical
18  settings are presented with specific
19  requests for drug therapy.
20          Some of those requests
21  were, you know, just general requests,
22  and some of the requests were requests
23  for a specific drug based upon DTC, and
24  some of the requests were just for help.
25  Q.   Okay.  And even though --

Page 184

1      A.   And they were role-
2  played -- it was all -- you know, it --
3  Q.   I know.
4      A.   Yeah.
5  Q.   He undertook the study, and
6  he was unable to answer that question to
7  the extent to which patient behavior is
8  appropriately or inappropriately
9  influenced by direct-to-consumer
10  advertising?
11      A.   The study wasn't designed
12  to look at differential activation.  And
13  so to look at the extent to which
14  differential activation actually occurs,
15  we have to go out to other sources of
16  available literature to render opinions
17  about the impact.
18  Q.   Doctor, I didn't think I
19  was going to have to be fighting with you
20  about what you've written in your report.
21  If you look at Page 23 --
22      A.   Uh-huh.
23  Q.   -- you say that,
24  Unfortunately -- of your report, right
25  here.

Page 185

1      A.   Uh-huh.
2  Q.   -- the extent to which
3  patient behavior is appropriately or
4  inappropriately influenced by
5  direct-to-consumer advertising could not
6  be determined from this study.
7      A.   Uh-huh.  That's what I just
8  said to you.
9  Q.   Yeah.  Okay.
10      A.   That's the exact same thing
11  I just said to you.
12  Q.   Now, you have not
13  undertaken a study like Dr. Kravitz has
14  done to look at whether or not you could
15  see with respect to promotional
16  activities of Wyeth whether or not it
17  appropriately or inappropriately
18  influenced patient behavior?
19      A.   I have used other skills in
20  my expertise to evaluate the extent of
21  differential activation.
22  Q.   But you have not undertaken
23  a study like Dr. Kravitz did --
24      A.   Well, I --
25  Q.   -- with respect to hormone

Page 186

1 therapy?
2    A.   Huh?
3    Q.   You --
4    A.   I have not undertaken a
5 randomized control trial, but a
6 randomized control trial is only one form
7 of science.
8    Q.   Okay. And you haven't done
9 that form of science, correct?
10    A.   I have not done
11 specifically that form of science..
12 It's --
13    Q.   And subsequent --
14    A.   But it's not necessarily
15 the way you would get at answering
16 questions of differential activation,
17 so . . .
18         MR. JENNER: Counsel, we --
19 whenever you're ready for a break,
20 whenever you're at a good stopping
21 point.
22         MR. CHRISTIAN: I'm almost
23 there.
24         MR. JENNER: Okay.
25    Q.   (By Mr. Christian) Going

Page 187

1 back to Exhibit 11, 2005.
2    A.   Okay. I'm ready. What
3 page did you turn to?
4    Q.   Turn to 2032. What you say
5 in 2005, starting right there, that --
6 you ask the question, Do the benefits of
7 direct-to-consumer advertising outweigh
8 the danger that consumers will demand and
9 use medicines inappropriately? On
10 balance, you say, the answer appears
11 equivocal, and it awaits further
12 research, correct?
13    A.   Uh-huh.
14    Q.   Is that a yes?
15    A.   I'm sorry. Yes.
16    Q.   Okay. And there's been --
17    A.   But again --
18    Q.   -- no research on this
19 issue that's come out since April of
20 2005?
21    A.   This refers specifically
22 to -- on balance it refers to the general
23 impact of direct-to-consumer marketing on
24 our healthcare system.
25         So on balance, we don't

Page 188

1 know if the answer is, in sum, it's good
2 for the populations health, or, in sum,
3 if it's poor -- if it negatively impacts.
4         In specific circumstances,
5 we can use the rules that I've outlined
6 here in my report before to evaluate
7 specific circumstances, such as hormone
8 supplementation, to evaluate whether or
9 not on balance it's healthful or harmful.
10         So that's the -- that's the
11 answer. But looking at -- if you're
12 trying to get a big picture perspective,
13 we really don't have -- as I said in
14 the -- in the -- we don't have a -- we
15 really lack a comprehensive framework
16 that organizes these diverse health
17 outcomes, behavioral, economic, health
18 policy, business models that can be
19 applied to DTC marketing research, so we
20 don't have that big picture tool yet.
21         MR. CHRISTIAN: Objection.
22 Nonresponsive.
23    Q.   (By Mr. Christian) My
24 question is, in April 2005, when you say
25 the answer appears equivocal and awaits

Page 189

1 further research, has there been any
2 research that you can point to since
3 April of 2005 which would help answer the
4 question, do the benefits of
5 direct-to-consumer advertising outweigh
6 the danger that consumers will demand and
7 use medicines inappropriately?
8    A.   I stay really current on
9 this research, obviously, because it's --
10 you know, it's relevant to all of the
11 academic work that I do on it, and the
12 answer is that there is not further
13 research that summarizes in gen- -- in a
14 broad sense the impact of
15 direct-to-consumer marketing on health --
16 on the health of the American people.
17         But it doesn't preclude us
18 looking at specific cases like hormone
19 supplementation and the impact of Wyeth's
20 promotional activities.
21    Q.   Has there been further
22 research which has looked and been
23 published about Wyeth's specific
24 promotional materials since April of
25 2005?

48  (Pages 186 to 189)

Page 190

1    A.   Not that I'm aware of, but
2   there -- not -- not peer-reviewed
3   publications of that.
4        MR. CHRISTIAN:  All right.
5   Let's take a break.
6        THE VIDEOGRAPHER:  Going
7   off record.  The time is 11:48.
8        (Recess.)
9        THE VIDEOGRAPHER:  We are
10  back on record.  The time is
11  11:59.
12       Q.   (By Mr. Christian)  Dr. Hollon,
13  in critiquing Wyeth's promotional efforts
14  with respect to hormone therapy, you
15  characterized that promotional effort
16  throughout your report, which is
17  Exhibit 4, that it was -- included
18  overzealous marketing schemes.  Is
19  that --
20       A.   Let me say -- I would
21  say -- if the question was phrased in
22  evaluating Wyeth's marketing, then I
23  would say that -- that -- one moment.  I
24  would say specifically like comments from
25  the 1992 brochure state --

Page 191

1        Q.   I am just asking you about
2   what your opinions are.
3        A.   Yes, sir.  Yeah.
4        Q.   I'm just --
5        A.   My professional opinion is
6   that, based on comments from 1992 on a
7   representative brochure that implored
8   patients, So please, when you begin
9   Premarin, stay with it to get all the
10  long-term benefits it has to offer.  Take
11  an active role.  Doesn't lack -- don't
12  let lack of estrogen rob you of a healthy
13  productive future you deserve, is
14  overzealous.
15       Q.   And you also think the
16  promotional campaign was overly
17  aggressive, correct?
18       A.   Can you --
19       Q.   Well, I mean, do you have
20  that opinion?  I just --
21       A.   Not specifically do I use
22  that phrase.
23       Q.   Is that your opinion?
24       A.   Well, what's my opinion is
25  in my report.

Page 192

1        Q.   Right.  And so if it says
2   that Wyeth's efforts at marketing was
3   overly aggressive, then that's -- you'd
4   agree with that?
5        MR. JENNER:  Objection.
6        A.   Well, we'd have to go and
7   look and see what's -- if it's in my
8   report.
9        Q.   (By Mr. Christian)  You
10  can't answer that question without
11  looking at your report, why you think
12  Wyeth's promotion of hormone therapy was
13  overly aggressive?
14       MR. JENNER:  Objection.
15       A.   I would like to see where
16  in my report I phrased it exactly like
17  that.
18       Q.   (By Mr. Christian)  So you
19  can't answer that question, just sitting
20  there?
21       MR. JENNER:  Objection.
22       A.   It's not a question of can
23  or can't, I guess.  I -- what I want to
24  do is, I want to see it in the -- where I
25  used that phrase specifically in the

Page 193

1   context of my overall document.
2        Q.   (By Mr. Christian)  I
3   understand you want to do that.  I want
4   to know if you can answer that question
5   just the way it's phrased.
6        A.   I guess I would --
7        MR. JENNER:  Do your best
8   to answer the question straight
9   up.
10       A.   Yeah, I would answer
11  that -- that they -- you know, that it
12  was aggressive in the sense that they
13  utilized aggressive integrated marketing
14  tactics that targeted physicians and
15  patients together, such that physicians
16  ultimately prescribed hormone
17  supplementation in the face of patient
18  requests.
19       Q.   (By Mr. Christian)  So do
20  you agree it was overly aggressive?
21  That's what your opinion is?
22       A.   I think that that's safe to
23  say it that way.
24       Q.   You cite from a document
25  the language about a crusade more than a

Page 230

1    MR. JENNER: Let him finish
2  his answer, please.
3    A.   Again, I'm not a FDA
4  expert, so when they lay down this
5  initial -- when they send this initial
6  letter, the extent to which that should
7  subsequently influence, but the fact is
8  that there were no studies done -- I can
9  confidently tell you -- between 1991 and
10  2000, there were no studies done that
11  documented that the hormone -- the
12  Premarin family of hormone
13  supplementation improved vitality in
14  women.
15    Q.   (By Mr. Christian) You've seen
16  no correspondence between the FDA and
17  Wyeth regarding the Lauren Hutton
18  vitality campaign, correct?
19    MR. JENNER: Objection.
20    A.   Not that I can recall.
21    Q.   (By Mr. Christian) Okay.
22  You next cite another letter, in 1991,
23  from the FDA to Wyeth, correct, regarding
24  the Seasons magazine?
25    A.   Later -- are we talking

Page 231

1  later in February 1991, the FDA --
2    Q.   Right.
3    A.   -- also took exceptions
4  with respect to promotions of Season
5  magazine.
6    Q.   And do you know why Wyeth
7  submitted the Seasons magazine to the FDA
8  before it was put into use?
9    A.   Again, you know, I've never
10  worked for the FDA, so -- but my
11  recollection was that they actually did,
12  but I can't be certain of that.
13    Q.   Okay. And did Wyeth make
14  the changes requested by the FDA with
15  respect to Seasons magazine?
16    A.   I think I remember seeing a
17  letter that, at that point in time, they
18  acknowledged these changes, or they
19  acknowledged this -- they acknowledged
20  the FDA requests, and they subsequently
21  made some changes, but disputed others,
22  but again, I -- I can't recall
23  specifically.
24    Q.   And do you know whether or
25  not the FDA then accepted those changes

Page 232

1  and approved the Seasons magazine with
2  those changes?
3    A.   Well, at that point in
4  time, I can't recall specifically, but it
5  does lay out that they shouldn't be
6  promoting -- I mean, the beauty of --
7  excuse me. The value of this initial FDA
8  letter says that discussions about
9  moodiness and cardiovascular prevention
10  are -- are -- fall outside of FDA
11  expectations.
12    And that what we do know
13  then, from looking at Wyeth documents, is
14  that in subsequent years the promotion
15  of -- by Wyeth of cardiovascular benefits
16  of the Premarin family of drugs continued
17  unabated.
18    MR. CHRISTIAN: Objection.
19  Nonresponsive.
20    Q.   (By Mr. Christian) Out of
21  all of these letters that you cite, six
22  different letters from the FDA, do you
23  have any idea whether or not Wyeth
24  responded to those letters, and that any
25  deficiencies seen by the FDA according to

Page 233

1  their regulations were later corrected?
2    MR. JENNER: Objection.
3    A.   I have some sense that
4  Wyeth responded to these letters and
5  often would make short-term changes, but
6  then return to the unabated strategy of
7  promoting cardiovascular benefits despite
8  being admonished not to do so.
9    But again, not being a
10  regulatory expert and not having worked
11  within the FDA, I can't comment on the
12  full scope of communication. My
13  expertise lies more in the impact of
14  marketing of prescription drugs and
15  public health prevention and
16  osteoporosis.
17    Q.   (By Mr. Christian) Let's
18  look at Page 35 of your report. And
19  Footnote 179, you talk about a -- DDMAC
20  responding to Wyeth's requests for a
21  meeting to discuss lipid claims; is that
22  correct?
23    A.   The DDM -- excuse me.
24  DDMAC noted that Wyeth had failed to
25  address new information available, and

Page 254

1  could tell, they never followed through
2  with those regulatory -- that regulatory
3  effort because they were concerned that
4  it would limit their ability to promote
5  cardiovascular benefit.
6        It's clear then,
7  subsequently, from the citizen petition
8  on behalf of Wyeth, that they don't feel
9  that restraint in submitting that
10  petition.
11       Q.   Do you know how many
12  complaints to the FDA about competitor
13  promotion of hormone therapy products
14  that Wyeth made before the WHI study?
15       A.   Well, I couldn't speak to
16  exactly how many complaints they made
17  about competitor therapy, but it -- you
18  know, there's definitely evidence that
19  they exhibited some level of restraint.
20       Q.   Just based upon that one
21  document that you've referred to?
22       A.   That's some level of
23  restraint.
24       Q.   You don't know how many
25  they sent to the FDA before WHI versus

Page 255

1  how many they've sent after the WHI, do
2  you?
3        A.   What I would say is that,
4  while I'm unaware of how many exactly
5  they have or they haven't set -- sent, it
6  would really depend on the details of
7  those actions for me to make any
8  particular comment on their relevance, or
9  how they influence the overall picture.
10       Q.   Do you know what bio-identical
11  hormone replacement therapy is?
12       A.   I'm not an expert in
13  alternative medicine therapies, and I
14  know of them in the context as a
15  practicing clinician.
16       Q.   And so that is considered --
17  bio-identical replacement hormone therapy
18  is considered an alternative therapy?
19       A.   To the best of my
20  understanding, it's considered an
21  alternative therapy, although they have
22  physiologic -- well, I guess most
23  alternative therapies have physiologic
24  actions. These ones are thought -- or
25  believed to mimic more intensely

Page 256

1  physiology of -- of estrogens.
2        Q.   Do you know whether the
3  Food and Drug Administration has approved
4  a safe and effective bio-identical
5  hormone replacement?
6        A.   I'm unaware of whether or
7  not the Food and Drug Administration has
8  approved a safe bio-identical.  My
9  suspicion, if I -- on the basis of my
10  clinical expertise, I would presume that
11  they have not.
12       Q.   You would be correct.
13       So what allegations did
14  Wyeth make in that complaint to the FDA
15  about bio-identical hormone replacement?
16       A.   Well, let's pull up the
17  document.
18       Q.   Okay.
19       A.   I -- off the top of my
20  head -- we could go over it.  I think --
21  I think the bulk of them, if I remember
22  correctly, were around cardiovascular
23  concerns, but it was far-reaching.
24       It might have been -- the
25  document might have been like 55 pages

Page 257

1  long or something like that.  So without
2  us pulling out the document and going
3  through it, you know, I'm not speaking as
4  confidently as I would like.
5        Q.   Okay.  Do you know whether
6  or not compounding pharmacies that were
7  selling and promoting bio-identical
8  hormone replacement were following good
9  manufacturing practices set forth by the
10  FDA?
11       A.   I can't comment.
12       Q.   All right, sir.  The --
13  you've referred to several advertisements
14  relating to hormone therapy put out by
15  Wyeth in your report; is that correct?
16       A.   That's correct.
17       Q.   Okay.
18       A.   Several, I think, is a
19  reasonable summary.  More than several.
20       Q.   And do you know which of
21  those ads appeared to be, you know,
22  finished ads that were actually run, or
23  finished promotional pieces that were
24  used?
25       A.   I reviewed -- sometimes it

65 (Pages 254 to 257)

Page 258

1   was hard to distinguish between what were
2   finished and unfinished, but I have -- I
3   did have a catalog or binder of ads that
4   were taken, for example, as -- the
5   example of direct-to-consumer marketing,
6   a binder of ads taken directly out of
7   print magazines, as well as reviewing
8   television advertisements, as well as
9   reviewing promotional material that
10  direct -- was directed at healthcare
11  providers.
12      Q.   Ads that you're criticizing
13  regarding Wyeth's promotional practices
14  are referenced in Exhibit No. 4, your
15  report, correct?
16      A.   Which ones are you
17  referring to specifically, or what page?
18      Q.   Well, are -- is that what
19  you did in writing your report, in giving
20  your summary of your opinions in this
21  case, and --
22      A.   Is what what I did?
23      Q.   Did you identify the Wyeth
24  ads that you're criticizing?
25      A.   Well, I think the bulk of

Page 259

1   my evaluation and summary opinion about
2   Wyeth comes from the overarching
3   intentions of their marketing campaign
4   that were revealed subsequently in
5   certain advertisements.
6           And so I -- when I came
7   across advertisements that were
8   consistent with the overarching intention
9   to make sure that all menopausal women,
10  regardless of their chance of fracture,
11  hip fracture, ended up on a carcinogenic
12  substance, I -- when I found these
13  advertisements that reflected that
14  policy, exaggerating or -- let me
15  rephrase that -- misleading women about
16  their chance of dying from hip fracture,
17  I would hold on -- you know, I would use
18  those as an advertisement that represents
19  the policy delineated in marketing
20  documents that Wyeth produced.
21      Q.   Okay.  Since it would
22  probably take you a while to pull all of
23  those out of your report, I've done that
24  for you ahead of time.
25      A.   Are you done with this for

Page 260

1   now?
2       Q.   Yes.
3           (Exhibit No. 25 marked for
4           identification.)
5       Q.   (By Mr. Christian)  And I'm
6   marking as Exhibit No. 25 the advertisements
7   referenced in your report that appear to
8   be final ads that may have been run in
9   the United States or elsewhere.
10          Would that seem to --
11      A.   Yes.
12      Q.   -- be a fair presentation
13  of those ads, as far as --
14      A.   I think that "seem" is a --
15  would be an accurate reflection.  Whether
16  it represents the entire -- all of the
17  advertisements, I can't say off the top
18  of -- or off my -- off the cuff.
19      Q.   And did you take these
20  advertisements in Exhibit 25 and do a
21  systematic review of them to determine if
22  they were in compliance with the Food and
23  Drug Administration regulations?
24      A.   You'll need to explain to
25  me what you mean by "systematic review."

Page 261

1   Systematic review has a very specific
2   meaning, at least in a -- in a clinical
3   context --
4       Q.   Okay.
5       A.   -- when we talk about --
6   primarily relating to evidence-based
7   medicine and the techniques used to
8   evaluate medical literature.
9           We wouldn't typically do
10  systematic reviews on advertisements, so
11  I think that we have a bit of a
12  miscommunication around --
13      Q.   Did you do any kind of
14  review of the ads in Exhibit 25 to
15  determine if they comply with Food and
16  Drug Administration regulations regarding
17  direct-to-consumer advertising?
18      A.   I am familiar with the
19  regulations and reasonable standards of
20  care based on my expertise in promotion
21  of pharmaceutical agents to patient and
22  physicians, and I evaluated these
23  advertisements on the basis of that
24  expertise.
25      Q.   I understand that.  My

Page 270

1   misleading statements.  And so I'm not
2   going to say for the record that there's
3   absolutely no untrue statements in this
4   stack.
5        Q.   (By Mr. Christian) That's
6   fine.  That's all I'm asking.
7            Now, you took your
8   background and experience and reviewed
9   these ads in Exhibit No. 25, and read
10  through them, right?
11       A.   Correct.
12       Q.   Okay.  Do you know whether
13  or not the Food and Drug Administration
14  reviewed the ads in Exhibit 25 to see if
15  they were false and misleading or not?
16       MR. JENNER: Objection.
17       A.   I can't speak for the FDA.
18       Q.   (By Mr. Christian) Okay.
19  Do you know which ads in Exhibit 25 that
20  any of the plaintiffs in this case saw?
21       MR. JENNER: Objection.
22       A.   I know that there are
23  statistics that Wyeth speaks to about the
24  frequency or the anticipated frequency
25  with which the population of women in

Page 271

1   this country would see certain campaigns.
2   They're -- studied this
3   issue intensively, and so they would say
4   there -- we could go through here and
5   figure it out.  But just off the top of
6   my head, they would say, Well, I can
7   promise you that six -- you know, the
8   average woman in the country will see
9   this advertisement six times in the next
10  three months.
11       Q.   (By Mr. Christian) That
12  doesn't mean that every woman in the
13  country saw the ad in the next six
14  months, correct?
15       A.   But on a probabilistic
16  basis, when we're talking about several
17  million women taking this -- you know,
18  what eventually proved to be a
19  carcinogenic -- carcinogenic substance,
20  there is a probability beyond a
21  reasonable doubt that women were
22  influenced or healthcare providers --
23  we're talking about promotion in
24  general -- were influenced by these
25  advertisements.

Page 272

1        Q.   Identify for the jury the
2   ads in Exhibit 25 that Linda Reeves saw.
3        MR. JENNER: Objection.
4        A.   I haven't spoken with
5   Ms. Reeves.
6        Q.   (By Mr. Christian) Can you
7   identify for the jury the ads in
8   Exhibit 25 that Helene Rush saw?
9        MR. JENNER: Objection.
10       A.   Once again, I can't -- I've
11  never spoken with Ms. Reeves, although I
12  can say that, on a more probable than not
13  basis, there -- given the extent of the
14  marketing campaign and the intensity of
15  the promotional efforts by Wyeth, that
16  the women and healthcare providers in
17  this country were unduly influenced by a
18  campaign that sought to make sure that
19  all women, all menopausal women, were
20  placed on hormone supplementation.
21       Q.   (By Mr. Christian) Doctor,
22  is it your testimony in front of the jury
23  in this case that you can't tell the jury
24  a single advertisement in Exhibit No. 25
25  that any of the plaintiffs in this case

Page 273

1   saw?  Can you say that?
2        MR. JENNER: Objection.
3        A.   All I can say is that, on a
4   more probable than not basis, this
5   marketing campaign, of which there are
6   some representative advertisements, but
7   this doesn't reflect the world of
8   possible advertisements, on a more
9   probable than not basis, that these
10  advertisements impacted the decisions
11  that patients and providers made
12  together.
13       Q.   (By Mr. Christian) You say
14  it impacted the plaintiffs in this case?
15       MR. JENNER: Objection.
16       A.   It impacted the decision
17  that millions of patients and providers
18  in this country made together.  Now,
19  whether or not those people are amongst
20  the -- you know, whether that million or
21  two million --
22       Q.   (By Mr. Christian) You
23  don't know?
24       A.   -- is -- specifically
25  includes the plaintiffs in this case, I'm

Page 274

1  not sure anybody could speak to. Because
2  the other concern here is that a lot of
3  times people can't specifically identify
4  the sources of -- predominant sources of
5  the -- of influence, and particularly for
6  healthcare providers, there's a lot of --
7  of -- of -- of -- of sources of
8  information out there that were
9  cultivated by Wyeth that doesn't clearly
10 identify that the source of the
11 promotional information was from Wyeth.
12     Q.  Just as you say a plaintiff
13 may not be able to specifically identify
14 what promotional items persuaded them,
15 the same goes for you; you can't say
16 which promotional item persuaded any
17 plaintiff or not persuaded any plaintiff
18 in this case, correct?
19     MR. JENNER:  Objection.
20     A.  I'm sorry.  Say that again.
21     Q.  (By Mr. Christian) You
22 were saying that a plaintiff may not be
23 able to specifically identify promotional
24 piece that they saw.  Neither can you.
25 That applies to you, too.  You cannot

Page 275

1  identify a specific promotional piece
2  that any of the plaintiffs in this case
3  saw?
4      A.  What I can say, though,
5  beyond a reasonable doubt, is that the
6  cumulative effects of the promotional
7  campaign by Wyeth unequivocally
8  influenced decisions about who was placed
9  on Prempro and for how long.
10     And I mean, the flip side
11 of the way to look at this -- the flip
12 side of the way to look at this is to
13 say, Let's just take the entire
14 promotional campaign away and ask
15 ourselves to pause -- to think for a
16 moment, would there have been nearly one
17 billion prescriptions from the Premarin
18 family written up to 2001?
19     And I think we sit --
20 personally -- I mean, excuse me,
21 professionally, beyond a reasonable
22 doubt -- professionally, beyond a
23 reasonable doubt, those pre--- one
24 billion prescriptions would not have been
25 written.

Page 276

1      MR. CHRISTIAN:  Objection.
2  Nonresponsive.
3      Q.  (By Mr. Christian)  When I
4  asked you a question about what you can't
5  say, you answered it -- you go on with
6  what you can say.  I know what you can
7  say.
8      Can you answer my question
9  about that you can't say which particular
10 ad any of the plaintiffs in this case
11 saw, a particular ad?
12     MR. JENNER:  Objection.
13 Asked and answered.
14     A.  I'm trying to give you the
15 best answer that I possibly can.
16     Q.  (By Mr. Christian)  Okay.
17 And the best answer might be that you
18 can't say that.
19     MR. JENNER:  Objection.
20 Asked and answered.
21     A.  No, the best answer that I
22 can give to that is that what I can do,
23 based on my expertise in pharmaceutical
24 promotion, my understanding of population
25 prevention and osteoporosis is that the

Page 277

1  sum of this campaign under duly
2  influenced prescribing decisions in this
3  country and led to millions of women, on
4  a more probable not -- than not basis,
5  some of which, you know, on a -- on just
6  a chance basis, were likely to include
7  the plaintiffs and their prescribing
8  providers.
9      Q.  (By Mr. Christian)  I
10 understand that you're saying it's more
11 likely than not they would have saw
12 these, but you cannot say definitely --
13     A.  I can say more likely than
14 not.
15     Q.  I understand that.  But you
16 can't identify definitely an ad that they
17 saw?
18     A.  With 100 percent
19 assuredness?
20     Q.  Right.  Right.
21     A.  I can't say that for
22 100 percent assuredness.
23     Q.  Okay.  Thank you.
24     The first ad in Exhibit 25,
25 what magazine did this run in?

Page 278

1    A.   I'm uncertain.
2    Q.   Do you know what time
3  period this ad ran?
4    A.   Do you know where it's
5  referenced in my report?  We could
6  probably -- we could work backwards that
7  way.
8    Q.   Exhibit 202.
9    A.   So that's Footnote 202?
10   Q.   Right.
11   A.   So representative
12  advertisements from 19 -- this is 1970,
13  although -- so I would guess that this is
14  from on or around the 1970s.
15   Q.   Do you know when in 1970?
16   A.   I don't know when.
17   Q.   Do you know what journal it
18  ran in?
19   A.   No, I can't speak to that
20  specifically.  I'd have to go back and
21  look at all my notes about how I identify
22  that this came from on or around the
23  1970s, so I can't recall specifically how
24  I was able to.
25       A lot of the times the

Page 279

1  documents didn't have specific dates, so
2  there were a variety of ways that I would
3  either look at reference lists to try and
4  get an accurate representation of the
5  approximate date because I didn't want to
6  get it out of sequence to misrepresent
7  the nature of the campaign.
8    Q.   Okay.  I'm going to
9  sub-mark these 25 -- Exhibit 25 into
10  letters so that the record will be clear.
11  The first one we were just talking about
12  is 25-A.
13   A.   Uh-huh.
14   Q.   I'll just go ahead and mark
15  all of these.
16   A.   Okay.
17   Q.   Back to 25-A real quickly.
18  Which plaintiff in this case, or which
19  prescribing physician in this case saw
20  Exhibit 25-A?
21       MR. JENNER:  Objection.
22   A.   Again, I would wonder
23  whether the prescribing physician in the
24  case would even be able, or would even
25  willingly identify an advertisement that

Page 280

1  had influence on their practice.
2    Q.   (By Mr. Christian)  So the
3  answer is, you can't identify one of the
4  prescribing physicians in this case that
5  saw Exhibit 25-A, can you?
6       MR. JENNER:  Objection.
7       Asked and answered.
8    A.   Ask me again.
9    Q.   (By Mr. Christian)  So your
10  answer is that you can't identify a
11  prescribing physician in this case that
12  saw Exhibit 25-A?
13   A.   No.  But again, given the
14  extent of the campaign, on a more
15  probable than not basis, there were lots
16  of physicians that did see these
17  advertisements.
18       MR. CHRISTIAN:  Objection.
19       Nonresponsive, everything starting
20       with the word "but."
21   Q.   (By Mr. Christian)  Okay.
22  Let's look at Exhibit 25-B.  Do you know
23  what magazine or journal Exhibit 25-B ran
24  in?
25   A.   No.  I can't tell you that.

Page 281

1    Q.   Okay.  Do you know whether
2  this ad ever ran at all?
3    A.   This looks unfamiliar to
4  me.  Do you know where it's cited in the
5  report?  I'd like to see it in a context.
6    Q.   It's at Footnote 205.
7    A.   Oh, undated.  205.  Well,
8  there -- this one makes a statement
9  about -- I'm uncertain whether this
10  advertisement ever ran at all.  I use
11  this mostly to illustrate not, per se,
12  advertisements, but that Wyeth was
13  advancing a concept of a menopause -- of
14  menopause as a disease by equating it
15  with insulin deficiency disease of Type I
16  diabetes, which is horribly erroneous to
17  make that -- to make that equation.
18       And they were doing this --
19  they were trying to set up this paradigm
20  that they intended to utilize in all of
21  their marketing over the ensuing decades
22  around the idea that this estrogen
23  deficiency -- that there was this
24  estrogen deficiency state disease.
25       MR. CHRISTIAN:  Objection.

Page 282

1      Nonresponsive to everything
2   after "I'm not sure this is an ad
3   that ever even ran."
4      Q.   (By Mr. Christian) I know
5   you haven't ever given a deposition
6   before; is that right? We established
7   that?
8      A.   We established that.
9      Q.   Okay. Did anyone give you
10  any instructions about how to answer
11  questions for a deposition?
12     MR. JENNER: Objection.
13     A.   Not specifically.
14     Q.   (By Mr. Christian) Did
15  anyone tell you to not answer the
16  questions that are being asked?
17     MR. JENNER: Objection.
18     A.   No. In fact, I was
19  actually told that the purpose of the
20  deposition was for me to -- for -- for
21  Counsel to ask questions, and for me to
22  answer the questions.
23     Q.   (By Mr. Christian) Okay.
24  Did you review Pages 1 to 5, and any
25  pages that came after 6 in Exhibit 25-B?

Page 283

1   Do you see that's marked Page 6 down
2   there at the bottom left-hand corner?
3      A.   Do you have those pages
4   available for me to review? Without
5   looking at them, I can't recall if I saw
6   them.
7      Q.   I don't have them with me,
8   but this is all that's cited in your
9   report, so I don't know if you just
10  picked this page out or --
11     A.   If it was buried within
12  the -- if it was buried within a series
13  of documents, I probably saw the ones
14  before and after.
15     Q.   Okay. All right. Let's
16  look at 25-C. I guess you can tell us
17  where this ad ran?
18     A.   Contemporary OB/GYN.
19     Q.   And do you know whether any
20  prescribing physicians in this case saw
21  Exhibit 25-C?
22     MR. JENNER: Objection.
23     A.   I'd answer that by saying
24  that I don't know specifically if any
25  prescribing physicians, but on a more

Page 284

1   likely than not basis, it was probable
2   that some physicians that were involved
3   in the -- in the litigation would have
4   seen these ads, given -- or some version
5   of these ads.
6      I don't know about this
7   specific ad, but would have seen some --
8   or would have been exposed to the
9   marketing influence of Wyeth's promotional
10  materials.
11     Q.   (By Mr. Christian) Exhibit 25-D.
12  Do you know where this promotional piece
13  ran?
14     A.   I don't know where this
15  promotional piece ran.
16     Q.   Do you know what time
17  period this piece was used?
18     A.   Can you give me the point
19  at which it occurs in my report?
20     MR. JENNER: 207.
21     A.   I would estimate in the --
22  in the mid-1970s.
23     Q.   (By Mr. Christian) And you
24  cannot say whether or not any prescriber
25  or plaintiff in this case actually saw

Page 285

1   Exhibit 25-D, can you?
2      MR. JENNER: Objection.
3      A.   Not this specific
4   advertisement.
5      Q.   (By Mr. Christian)
6   Exhibit 25-E is Footnote 220 in your
7   report?
8      A.   I mean, my report is
9   organized chronologically, so with
10  respect to the dates of all of these that
11  they were either developed and/or ran,
12  it's -- basically the approximate date
13  could be determined from the report.
14     Q.   Okay. You say that this
15  ran in 1987, in your report; is that
16  correct?
17     A.   It's copyrighted 1987
18  Ayerst Laboratories.
19     Q.   Okay. But you don't know
20  if it ran in 1987 or some other time, do
21  you?
22     A.   Well, I'm -- I can't speak
23  specifically to at what point the
24  advertisement was used.
25     Q.   Okay. And can you say

Page 286

1  whether any prescribing physician in this
2  case, or any plaintiff in this case
3  specifically saw Exhibit 25-E?
4      MR. JENNER: Objection.
5      A. We have now this growing
6  body of advertisements that we're going
7  through, and on a more probable than not
8  basis, some of the people involved
9  probably saw something along these lines,
10 but I can't say specifically about that
11 one there.
12     MR. CHRISTIAN: Okay.
13 Objection. Nonresponsive, except
14 for "can't say specifically except
15 [sic] for that one there."
16     Q. (By Mr. Christian) Exhibit 25-F,
17 this is Footnote 234 in your report.
18     Do you know where
19 Exhibit 25-F was used?
20     A. Promotion strategies that
21 prey on patients' fears is inappropriate
22 marketing and violates the standard of
23 care because it lacks proper balance.
24     Q. Okay. I'm not asking you
25 to read your report.

Page 287

1      A. I'm sorry. I'm just trying
2  to -- that helps me --
3      Q. I know, but you don't need
4  to read your report out loud. You can
5  just tell me where this ad ran.
6      A. Okay. I'm sorry. End of
7  the decade, concludes that a physician
8  can now -- I mean, it's an interesting
9  misleading statement, but I can't tell
10 you where it ran at all.
11     Q. Okay. Or what time period?
12     A. Well, again, using -- as
13 I've elaborated before, I was able, to
14 the best of my abilities, either by using
15 a copyright date or triangulating against
16 the hard drive and looking if there
17 are -- I don't know if there are page --
18 you know, if this is the complete
19 document, it would -- based on the
20 report, it's likely to have been produced
21 and/or used at the end of the 1980s.
22     Q. Okay. And you cannot say,
23 with respect to any specific prescribing
24 physician in this case or any plaintiff,
25 whether they saw Exhibit 25-F?

Page 288

1      MR. JENNER: Objection.
2      A. Well, not this specific
3  advertisement, again, but they were
4  likely to have been influenced by the now
5  accumulating stack of advertisements that
6  are sitting in front of me.
7      MR. CHRISTIAN: Objection.
8  Nonresponsive, starting with the
9  word "but."
10     Q. (By Mr. Christian) Looking
11 at Exhibit 25-G, which is Footnote 236 in
12 your report, you identify the date as
13 April 1990 for this piece, correct?
14     A. The effort to scare women
15 about the gravity of osteoporosis? That
16 one?
17     Q. You identify Exhibit 25-G
18 as coming from April 1990, correct?
19     A. Right. I just want to make
20 sure we're talking about the one that I
21 believe represents an effort to scare
22 women about the gravity of osteoporosis?
23     MR. CHRISTIAN: Objection.
24 Nonresponsive.
25     MR. JENNER: He's asking a

Page 289

1  question, which one you're talking
2  about.
3      Q. (By Mr. Christian) I've
4  referenced Footnote 236, right?
5      A. 236.
6      Q. Okay.
7      A. Yes.
8      Q. Okay. And do you know what
9  journal or magazine Exhibit 25-G ran in?
10     A. It's not stated on this
11 advertisement here.
12     Q. And you don't know,
13 correct?
14     A. And for that reason, I
15 don't know.
16     Q. Okay. And you cannot state
17 whether any doctor -- prescribing doctor
18 in this case or any plaintiff saw
19 Exhibit 25-G, can you?
20     MR. JENNER: Objection.
21     A. My answers to that would be
22 the same answers as before, which is not
23 specifically.
24     Q. (By Mr. Christian) Okay.
25 Just to shortcut it then, can I get that

Page 310

1  there, and that's not the question I
2  asked you.
3      A.   Uh-huh.
4      Q.   Okay.
5      A.   So --
6      Q.   Without the word
7  "randomized," is that statement accurate?
8          MR. JENNER:  Objection.
9      A.   I'd say the statement is
10  misleading.
11     Q.   (By Mr. Christian)  Under
12  "Bone," "Decades of research have proven
13  that estrogen loss decreases bone mineral
14  density and increases the risk of
15  fractures from osteoporosis."
16         Is that accurate?
17     A.   Yes.
18     Q.   Under "Colon:  Ongoing
19  epidemiological research continues to
20  explore the risk of colon cancer among
21  women after menopause."
22         Is that accurate?
23     A.   Yes.
24     Q.   All right, Doctor.
25     A.   Are we done with this one?

Page 311

1      Q.   Yeah.
2          MR. CHRISTIAN:  Why don't
3  we take a break here.  I'm at kind
4  of a transition point.
5          THE VIDEOGRAPHER:  Going
6  off record.  The time is 2:56.
7          (Recess.)
8          THE VIDEOGRAPHER:  We are
9  back on record.  The time is 3:10.
10     Q.   (By Mr. Christian)  Okay,
11  Dr. Hollon, are you ready to proceed with
12  your deposition?
13     A.   Yes.
14     Q.   Okay.  You talk about, in
15  your report, some document that you
16  reviewed from a company called
17  DesignWrite.
18         Do you recall that?
19     A.   Yes.
20     Q.   And in it, you talk about
21  something called ghostwriting, correct?
22     A.   Can you take me to the page
23  that you're referring to, please?
24     Q.   62.
25     A.   Is there a specific

Page 312

1  paragraph that you'd like me to look at?
2      Q.   You can look at whatever
3  you need to.
4      A.   This one, In short,
5  DesignWrite took over and then subsequently
6  expanded dramatically the full reach of
7  Wyeth's promotional efforts.  This would
8  include activities that most medical --
9  that most people in the medical community
10  deemed improper such unrevealed conflicts
11  of interest and the deceptive activity of
12  ghostwriting.
13         MR. CHRISTIAN:  Objection.
14  Nonresponsive.
15     Q.   (By Mr. Christian)  What
16  you say on Page 62, that, Ghost
17  authorship exists when someone, such as
18  an employee of DesignWrite working on
19  behalf of Wyeth-Ayerst, has made, one,
20  substantial contributions to writing a
21  manuscript, and this role is not
22  mentioned in the manuscript itself,
23  correct?
24     A.   Correct.
25     Q.   Can you identify a

Page 313

1  published medical or scientific article
2  where a DesignWrite employee made a
3  substantial contribution to writing a
4  manuscript and that role was not
5  mentioned in the manuscript?
6      A.   Unfortunately, I didn't
7  have time to go and get this manuscript
8  from the -- from the library, so I have
9  the abstract with the authors listed
10  here.
11         This is the one that I
12  actually -- I was curious if it
13  actually -- before I ever did this, I was
14  curious if the -- what appeared to be
15  comprehensive plans for ghostwriting ever
16  led them to have actually success.
17         This is a really
18  disconcerting topic for those of us who
19  rely on the medical literature to provide
20  us with what we hope at their core are
21  responsible pieces of medical science.
22  And by "responsible," I mean that the
23  science is well done, that all the
24  people --
25     Q.   Doctor, I only have a

Page 318

1  call it misleading, but it, beyond a
2  reasonable doubt, is deceptive.
3       And those kind of
4  activities really, in my mind,
5  subsequently undermine our -- our
6  confidence in the medical literature as a
7  whole that would surround the hormone
8  supplementation.
9       Q.  Is there anything
10  inaccurate in the article that's
11  referenced in Exhibit No. 28?
12       A.  I suppose the inaccuracy is
13  that there is no author listed -- no --
14  no employee of DesignWrite listed in the
15  authorship.
16       Q.  Is there any substance,
17  scientific substance, in the article,
18  Exhibit No. 28, that is inaccurate?
19       A.  I'm not a sex hormone-
20  binding globulin expert, and so I
21  wouldn't feel that that would be within
22  my abilities to comment on.
23       Q.  Were you able to identify,
24  in your opinion, any other published
25  medical or scientific article where a

Page 319

1  DesignWrite employee made a substantial
2  contribution to writing a manuscript and
3  their role was not mentioned?
4       A.  There's a host of -- I
5  didn't have time to -- this would have
6  been a very intensive process. I didn't
7  have time to go and put together the long
8  list of anticipated publications that
9  DesignWrite was crafting.
10       There is an interesting
11  piece here where they talk about having
12  secured 16 authors for 20 of these
13  publications, but I don't have the
14  specific ones that, beyond a reasonable
15  doubt, appear to be ghostwritten, in
16  front of me today.
17       Q.  Okay. Now then, you talk
18  about DesignWrite assisting Wyeth in
19  controlling and influencing information
20  regarding hormone therapy, correct?
21       A.  What page is that
22  specifically, please?
23       Q.  I just have that from my
24  notes without a page. Do you -- does
25  that sound --

Page 320

1       A.  I want to find it because I
2  want to make sure that the way that
3  you're quoting me is what I've written.
4  If you want to -- I can keep looking. It
5  sounds approximately correct.
6       Q.  Okay. Then you go on to
7  say -- and I'm sorry; I don't have the
8  page cite for this -- that Wyeth has
9  created or managed almost all sources of
10  information about Premarin, Prempro
11  available to doctors and women.
12       A.  Now we really need to find
13  the page.
14       Q.  Okay.
15       A.  So I can read that in the
16  context of the larger one. I kind of
17  know approximately where it -- no, that's
18  too far.
19       There's a paragraph where
20  Jeff Solomon talks about how Wyeth
21  recog- -- According to Jeff Solomon --
22  Page 64. According to Jeff Solomon of
23  Wyeth marketing, one of the rationales
24  for the publication program was the
25  recognition of high clinician reliance on

Page 321

1  medical articles or journal articles --
2  journal articles for credible product
3  information. DesignWrite thanked Jeff
4  for awarding it the publication plan in
5  support of the brand and in defense of
6  raloxifene competitive threat.
7       And then the next paragraph,
8  DesignWrite assisted Wyeth in controlling
9  and influencing the published scientific
10  information about hormone supplementation
11  that most clinicians ultimately relied on
12  to make their best possible decisions.
13  Controlling this information such that it
14  was favorable to the Premarin family, and
15  menopausal hormone supplementation in
16  general, would prime healthcare providers
17  to be receptive to the demand generated
18  by patients influenced by the company's
19  DTC marketing schemes.
20       MR. CHRISTIAN: Objection.
21  Nonresponsive.
22       Q.  (By Mr. Christian) Doctor,
23  if you want to read through your report,
24  can you do that on your own time, and we
25  can have the record going after the end

Page 322

1  of this deposition if you want to go past
2  the end of your seven hours and read your
3  report, you're welcome to do that?
4      MR. JENNER: Objection.
5      A.  We're trying to find,
6  though, where the stuff is so I can
7  comment --
8      Q.  (By Mr. Christian) Reading
9  all that doesn't help us much, I don't
10  think.
11          Let's look at the bottom of
12  Page 64. It says, "DesignWrite assisted
13  Wyeth-Ayerst in controlling and
14  influencing the published scientific
15  information about hormone supplementation
16  that most clinicians ultimately relied on
17  to make their possible decisions."
18      A.  Uh-huh.
19      Q.  Okay. And the only thing
20  that we've been able to identify that's
21  published scientific information is the
22  Exhibit No. 28, correct?
23      MR. JENNER: Objection.
24      A.  That's all that we've had
25  time to identify to this date, but it

Page 323

1  doesn't mean that there's not -- I mean,
2  DesignWrite's plan was for 20
3  publications per year. I mean, they
4  had -- most scientists -- good scientists
5  produce one or two publications a year.
6          You're talking about 20
7  publications a year, and there's
8  reasonable evidence that the whole
9  process that was working to produce all
10  of this literature around some really
11  interesting or notable, noteworthy
12  topics, was moving forward.
13      Q.  (By Mr. Christian) Do you
14  know how many textbooks there are that
15  discuss scientific information about
16  hormone therapy?
17      A.  Lots.
18      Q.  Okay. Do you agree that
19  there's been thousands of articles in the
20  medical literature on menopause and
21  hormone therapy?
22      A.  I can't quantify exactly
23  how many there have been.
24      Q.  Would you dispute that
25  there's been thousands?

Page 324

1      MR. JENNER: Objection.
2      A.  No.
3      Q.  (By Mr. Christian) Okay.
4  And out of those thousands, how many do
5  you believe Wyeth had control over?
6      MR. JENNER: Objection.
7      A.  I can't quantify that
8  specifically.
9      Q.  (By Mr. Christian) Did you
10  make a comprehensive analysis of the
11  hormone therapy literature to determine
12  how many, if any, articles on hormone
13  therapy was funded by Wyeth?
14      A.  Well, you know, this was a
15  piece of the overall marketing plan that
16  influenced providers and patients
17  together.
18          The -- it was an important
19  part of the marketing scheme that Wyeth
20  continued to invest in. It's reasonable
21  to suppose that they continued to invest
22  in it because it was effective.
23      Q.  But as you said, you
24  haven't done that yet, go look to see
25  whether or not other published articles

Page 325

1  that meet that definition have been
2  published, correct?
3      A.  I have not looked
4  specifically in PubMed. It was
5  disconcerting enough to find that there
6  was this effort out there to control and
7  influence medical literature in a
8  deceptive fashion.
9      MR. CHRISTIAN: Objection.
10  Nonresponsive, to the second part
11  of the question -- answer.
12      Q.  (By Mr. Christian) Do you
13  attend continuing medical education
14  seminars?
15      A.  I've put on -- I've
16  participated in presenting at continuing
17  medication -- continuing medical
18  education seminars. I've attended
19  national meetings that include the
20  Society for General Internal Medicine.
21      Q.  And do you know whether or
22  not any pharmaceutical companies have
23  sponsored all or part of these CMEs that
24  you've gone to?
25      A.  These are ones that I've

82 (Pages 322 to 325)

Page 414

1   primarily to inform of the -- you know,
2   the risk of fracture and mortality risk,
3   that first one.
4            I have confidence and
5   expertise in population prevention, and
6   would tend to rely on that developed
7   expertise about making assessments about
8   strategies for population prevention,
9   perhaps even more than I would rely on
10  the United States -- on the technology of
11  office assessment.  I'd be interested in
12  reviewing it again in more detail.
13       Q.   Okay.  As you sit here
14  today, you don't plan on doing any
15  additional work for trial in this case?
16           MR. JENNER:  Objection.
17       A.   I have no idea one way or
18  another.
19       Q.   (By Mr. Christian)  Okay.
20  Do you know what it means for a company
21  to give an unrestricted educational grant
22  to a medical education company?
23       A.   Yes.
24       Q.   Okay.  If you look at
25  Page 83 of your report, you talked

Page 415

1   about -- and actually, this is, I think,
2   listed several times throughout your
3   report, this statement about Wyeth
4   manufacturing clinical data.
5       A.   Oh, yeah.  Let me -- hold
6   on a second.  Let's see.  I need -- I
7   hope these are -- yes, I -- go ahead.
8       Q.   Okay.  Could you identify
9   what data that you say Wyeth
10  manufactured?
11      A.   Well, by "manufacture," I
12  mean that they set out to -- and
13  delineated their intent to find and
14  generate evidence that would be favorable
15  to the Premarin family, and Prempro in
16  particular.  And so there are a number of
17  examples about their efforts to -- to
18  generate this data.
19           The footnote that I'm
20  referring to here is when they long --
21  they developed these long-term tactics,
22  including funding studies to demonstrate
23  positive effects on sexuality, quality of
24  life, and acute cognitive functioning,
25  and they go on here to say, in an

Page 416

1   underlined document, This acute cognitive
2   symptoms is not well defined or
3   articulated in medical literature.  We
4   must define it.  Develop quick proof
5   studies, and determine if there is
6   potential for labeling or additional
7   claim.
8            So that to me is -- is this
9   strategy that -- this speaks to the
10  overall strategy of -- of -- of
11  manufacturing data.  That's what I'm
12  referring to.
13       Q.   And the document you just
14  referred to, is that one of the footnotes
15  in your report?
16       A.   Yeah.  This is footnoted,
17  right.
18       Q.   Where at?
19       A.   It's Footnote 408, and
20  these are HRT Summit:  Strategic
21  Implications, Medical/Marketing Sub-team,
22  a bunch of objective strategies.
23           Increase the awareness of
24  early menopausal symptoms and expand the
25  definition of menopause symptoms.  So

Page 417

1   here their goal is to expand the
2   definition of menopause symptoms, so they
3   then come up with this strategy in which
4   they define what the condition is, and
5   then they're -- with the goal of
6   developing quick proof studies.
7            They actually rate their
8   probability of success for a short, quick
9   study as medium to high, and that the
10  potential impact for those studies for
11  indication labeling claim would be high.
12       Q.   So where would I go to look
13  at the data that you claimed Wyeth
14  manufactured?
15       A.   Well, this is just -- this
16  is an effort on their part that's
17  representative of, I think, you know, their
18  more comprehensive efforts.  Their
19  influence with -- through DesignWrite, I
20  think would be another potential example
21  of these -- this idea that you could
22  create the necessary data.
23       Q.   So you're unable to
24  identify specific data that Wyeth
25  manufactured, in your opinion?

Page 418

1    MR. JENNER: Objection.
2    A.   At the moment I'm not going
3    to be able to give you a specific study
4    that says, Well, this study was a study
5    manufactured. The scope of their
6    influence and their efforts was huge, as
7    we -- as is revealed by all of this here,
8    and so certainly their intent to do so is
9    laid out in all of these different
10   studies. And I believe that they, given
11   the money that they spent on doing this,
12   met with success.
13   MR. CHRISTIAN: Objection.
14   Nonresponsive, everything after
15   the word -- the first "the."
16   Q.   (By Mr. Christian) You
17   also say in your summary of opinions that
18   Wyeth purchased professional opinions.
19   Can you tell --
20   A.   Hold on a second.
21   Q.   Okay. Look at Page 3 of
22   your report.
23   A.   Yes.
24   Q.   Okay?
25   A.   Okay.

Page 419

1    Q.   You have a little list
2    there of things that -- we just talked
3    about manufacturing data. The next thing
4    you have here is purchasing professional
5    opinions; is that correct?
6    A.   Yes.
7    Q.   Tell me what professional's
8    opinion was purchased in -- that you're
9    referring to in this case?
10   A.   Well, there are a number of
11   different examples, but I think that
12   people like Charles Hammond had developed
13   ideas that included that hormone therapy
14   would be used to prevent cardiovascular
15   disease, that were subsequently put into
16   the Duke monograph, and received money
17   for development of the Duke monograph
18   from Wyeth. So that to me is a purchased
19   professional opinion.
20   Q.   So your opinion is that
21   Wyeth purchased the professional opinion
22   of Dr. Charles Hammond, that was
23   reflected within the Duke monograph?
24   MR. JENNER: Objection.
25   A.   Can you say that again?

Page 420

1    Q.   (By Mr. Christian) It's
2    your opinion that Wyeth purchased the
3    professional opinions of Dr. Charles
4    Hammond, which was reflected in the Duke
5    monograph?
6    A.   Correct.
7    Q.   Okay. How much did Wyeth
8    pay Dr. Hammond, in your opinion, to
9    purchase this opinion?
10   A.   I don't know specifically
11   that information about the quantity of
12   money that was paid for the Duke
13   monograph, although it's -- Wyeth is --
14   gives -- there's an unrestricted --
15   there's a little thing on -- you know,
16   this is -- we're giving money -- Wyeth is
17   giving money to support the development
18   of this.
19   Q.   And that has been
20   recognized by the FDA and others --
21   companies -- pharmaceutical companies
22   giving unrestricted grant for medical
23   education as very valuable?
24   MR. JENNER: Objection.
25   A.   As very valuable. I'm not

Page 421

1    sure if -- I won't speak on behalf of the
2    FDA or other people about the value that
3    they associate with it.
4    Q.   (By Mr. Christian) So
5    what -- what can I look at that supports
6    your opinion that Dr. Charles Hammond's
7    professional opinions were purchased by
8    Wyeth?
9    A.   The Duke monograph.
10   Q.   Okay. That's your only
11   evidence?
12   A.   That's the one that I can
13   pull off the top of my head at the
14   moment. I think that there are other
15   examples in the report that you're
16   free to look at.
17   Q.   Is there any other
18   professional opinions that you believe
19   Wyeth purchased?
20   A.   There was one, I think, in
21   my report on -- by Leon Speroff on the --
22   it would take me a -- I think a
23   substantial time to find it within here.
24   Let's see if I have footnotes related to
25   that. No, I don't. About breast cancer