# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | MDL Docket No. 4:03CV1507 WRW |
| | : | |
| PREMPRO PRODUCTS LIABILITY | : | *Scroggin v. Wyeth, et al.* |
| LITIGATION | : | Case No. 4:04-CV-1169 WRW |

### PLAINTIFF'S RESPONSES TO DEFENDANT WYETH'S
### FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Wyeth propounds the interrogatories set forth below. Plaintiff is required to answer each interrogatory separately and fully in writing, under oath, and to serve a copy of her answers, within thirty (30) days of service hereof.

### DEFINITIONS AND INSTRUCTIONS

1.     In answering these interrogatories, plaintiff is requested to furnish such information as is available to her, or in the possession of her agents and representatives, including attorneys and investigators. Whenever the term "you," "your" or "yourself" is used, it refers to the plaintiff and her agents and representatives.

Objection

1.    **Plaintiff objects to this definition because it would broaden the requests to invade privilege.**

Namely, the attorney-client and work product privileges. The definition would make the requests encompass communications protected by the attorney-client privilege and counsel's mental thoughts and processes, protected by the work product privilege.

2.     The term "document(s)" has the meaning set forth in FED. R. CIV. P. 34(a) and refers to every original, draft, and duplicate of every writing and recording of every

1

type and description, including, but not limited to, all writings, recordings, electronic or magnetic recordings or transmissions of information, and photographs, and all documents or tangible things, including all writings, drawings, graphs, charts, papers, books, accounts, photographs of any kind (including but not limited to prints, microfilm, imaging, slides or negatives), tape recordings, video cassettes, and other data compilations from which information can be obtained, including originals and nonidentical copies thereof, that are in your possession, custody, or control, whether actual or constructive, or of which you have knowledge, including without limitation: writing, papers, publications, books, documents, records, forms, photographs, tangible things, letters, correspondence, intra- or interoffice communications, telegrams, cables, telex messages, memoranda, notes, notations, drafts, work papers, transcripts, minutes, stenographic or handwritten notes, reports, recordings of telephone or other conversations (including telephone bills), interviews, conferences or other meetings, affidavits, statements, summaries, opinions, investigative reports, daily reports, calendars, studies, analyses, evaluations, announcements, advertisements, instructions, charts, diagrams, pictures, manuals, brochures, pamphlets, schedules, price lists, client lists, statistical records, lists, tabulations, programs, computer data, computer text files, electronic mail, data processing input and output, microfilm, releases, contracts, agreements, ledgers, accounts, books of account, checks, receipts, records and invoices reflecting business operations, all records kept by electronic, photographic or mechanical means, and all things similar to any of the foregoing, however described. The term also includes other data compilations from which information can be obtained and translated if necessary, by you through detection devices into reasonably usable form.

**Objection**

1.  **Plaintiff objects to this definition as overly broad, unduly burdensome and exceeding the scope of permissible discovery.**

    The definition begins by stating the term "documents" will be defined as it is defined in Rule 34(a). The definition then goes on to provide a definition far beyond what that rule provides. By way of example only, the last sentence of the definition could arguably be interpreted to require Plaintiff to generate documents that do not yet exist -- something that exceeds the scope of permissible discovery. As another example, the request includes "client lists" which, particularly in light of Definition No. 1 would invade attorney-client privilege. Plaintiff's responses below are based on the definition of documents contained in the federal rule.

    3. The term "correspondence" refers to every original, draft, and duplicate of any letters, facsimiles, electronic mail, handwritten notes, intra- or interoffice communications, telegrams, cables, telex messages, recordings of telephone or other conversations, and all things similar to any of the foregoing, however described.

    4. If you are completing these interrogatories and requests in a representative capacity, please respond with respect to the person who used the Hormone Therapy ("HT") medications. Those questions using the term "you" refer to the person who used the HT medications and the agents and representatives of that person. If the individual is deceased, please respond as of the time immediately prior to his or her death unless a different time period is specified.

    5. "Identify" or "identity," when used in reference to a natural person, means to state the person's full name, present or last known address, present or last known telephone number, and relationship, if any, to you.

**Objections**

1.  **This definition exceeds the scope of permissible discovery.**

    At most, Plaintiff is required to provide name, address and telephone number, not "relationship to plaintiff."

2.   **This definition is so vague that one would have to guess as to its meaning.**

"Relationship" to plaintiff is undefined.  Does it encompass social, economic, litigation or ideological-sharing relationships?

3.   **This definition invades attorney-client privilege, invades Plaintiff's privacy expectations and is not reasonably calculated to lead to the discovery of admissible evidence.**

At least, it could, depending upon the meaning of the term "relationship." Without knowing that definition, Plaintiff does not know.

6.   "Identify" or "identity," when used in reference to a document, means to state its type (*e.g.*, letter, facsimile, memorandum, sales receipt), subject matter, and date, and the identity of each author, addressee, and recipient.

**Objections**

1.   **This definition is overly broad and unduly burdensome.**

It calls for the provision of such detailed information about each document which would be unduly burdensome to provide.

7.   "Identify" or "identity," when used in reference to a place of business or education institution, means to state its name, street address, and phone number.

8.   The term "communication(s)" means every manner or means of disclosure, representation or warranty, transfer or exchange, and every disclosure, transfer, or exchange of information, whether made or accomplished orally, by physical action, or by document, whether face to face, over the telephone or modem, electronically, by mail, by courier, personal delivery, or otherwise.

**Objections**

1.   **This definition is overly broad, unduly burdensome and exceeds the scope of permissible discovery.**

4

It would require Plaintiff to recall or investigate every conversation or communication ever made.

9.      "Person" includes any natural person, firm, association, partnership, trust, corporation, or government entity.

10.     Whenever the term "Hormone Therapy" or "HT" is used, that term includes Prempro, Premarin, Premphase, and Cycrin, as well as any other product intended to compensate for loss of estrogen associated with menopause or to alleviate symptoms associated with menopause, whether prescription, herbal, or over-the-counter.

11.     If you cannot answer the foregoing interrogatories in full and complete detail after exercising due diligence to secure the information to do so, please so state and answer to  the extent possible, specifying in each instance your inability to answer the remainder and stating whatever information or knowledge you have concerning the unanswered portions.

**Objection**

1.      **This request is overly broad and exceeds the scope of permissible discovery.**

Plaintiff is required only to provide the information she possesses.  She is not required to speculate about what information she may not possess.

12.     Pursuant to FED. R. CIV. P. 26(e), you are required to supplement your responses to these interrogatories if you acquire responsive information after serving your initial answers.  If you fail to do so, you may be precluded at trial from introducing evidence relating to the subject matter of these interrogatories.

**Objection**

1.      **Plaintiff objects to the self-serving language regarding the effect of their answers.**

The Court will decide the effect of Plaintiff's answers or purported lack thereof, not Wyeth.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Do you contend that Dr. Kuperman was negligent in prescribing hormone therapy to Ms. Scroggin in any year from 1989 to 2000?

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Provides no definition for the word "negligence" and whether such meaning refers to medical malpractice or common law wrongful conduct. Plaintiff is clearly not qualified to answer a question concerning a medical doctor's negligence.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: Plaintiff does not assert that Dr. Kuperman was negligent in prescribing hormone therapy to Ms. Scroggin since Dr. Kuperman believed Defendants' representations that these drugs had been fully tested, that these drugs were safe for long-term use and that combination hormone therapy had minimal or no significant risks. Further, Plaintiff believes that Dr. Kuperman trusted Defendants to conduct adequate testing of its hormone therapy drugs and to convey complete and accurate risk information to him. Dr. Kuperman cannot, and should not, be blamed for Defendants' wrongful conduct.

### INTERROGATORY NO. 2:

Do you contend that Dr. Kuperman was negligent in advising Ms. Scroggin about the risks and/or benefits of hormone therapy? If so, state what Dr. Kuperman should have told Ms. Scroggin (at her office visit[s] for each of the years listed below) about the risks of hormone therapy:

(a) in 1989;
(b) in 1990;
(c) in 1991;
(d) in 1992;
(e) in 1993;
(f) in 1994;
(g) in 1995;
(h) in 1996;
(i) in 1997;
(j) in 1998;
(k) in 1999;
(l) in 2000.

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Provides no definition for the word "negligence" and whether such meaning refers to medical malpractice or common law wrongful conduct. Plaintiff is clearly not qualified to answer a question concerning a medical doctor's negligence.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: Defendants misrepresented the risks and benefits of its hormone therapy drugs to prescribing physicians. Dr. Kuperman cannot pass along to his patients risk or benefit information that was not provided to him by Defendants. Dr. Kuperman cannot, and should not, be blamed for Defendants' wrongful conduct.

### INTERROGATORY NO. 3:

State whether you contend Premarin was (or is) defectively designed.

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Provides no definition for the word "defectively designed". Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: See Plaintiff's complaint in this matter. Yes, Plaintiff has made a claim that Wyeth's hormone therapy products, including Premarin when used in conjunction with Medroxyprogesterone Acetate, are defectively designed as they were promoted for use by Defendants.

### INTERROGATORY NO. 4:

State whether you contend Prempro was (or is) defectively designed.

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Provides no definition for the word "defectively designed". Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: See Plaintiff's complaint in this matter. Yes, Plaintiff has made a claim that Wyeth's hormone therapy products, including Premarin when used in conjunction with Medroxyprogesterone Acetate, are defectively designed as they were promoted for use by Defendants.

### INTERROGATORY NO. 5:

State whether the Prempro label failed adequately to warn about the risk of breast cancer in:

(a) 1995?
(b) 1996?
(c) 1997?
(d) 1998?
(e) 1999?
(f) 2000?
(g) 2001?
(h) 2002?

ANSWER:  Objection.  Relevance.  Vague.  Overbroad.  Calls for a legal conclusion. Provides no definition for the word "failed adequately to warn".  Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: See Plaintiff's complaint in this matter.  Yes, Plaintiff has made a claim that Wyeth failed to adequately warn about the risk of breast cancer in Prempro's label throughout the time that Ms. Scroggin used that product and up until the time that the label was changed following the release of the WHI study results.


**INTERROGATORY NO. 6**:

State whether you contend that low dose Prempro (either 0.3 mg/1.5 mg or .45 mg/1.5 mg Prempro) is a safer alternative design to 0.625 mg/2.5 mg Prempro.

ANSWER:  Objection.  Relevance.  Vague.  Overbroad.  Calls for a legal conclusion. Provides no definition for the word "safer alternative design".  Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: Yes.


**INTERROGATORY NO. 7**:

State whether you contend the Food and Drug Administration at any time should have withdrawn, or taken steps to withdraw, Premarin from the market.  If so, when?

ANSWER:  Objection.  Relevance.  Vague.  Overbroad.  Calls for a legal conclusion. Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows:  No.

**INTERROGATORY NO. 8:**

State whether you contend the Food and Drug Administration at any time should have withdrawn, or taken steps to withdraw, Prempro from the market. If so, when?

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: No.

**INTERROGATORY NO. 9:**

State whether you contend Wyeth should at any time have withdrawn, or taken steps to withdraw, Premarin from the market. If so, when?

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: This question does not take into account any of the information that accompanies a prescription drug product such as dose, duration, warnings or indications. Plaintiff asserts that "Old Premarin" has been removed from the market by Wyeth and replaced with "New Premarin" which is detailed and described in the current Premarin label.

**INTERROGATORY NO. 10:**

State whether you contend Wyeth at any time should have withdrawn, or taken steps to withdraw, Prempro from the market. If so, when?

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: This question does not take into account any of the information that accompanies a prescription drug product such as dose, duration, warnings or indications. Plaintiff asserts that "Old Prempro" has been removed from the market by Wyeth and replaced with "New Low Dose Prempro" which is detailed and described in the current Prempro label.

**INTERROGATORY NO. 11:**

Identify any and all lawsuits and/or legal proceedings to which you have been a party, including: (a) the case name; (b) the case number; (c) the jurisdiction in which the case

was filed; (d) whether you were the plaintiff or defendant; (d) the nature of the claims made by or against you; and (e) the outcome of the case.

ANSWER:  Plaintiff was involved in a car accident in the early 1990s and sued the defendant for injuries sustained to her back.  Her case was filed in Little Rock, Arkansas and she was represented by Peter Miller.  The case ended in settlement.  Plaintiff does not recall the name, number, or jurisdiction associated with the case.

## INTERROGATORY NO. 12:

Identify which, if any, specific picture(s) of yourself that you intend to show the jury at trial in light of Judge Wilson's caution that any picture "slide shows" should be significantly pared down from the one used by counsel at the *Reeves* trial.

ANSWER:  Neither the Plaintiff nor her counsel has any idea what "caution" this question refers to.  Plaintiff has already provided copies of photographs that she intends to use at the trial of this matter either during her testimony, the testimony of fact witnesses or to respond to issues raised by defendants in this case.

## INTERROGATORY NO. 13:

Identify any physicians you have seen or been examined by since your deposition on October 21, 2005.

ANSWER:   Plaintiff has been seen or examined by the following physicians since her deposition:

Marriann Harrington, M.D., 9500 Lile Dr., Little Rock AR 72205 (501) 664-4820

Cynthia Frazier, M.D., 500 S. University Ave., Suite 709, Little Rock, AR 72205 (501) 663-5055

Jerry Carter, M.D., 11719 Hinson Rd., Suite 110, Little Rock, AR  72212 (501) 224-2875

Timothy Boehm, M.D., 10001 Lile Drive, Little Rock, AR  72205 (501) 227-8000

Ronald Hardin, M.D., 9501 Lile Drive, Little Rock, AR  72205 (501) 224-9100

David Smith, M.D., 10100 Kanis Rd., Little Rock, AR 72205 (501) 255-6000

Kent McElvey, Jr., M.D., 521 Jack Stephens Dr., Suite 530, Little Rock, AR  72205 (501) 686-6564

Jay Flaming, M.D., 500 S. University Ave., # 301, Little Rock, AR 72205 (501) 664-4161

## INTERROGATORY NO. 14:

Identify any medical conditions or problems that have developed and/or been diagnosed since your deposition on October 21, 2005.

ANSWER: Plaintiff has not developed or been diagnosed with any medical conditions or problems since her deposition.

## INTERROGATORY NO. 15:

Regarding paragraph 79(e) of plaintiff's complaint filed on October 8, 2004 ("the Complaint"), for each year that plaintiff used Premarin or Prempro, state what the "proper warnings regarding all possible adverse side effects associated with the use of such products and the comparative severity and duration of such adverse effects" should have said.

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: See the expert reports, depositions and trial testimony of Plaintiff's experts for details about Plaintiff's failure to warn claim and the specifics of what information should have been contained in the label. In summary, Plaintiff asserts that if Defendants had conducted adequate testing, then for each year of hormone therapy use by the Plaintiff, Premarin and Prempro breast cancer warnings would have been in a black box and would have contained clear and definitive information about the connection between hormone therapy drugs and breast cancer. For details of what warnings would have been appropriate, see for example paragraphs 185-260 of Dr. Gueriguian's expert report dated February 15, 2006.

## INTERROGATORY NO. 16:

Regarding paragraph 80 of the Complaint, state what "safer and more effective methods of countering any health effects of menopause were available."

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows:

11

The following safe alternatives were (or could have been) available for the Plaintiff to use: bioidentical hormones or low dose combination hormone therapy.

**INTERROGATORY NO. 17**:

Regarding paragraph 82 of the Complaint, identify by date and source the "false and misleading information with regard to the safety and efficacy of the products" Wyeth provided.

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: See the expert reports, depositions and trial testimony of Plaintiff's experts for details about Plaintiff's negligence and misrepresentation claims.

**INTERROGATORY NO. 18**:

Regarding paragraph 107 of the Complaint, identify by date and source each statement by which Wyeth "expressly warranted to the FDA, prescribing physicians, and the general public, including the Plaintiff, that their hormone therapy products were both efficacious and safe for the intended use."

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: See the expert reports, depositions and trial testimony of Plaintiff's experts for details about Plaintiff's claims based upon Wyeth's representations to the FDA, prescribing physicians and patients, including the Plaintiff.

**INTERROGATORY NO. 19**:

Regarding paragraph 114 of the Complaint, identify by date and source each statement by which Wyeth "impliedly warranted the product to be of merchantable quality and safe and fit for its intended use."

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows:

See the expert reports, depositions and trial testimony of Plaintiff's experts for details about Plaintiff's claims based upon Wyeth's implied representations about combination hormone therapy.

**INTERROGATORY NO. 20:**

Regarding Count VII of the Complaint, identify by date and source each of the intentional misrepresentations that Wyeth made to plaintiff and/or her prescribing physician(s).

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: Discovery is not completed in this case and so Plaintiff cannot answer this question. However, see the Plaintiff's deposition as well as expert reports, depositions and trial testimony of Plaintiff's experts for details about Plaintiff's claims based upon Wyeth's intentional misrepresentations or fraud.

**INTERROGATORY NO. 21:**

Regarding Count VII of the Complaint, identify by date and source each of the intentional misrepresentations made by Wyeth upon which plaintiff and/or her prescribers relied.

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: Discovery is not completed in this case and so Plaintiff cannot answer this question. However, see the Plaintiff's deposition as well as expert reports, depositions and trial testimony of Plaintiff's experts for details about Plaintiff's claims based upon Wyeth's intentional misrepresentations or fraud.

**INTERROGATORY NO. 22:**

Regarding paragraph 123 of the Complaint, identify the "false and misleading information" that Wyeth provided "to the FDA to support inaccurate risk and benefit information contained in the product labeling."

ANSWER: Objection. Relevance. Vague. Overbroad. Calls for a legal conclusion. Plaintiff is clearly not qualified to answer this legal question.

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows:

13

See the expert reports, depositions and trial testimony of Plaintiff's experts for details about Plaintiff's claims based upon Wyeth's misrepresentations about the risk and benefit of its products.

**INTERROGATORY NO. 23**:

State whether you contend that the following labels failed adequately to warn of the risk of breast cancer:

(a) 2003 (attached as Ex. 1)?
(b) 2004 (attached as Ex. 2)?
(c) 2005 (attached as Ex. 3)?
(d) 2006 (attached as Ex. 4)?
(e) 2007 (attached as Ex. 5)?

ANSWER:  Objection, vague, ambiguous, no definition for the phrase "adequately warn."

Subject to these objections, Plaintiff's counsel answers this interrogatory as follows: Plaintiff states that the identified labels provide clear, definitive warnings about the risk of breast cancer from Prempro including a black box warning.  As discussed by both Dr. Gueriguian and Dr. Blume in their trial testimony, such labels do not contain any warnings about increased breast cancer risk to subgroup populations.  Further, the 2007 Prempro label does not include information about the new SEER data which was published after the approval of the 2007 Prempro label.  Plaintiff anticipates that once the FDA has been provided that data to review, the 2008 Prempro label will provide even more detailed information to physicians and doctors about the clear link between hormone therapy and breast cancer.

Dated this 19th day of July, 2007.

LITTLEPAGE BOOTH

_____
Zoe B. Littlepage
SBOT# 12430050; Federal Bar #12896
1012 W. Alabama St.
Houston, Texas 77006
(713) 529-8000 – Telephone
(713) 529-8044 – Facsimile

14

## CERTIFICATE OF SERVICE

I hereby certify that on this the 19th day of July, 2007, a true and correct copy of

the foregoing document was forwarded by e-mail to the parties below:

Ms. Lyn Pruitt
Mitchell, Williams, Selig, Gates & Woodyard
425 West Capitol, Suite 1800
Little Rock, Arkansas 72201
lpruitt@mwsgw.com

John W. Vardaman
F. Lane Heard, III
Williams & Connolly, LLP
725 12th Street N.W.
Washington, D.C. 20005
jvardaman@wc.com
lheard@wc.com

Jay Mayesh
Alan E. Rothman
Steven J. Glickstein
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
maoedar@kayescholer.com
arothman@kayescholer.com

Elizabeth Robben Murray
Kevin A. Crass
Friday, Eldredge & Clark, LLP
Regions Center
400 West Capitol Avenue
Suite 2000
Little Rock, AR 72201-3493
crass@fec.net
murray@fec.net

Zoe B. Littlepage

15

# Exhibit 2

CONFIDENTIAL - Subject to Protective Order

Page 354

IN THE SECOND JUDICIAL DISTRICT COURT
OF THE STATE OF NEVADA
IN AND FOR WASHOE COUNTY

ARLENE ROWATT,                )
PAMELA FORRESTER and          )
JERALDINE SCOFIELD,           ) CASE NO. CV04-01699
                              )
        Plaintiffs,           ) DEPT NO. 9
                              )
v.                            )
                              )
WYETH and PHARMACIA &         )
UPJOHN COMPANY, LLC           )
                              )
        Defendants.           )

_____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

In re:                        )
                              ) MDL DOCKET NO.
PREMPRO PRODUCTS              ) 4:03CV1507WRW
LIABILITY LITIGATION          )

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

-   -   -

July 20th, 2007

-   -   -

SUZANNE PARISIAN, M.D. (VOLUME 2)

-   -   -

GOLKOW TECHNOLOGIES, INC.
One Liberty Place, 51st Floor, 1650 Market St.
Philadelphia, PA 19103
877.370.3377

CONFIDENTIAL - Subject to Protective Order

1    have a duty, once you've started promoting a

2    product for a new indication, which would be

3    prolonged use, to determine the safety and

4    effectiveness, that's without the FDA, and to

5    warn.

6                So those are not necessarily

7    the FDA, that would just be in terms of

8    conduct of other pharmaceutical

9    manufacturers.

10               You don't market a product

11   without ensuring that it remains safe and

12   effective and adequately labeled, that the

13   physician has the adequate information.

14   That's without the FDA.

15        Q.    So that -- if I understood your

16   terminology correct, that is an industry

17   standard that isn't written down anywhere.  I

18   can't go and look at it and say, "Okay, this

19   is the standard.  This is what it says the

20   company is supposed to do," correct?

21        A.    Correct.  That's just

22   responsible conduct.

23        Q.    And that is -- you'll agree,

24   that is a subjective judgment that each

Golkow Technologies, Inc. - 1.877.370.DEPS

CONFIDENTIAL - Subject to Protective Order

Page 572

1    company has to make on its own as to what

2    that standard is and how it chooses to meet

3    it, correct?

4         A.      Yes, but the key that you said

5    is that each company does make that

6    determination, because it is the ethical

7    conduct of a manufacturer.

8         Q.      And you are --

9         A.      So they have to do it

10   themselves.

11        Q.      And you are offering your

12   subjective opinion as to whether or not Wyeth

13   met or did not meet that subjective industry

14   standard, correct?

15        A.      Correct.  It's not a

16   written-down standard.  It's just a code of

17   ethics in terms of not hurting people with --

18   it's bad business to hurt people.

19        Q.      Let's go back to the things

20   that are written down.  So we've talked about

21   the Food, Drug and Cosmetic Act.  Let's talk

22   about now the Code of Federal Regulation for

23   Premarin.

24               Are there any specific

# Exhibit 3

Confidential - Subject to Protective Order

```
IN THE UNITED STATES : MDL DOCKET NO.
DISTRICT COURT FOR   : 4:03CV1507 WRW
THE EASTERN DISTRICT :
OF ARKANSAS, WESTERN : Reeves v. Wyeth
DIVISION             : Case No.
                     : 4:05-cv-00163-WRW
                     :
                     : Rush v Wyeth, et
IN RE:               : al.
PREMPRO PRODUCTS     : Case No.
LIABILITY LITIGATION : 4:05-cv-00497-WRW
-------------------------------------------
IN THE COURT OF      : Banks, et al. v.
COMMON PLEAS         : Wyeth, et al.
PHILADELPHIA COUNTY  : June Term 2004
                     : No. 000420
                     :
                     : Coleman, et al.
                     : v. Wyeth, et al.
                     : June Term 2004
                     : No. 003179
                     :
                     : Daniel, et al. v.
                     : Wyeth, et al.
                     : June Term 2004
                     : No. 002368
                     :
IN RE:  HORMONE      : Dockter, et al. v.
THERAPY CASE         : Wyeth et al.,
                     : January Term 2004
                     : No. 003761
              -  -  -
         C O N F I D E N T I A L
      SUBJECT TO PROTECTIVE ORDER
              -  -  -
          April 7, 2006
              -  -  -
      Videotape deposition of
   CHERYL D. BLUME, Ph.D.
              -  -  -

      GOLKOW LITIGATION TECHNOLOGIES
            Four Penn Center
      1600 John F. Kennedy Boulevard
               Suite 1210
      Philadelphia, Pennsylvania 19103
               877.DEPS.USA
```

Confidential - Subject to Protective Order

1    that given it's their product.  And FDA

2    said, no, it's too high of a risk, and

3    they are aware of other data that is

4    coming from a foreign regulatory

5    authority.  So, despite the best

6    intentions of my client, the FDA said no.

7         Q.    Where is the standard

8    written that a reasonable pharmaceutical

9    company in Wyeth's position would have

10   done a WHI study earlier?

11        A.    FDA requires that companies

12   conduct pharmacovigilance studies,

13   pharmacovigilance assessments.  And if

14   pharmacovigilance data indicates that

15   there is a new event or a change in event

16   or something new about the drug, or

17   something unknown about the drug but is

18   of critical value, critical importance in

19   the patients that you are selling your

20   product to, then you must follow up on

21   that pharmacovigilance.

22              Now, there is nowhere in FDA

23   law that says -- defines exactly the type

24   of study you must do.  It says you will

Confidential - Subject to Protective Order

Page 225

1    conduct pharmacovigilance, and you will

2    follow up on pharmacovigilance.  The

3    standard in the industry is when one has

4    a pharmacovigilance signal, they are

5    expected to follow up on that signal, be

6    it with study design, patient

7    restrictions, removal of a product,

8    restrictions of certain doses, whatever.

9    But there is no set standard.  Every

10   company has to do what is appropriate for

11   their product.  Obviously, combination

12   estrogen products aren't handled in the

13   same way as a product that causes, you

14   know, rare skin reactions.  So, every

15   company has the same mandate, but there

16   are no specific requirements because it

17   varies by the product.

18        Q.    Let me ask you a different

19   question.

20              Would you be willing to

21   defer to the FDA on whether a WHI-like

22   study should have been conducted earlier?

23        A.    I don't know what you mean.

24        Q.    Would you be willing to

# Exhibit 4



NDA 20-303
Conjugated Estrogens Tablets and
Medroxyprogesterone Acetate Tablets
Wyeth-Ayerst Laboratories

Summary Basis of Approval

**Clinical**

March 2, 1993
December 30, 1994

**Chemistry**

December 22, 1994

**Pharmacology**

June 7, 1993

**Biopharmaceutics**

December 23, 1994

**Statistics**

August 15, 1994
July 15, 1994
December 23, 1994

cc:
Arch NDa
HFD-510/CKish
HFD-19

Confidential Pursuant to Confidentiality
Order

CHOOM010-000713

DEC 30 1994

Medical Officer's Review of Original and Resubmitted NDA Submissions

| | | | |
|---|---|---|---|
| NDA # | 20 303 | Original submission date: | 12/22/92 |
| MOR # | 2 | Resubmission date: | 12/30/93 |
| Sponsor: | Wyeth Ayerst Laboratories | Date Review completed: | 12/29/94 |

## 1. General Information
### Name of drug
Generic names:     Conjugated estrogens (Estrone sulfate and Equilin sulfate) and
Medroxyprogesterone acetate (MPA)

Proposed trade names: PREMPRO[R] [continuous combined regimen (Regimens "A" and "B"):
daily Premarin[R] conjugated estrogens and Cycrin[R] MPA]

PREMPHASE[R] [continuous sequential regimen (Regimen "C"):
daily Premarin[R] with MPA days 15-28 of each 28 day cycle]

Chemical names and structures:
3-Hydroxyestra-1,3,5(10)-trien-17-one 3-sulfate (Estrone sulfate)

3-Hydroxyestra-1,2,5(10),7-tetraen-17-one 3-sulfate (Equilin sulfate)

(6-α)-17-Hydroxy-6-methylpregn-4-ene-3,20-dione 17-acetate (MPA)

Pharmacologic Category:     Fixed combination oral estrogen and oral progestin

Proposed Indications:   In women with an intact uterus:
1.     Treatment of moderate to severe vasomotor symptoms associated with the menopause.
2.     Treatment of vulvar and vaginal atrophy.
3.     Prevention of osteoporosis.

Dosage Form and Route of Administration:
Separate oral tablets of Premarin[R] and Cycrin[R] in combined blister packaging:
Premarin 0.625 mg/Cycrin 2.5 mg for concomitant daily administration (Regimen "A");
Premarin 0.625 mg/Cycrin 5.0 mg for concomitant daily administration (Regimen "B");
Premarin 0.625 mg for daily administration/Cycrin 5.0 mg for
concomitant administration days 15-28 of each 28 day cycle (Regimen "C").

NDA Drug Classification:     4S

Related Drugs:
Conjugated estrogens (vaginal cream; injectable); Esterified estrogens (oral); Estrone (injectable);
Estropipate (oral, vaginal cream); 17β-Estradiol (micronized oral, transdermal; vaginal cream;
injectable); Ethinyl estradiol (oral); Progesterone (injectable and contraceptive IUD);
Hydroxyprogesterone caproate (injectable); Medroxyprogesterone acetate (oral, injectable).
[Unapproved progestins: Progesterone (micronized oral), Dydrogesterone (oral).]

Related Reviews:     Statistical Review dated 12/23/94;  Biopharm Review dated 12/23/94;
Memo of Consultation from Dr. B.V. Stadel, Epidemiologist, dated 12/29/94.

Confidential Pursuant to Confidentiality
Order



NDA   #20-303
MOR of Orig. and Resubmitted NDA, 12/29/94

## 2. Table of Contents

Section of Medical Review                                                          Page

                                                                                    3
Chemistry/Manufacturing Controls                                                    4
Animal Pharmacology/Toxicology                                                      4
Clinical Background                                                                 6
        Relevant human experience                                                   7
        Important information from related IND's and NDA's.                          10
        Foreign experience                                                          10
        Human Pharmacology, pharmacokinetics, pharmacodynamics                      11
        Other relevant background information                                       12
        Directions for Use                                                          13
Description of Clinical Data Sources                                                14
Clinical Studies                                                                    14
        Indications                                                                 14
        Reviewer's Trial # 1;          Sponsor's protocol # 713B-300,301            15
                Protocol                                                            17
                Endpoints                                                           18
                Statistical considerations including plan for analysis              21
        Efficacy endpoint outcomes:                                                 35
        Safety outcomes:                                                            45
        Conclusions regarding Efficacy Data                                         46
        Reviewer's Trial # 2;          Sponsor's protocol # 84-915-MD, 84-930-MD
                                                          82-028-MD, 84-903-MD
                                                                                    47
Overview of Efficacy                                                                48
Overview of Safety                                                                  49
        Significant/Potentially Significant Events                                  49
                Deaths                                                              50
                Other Significant/Potentially Significant Events                    50
                Overdose Experience                                                 50
        Other Safety Findings                                                       51
                ADR Incidence Tables                                                51
                Laboratory Findings, Vital Signs, EKGs                              51
                Special Studies                                                     52
                Drug-Demographic Interactions                                       52
                Drug-Disease Interactions                                           52
                Drug-Drug Interactions                                              53
                Withdrawal Phenomena/Abuse Potential                                53
                Human Reproduction Data                                             53
Labeling Review                                                                     64
Conclusions                                                                         66
Recommendations                                                                     68
REFERENCES                                                                          71
FEDERAL REGISTER NOTICES CITED

Confidential Pursuant to Confidentiality
Order

## 3. *Material Reviewed*

Volume 1.1 (Application Summary and Index; Refusal to file action letter, February 19, 1993);
Volumes 1.29-1.57 (Clinical section of original submission);
Volumes 1.78-1.166 (Case Report Tabulations) and 1.167-1.174 (Case Report Forms);
Volume 1.1A (Sponsor's response to Refusal to file letter, March 11 and September 27, 1993);
Volume 2.1 (Amendment 1: Resubmission: Table of Contents, December 30, 1993);
Volumes 2.46-2.58 (Case Report Tabulations)
Volume 3.1 (Sponsor's pre-meeting package with protocol synopsis: "A Prospective, Double-Blind,
     Randomized Study of Safety/Efficacy of Premarin/MPA in Postmenopausal Women",
     January 13, 1994;
     Replacement disks for virus-infected Biopharm data disks, January 24, 1994;
     Minutes of February 14, 1994, 45-day meeting of Resubmission;
     Sponsor's response to DMEDP request for re-reading of endometrial biopsies, 3/29/94;
     Sponsor's request for clearance of trade names, May 16, 1994, amended June 10, 1994;
     Letter to sponsor confirming revised request for re-reading of 10% sample of endometrial
     biopsies, July 11, 1994);
Volume 5.1 (Amendment 3: Report Comparing Endometrial Biopsy Results of Two Independent
     Pathologists: Wyeth Ayerst Study 713B-300, -301, August 10, 1994);
Volume 7.1 (Amendment 4: Application Summary and Revised Labeling Text, September 30, 1994);
Volume 8.1 (Additional Case Report Forms, October 24, 1994);
Volume 9.1 (Amendment 5: Safety Update Report, November 29, 1994);
     Amendment 6: Response to FDA Requests: Clinical, November 30, 1994);
     (Amendment 8: Response to FDA Requests: Clinical, December 15, 1994).

## 4. *Chemistry/Manufacturing Controls*

Please refer to the Chemistry Review. The following chemistry issues are noteworthy:

The Premarin$^R$ tablet formulation studied in the pivotal clinical trial differs from marketed Premarin$^R$ by removal of talc triturate and rubidium bromide from its core. Because of this formulation change, the extended release characteristics of the Premarin tablet (related to both core and coating composition), and the extensive clinical usage of this drug, the sponsor was required to submit in-vivo bioequivalence data to demonstrate that the new and currently marketed formulations are bioequivalent (see Biopharm Review).

The proposed labeling of the blister card packaging for PREMPHASE$^R$ is unacceptable because the print size on "Card 2" containing the "Directions for Use" is too small to be adequately legible by the elderly target population for this drug. The sponsor believes this is a short term problem based on their recent submission of NDA #20-527 (filing date 1/17/95) for combination tablets containing both Premarin/MPA. If approval is received for NDA #20-527, the sponsor proposes as a permanent solution to replace the separate Premarin$^R$ and Cycrin$^R$ tablets in NDA #20-303 with combination tablets containing both Premarin and MPA; since the combination tablets take up less

CHOOM010-000716

space than the 2 tablets now packaged together, more space would be available on the blister card for larger printed "Directions for Use". As an interim solution, they propose to include duplicate "Directions for Use" in large print on the outside of the box holding the blister cards. In response to this reviewer's request, they have agreed to include additional notations on the box stating "Save Box for Directions for Use" (to the patient) and "Place Prescription Label Here" (to alert the pharmacist not to occlude the "Directions for Use" with the Rx label). This solution is acceptable provided the sponsor also agrees to correct the print size directly on the blister cards (either by replacing the separate Premarin and MPA tablets with a combination tablet or by modifying the blister card configuration to accommodate all tablets with legible "Directions for Use") within one calendar year following approval of NDA #20-303.

### 5. Animal Pharmacology/Toxicology

Please refer to the Pharmacology Review. MPA was reported *carcinogenic by the oral route in rats* in a 2-year oral carcinogenicity study of Cycrin[R] MPA, conducted by the sponsor in support of this NDA (refer to Statistical Review and Consultation dated 7/15/94, appended to Pharmacology review #001, confirming the sponsor's finding). Treated rats developed islet cell hyperplasia, adenomas, and carcinomas in a dose-dependent manner, some with liver metastases, at doses approximately 25 times the human dose of 10 mg/day. Immunohistochemical studies of the proliferative pancreatic islets showed staining similar to normal islets, primarily for insulin with some variable staining for glucagon and somatostatin. Plasma glucose levels were decreased in the rats treated with MPA but circulating insulin levels were not determined. The sponsor "believe[s] this finding to be unique to rats given the sensitivity of their endocrine system to hormone imbalance" (NDA vol 1.1, p 264). They suggest that the pancreatic tumors were due to high MPA levels cross-reacting with glucocorticoid receptors to provoke hyperglycemia, which overstimulated the pancreatic islets to overgrow and transform. If this hypothesis is potentially applicable to human physiology, it emphasizes the importance of minimizing MPA dosage levels to maximize the safety of chronic administration to women. However, this reviewer is aware of no conclusive clinical evidence linking glucose intolerance or insulin deficiency diabetes mellitus as a risk factor to the development of islet cell tumors or pancreatic carcinoma in humans (Warshaw, 1992).

### 6. Clinical Background

PREMARIN TABLETS: In 1942, NDA #4-782 for Premarin[R] Conjugated Estrogens Tablets became effective based on a satisfactory safety review, under the original Food, Drug, and Cosmetic Act of 1938 (the Act).

In 1972, following a post-marketing efficacy review by the National Academy of Sciences National Research Council (NAS-NRC) under the Drug Efficacy Study (DESI), FDA initially classified certain estrogens including Premarin[R] Tablets as "effective" for a number of symptomatic indications and "probably effective" in selected cases of osteoporosis (DESI 1543; 37 FR 14826-9, July 25, 1972). A follow-up notice (DESI 1543; 41 FR 43114, September 29, 1976) defined the

conditions for marketing estrogens for their effective indications, reclassified all less-than-effective indications as "lacking substantial evidence of effectiveness", and published labeling requirements for the effective indications (as amended October 29, 1976; 41 FR 47573-8):

> Moderate to severe vasomotor symptoms associated with the menopause
> (There is no evidence that estrogens are effective for nervous symptoms or depression which might occur during menopause and they should not be used to treat these conditions).
> Female hypogonadism; Female castration; Primary ovarian failure.
> Atrophic vaginitis, kraurosis vulvae.
> Postpartum breast engorgement...
> Prostatic carcinoma – palliative therapy of advanced disease.
> Breast cancer (for palliation only) in appropriately selected women and men with metastatic disease.

The notice specifically excepted Premarin Tablets labeled for osteoporosis from reclassification as "lacking substantial evidence of effectiveness", stating that only Ayerst Laboratories had submitted data to support upgrading the indication to "effective" but that Ayerst's submission was found not to provide substantial evidence of Premarin's effectiveness, and that a future notice would specifically explain this conclusion. This action allowed Premarin Tablets to carry the "probably effective" indication for osteoporosis.

In 1986, based on the recommendations of two advisory committees (Endocrine and Metabolism, February 18, 1977; Obstetrics and Gynecology, July 28, 1977) and additional published literature, including clinical dose-ranging data using bone mineral density endpoints (Lindsay, 1984; Genant, 1982), non-contraceptive estrogens were reclassified as "effective" for the treatment of osteoporosis, including Premarin$^R$ Tablets (DESI 1543; 51 FR 12568, April 11, 1986).

In 1990, formal guideline texts were revoked for estrogen drug product professional and patient labeling, and replaced by informal labeling guidance texts (55 FR 18761, May 4, 1990). The availability of the most recently revised Labeling Guidance for Estrogen Drug Products Physician Labeling and Patient Package Insert (1992) was announced on June 28, 1994 (59 FR 33300).

CYCRIN TABLETS: In 1959, NDA #11-839 for Provera$^R$ Medroxyprogesterone Acetate (MPA) Tablets, sponsored by The Upjohn Company, became effective based on a satisfactory safety review. Following the DESI efficacy review, FDA classified Provera Tablets as "effective" for two indications:

> Secondary amenorrhea.
> Abnormal uterine bleeding in the absence of organic pathology, such as submucous fibroids or uterine cancer.

In 1977, labeling directed to the patient was required for all prescription estrogen and progestational drug products for human use, and guideline texts for professional and patient labeling were published (42 FR 37636 through 37648, July 22, 1977), and later revised (54 FR 1243, January 12, 1989).

Confidential Pursuant to Confidentiality
Order


On October 30, 1992, ANDA's #81-239 and #81-240 were approved for Cycrin[R] MPA Tablets 2.5 mg and 5.0 mg, respectively, sponsored by Wyeth-Ayerst Laboratories, as generic versions of Upjohn's Provera[R] Tablets, under the Waxman-Hatch Amendments to the Act.

To date, FDA has not approved any progestin drug product, including Provera[R] and Cycrin[R], for indicated usage in postmenopausal women. Based on accumulating epidemiologic evidence, oral MPA has been increasingly prescribed "off-label" with estrogen replacement therapy (ERT) as hormone replacement therapy (HRT) to postmenopausal women with a uterus to prevent endometrial cancer. The Fertility and Maternal Health Drugs Advisory Committee discussed this subject on February 10, 1984, and April 27, 1984, and concluded that the data were inadequate to determine the risks of concomitant progestin use with ERT. It revisited the issue on February 2, 1990, and June 20-21, 1991, and concluded: (1) that the addition of a progestin to ERT for more than 10 days each cycle greatly reduces the risk of endometrial cancer and does not reduce the protective estrogen effect on bone density; and (2) that due to the relative recency of HRT use, insufficient data were available to determine the effect of added progestins on either the risk of breast cancer or the possible cardioprotective effects associated with ERT.

### 6.1 Relevant human experience

Since the mid-1970's, observational data have consistently documented a direct relationship between unopposed ERT and increased risk of endometrial cancer, with the strength of association dependent upon dosage and duration of estrogen exposure (Ziel, 1975; Shapiro, 1985). In the 1980's, an inverse relationship was suggested between concomitant progestin use with ERT and the risk of endometrial hyperplasia, a possible precursor of endometrial cancer (Gelfand MM, 1989). The strength of this association appeared more dependent upon the monthly duration of progestin exposure than upon progestin dosage, with at least 10 days of treatment per month correlated with optimal endometrial outcomes. In the 1990's, observational data have begun to emerge reporting a reduction in endometrial cancer risk with HRT (Persson, 1989; Voigt, 1991), but the optimal progestin, its dosage, and regimen that would maximize this benefit while minimizing attendant risks remained to be determined..

Meanwhile, emerging reports in the 1980's suggested a direct relationship between ERT and increased risk of breast cancer (Hoover, 1976; Brinton, 1986), especially in long term users. Meta analyses of these observational findings failed to settle the controversy over this question (Dupont, 1991; Steinberg, 1991; Sillero-Arenas, 1992; Grady, 1992; Colditz, 1993), while observational data on prolonged estrogen usage continued to accrue (Yang, 1992; Risch, 1994). Because of the relative recency of HRT usage in the U.S., most published relative risk (RR) estimates of breast cancer and menopausal hormone use have continued to apply primarily to ERT usage, reporting overall RR's of 1.2 to 1.5 for usage of 3-5 years, and RR estimates of up to 2.0 for very prolonged usage (10-15 years or more).

Confidential Pursuant to Confidentiality
Order

In contrast to the protective effect of added progestins on the endometrium, recently reported RR estimates for HRT and breast cancer suggest that concomitant progestins do not reduce and may exacerbate the risk of breast cancer associated with ERT (Bergkvist, N Engl J Med 1989; Ewertz, 1988; Colditz, 1992; Colditz, 1993), without necessarily increasing breast cancer mortality (Bergkvist, Am J Epidemiol 1989; Yuen, 1993). Breast cancer is a major public health problem in the United States: the average American woman currently faces an approximately 1 in 10 total lifetime risk of developing breast cancer, with the vast majority of cases occurring after menopause. Thus, in the postmenopausal population, even small increments in the relative risk of breast cancer have great public health significance. Because of the long latency between exposure to promotional agents and detection of clinical tumors, however, prospective studies take many years to conduct and require extremely large sample sizes to ensure statistically meaningful treatment group comparisons. Since many more years are still needed before the relationship between HRT and breast cancer can be definitively determined, the public health impact of this safety concern increases with the growing popularity of HRT usage by a rapidly expanding population of perimenopausal "baby boom" women. As such, the true effect of HRT on breast cancer incidence and mortality must be considered the single most important safety issue concerning this class of drugs.

Although recent observational data strongly suggest that ERT reduces cardiovascular (especially coronary heart disease) morbidity and mortality (Bush, 1987; Stampfer, 1991), obvious selection bias permeates this literature, with treated women consistently slimmer, healthier, and less likely to have diabetes mellitus than untreated women. Unbiased data on the cardiovascular effects of ERT and HRT are expected to become available within the next 5-15 years from the ongoing NIH-sponsored Randomized Clinical Trial of the Women's Health Initiative (WHI/RCT: a primary/secondary prevention trial, see section 6.2 below) and the Wyeth-Ayerst-sponsored Heart and Estrogen Replacement Study (HERS: a secondary prevention trial, see section 6.2 below). Although the WHI/RCT is adequately designed to definitively answer the ERT/HRT cardiovascular question (i.e., whether drug efficacy or selection bias account for observed risk reduction), it is doubtful that even the WHI/RCT has sufficient statistical power to clearly define the relationship between HRT and breast cancer.

## 6.2 Important information from related IND's and NDA's.

### IND ₁

The Postmenopausal Estrogen and Progestin Interventions (PEPI) trial is a recently completed, NIH-sponsored, 3-year, 7-center, randomized, placebo-controlled, parallel trial of the effects of continuous and sequential treatment with Premarin$^R$ with/without Cycrin$^R$ MPA or micronized progesterone on coronary heart disease risk factors in 875 healthy postmenopausal women, ages 45-64. Subjects were stratified by hysterectomy status and clinical center, and randomly assigned to one of 5 treatment groups: Placebo; Premarin 0.625 mg po QD alone;

Confidential Pursuant to Confidentiality
Order



NDA   #20-303
MOR of Orig and Resubmitted NDA, 12/29/94

## 6.5 Other relevant background information

In 1978, Ayerst Laboratories submitted a labeling supplement for the concomitant use of Premarin and MPA tablets, based on a literature review suggesting that the addition of MPA to Premarin treatment attenuates the incidence of endometrial hyperplasia. The supplement was reviewed by the Fertility and Maternal Health Drugs Advisory Committee, which concluded that there was insufficient evidence to establish the purported beneficial effect of the added progestin and recommended that further studies be conducted. In 1983, Ayerst Laboratories submitted IND #21,696 to conduct a placebo-controlled and unopposed estrogen-controlled trial of the effects of cyclic Premarin 1.25 mg x 21 days/month with sequential MPA (Upjohn's Provera$^R$ Tablets) 10 mg x 10 days/month, on endometrial biopsy endpoints. Inadequate enrollment eventually led to the premature termination of this study.

On July 25, 1984, a meeting was held at the sponsor's request to discuss the labeled indications that would be permitted for the combination product. The Division of Metabolism and Endocrine Drug Products (DMEDP) agreed that combination product labeling could include all of Premarin's labeled indications, provided that biopsy-proven hyperplasia was shown to be reduced by the added progestin, and that the lowest effective progestin dose was determined in the clinical trial. In March 1986, an NDA was submitted, based on additional literature as well as limited data collected from the terminated study, but it was non-approvable, due to inadequate evidence to support the claimed indication of reduced incidence of endometrial hyperplasia.

In 1988, Wyeth-Ayerst had a number of teleconferences and meetings with DMEDP to discuss the design of the clinical study which would support the current NDA. These discussions focused on the number of women and study sites to be included in the trial as well as concurrence that one study of this magnitude (estimated sample size of 2080 with blocked randomization) would be adequate to support approval. The agreed-upon study design included the evaluation of 4 combination HRT regimens of Premarin and MPA compared to a Premarin-alone group, and reaffirmed the earlier agreement that all approved indications for Premarin alone, including osteoporosis, would apply to the combination, based on the assumption that the addition of MPA would not attenuate Premarin's beneficial effects. DMEDP agreed to allow the osteoporosis claim for the combination, provided the recommended combination dose of Premarin was the same as the recommended Premarin dose for osteoporosis (0.625 mg po daily administered cyclically 3 weeks on and one week off). It was acknowledged during these discussions that neither this study, nor any other similar clinical trial would likely resolve the issues related to breast cancer associated with either ERT or HRT, given that years of epidemiologic study had not completely settled them. Thus, the sponsor states that "agreement was reached that an evaluation of breast cancer risk would not be a subject of evaluation in this program" (NDA vol 1.1, cover letter, December 22, 1992, p 2).

NDA #20-303
MOR of Orig and Resubmitted NDA, 12/29/94

## 7. Description of Clinical Data Sources

The primary data source for this NDA is the large-scale, multicenter, randomized, prospective, placebo-controlled safety and efficacy study of concomitant MPA at 2 dosage levels and regimens, conducted by the sponsor under Protocols 713B-300 and 713B-301. This pivotal trial studied 1724 women in Europe and the United States between May 1989 and March 1992.

Other sources of safety information include 4 small ancillary safety and efficacy studies conducted by Ayerst Laboratories under Protocols 84-915-MD and 84-930-MD (double-blind, randomized, 3-month crossover studies of fixed and phasic cyclic sequential doses of Premarin x 25 days with MPA 10 mg x 10 days, which enrolled a total of 119 women), and under Protocols 82-028-MD and 84-903-MD (double-blind, randomized, placebo- and active-controlled, parallel 6-12 month study of Premarin 1.25 mg x 21 days/MPA 10 mg x 10 days, which enrolled a total of 235 women). These studies were terminated by administrative decision of the sponsor in 1988 due to recruitment difficulties.

Additional supportive safety information is provided from biopharmaceutics studies conducted by the sponsor under the following protocols:

| | | |
|---|---|---|
| 84-280-CR: | Multiple-dose crossover of separate versus combination Premarin 2.5 mg, MPA 10 mg x 6 days | n = 6 |
| 713X-110-US: | Comparative bioavailability study of marketed and research formulations of 0.625 mg Premarin tablets | n = 6 |
| 713B-103-US: | Drug interaction study of separate versus combination doses 2 x 0.625 mg Premarin alone, 2 x 5.0 mg MPA alone, or both combined | n = 54 |
| 713-B-114-US: | Food effect study of concomitant Premarin 0.625 and MPA 2.5 | n = 20 |
| 713-B-104-US: | Bioequivalence study of separate Premarin and Cycrin tablets and a combination CE/MPA 0.625/2.5 mg tablet | |
| 713-B-107-US: | Bioequivalence study of separate Premarin and Cycrin tablets and a combination CE/MPA 0.625/2.5 mg tablet | n = 66 |
| 713-B-111-US: | Bioequivalence study of separate tablets and a combination CE/MPA 0.625/5.0 mg tablet | |
| 713-B-101-US: | Bioequivalence study of separate tablets and a combination CE/MPA 0.625/5.0 mg tablet | |
| 713-B-109-US: | Bioequivalence study of separate tablets and a combination CE/MPA 0.625/5.0 mg tablet | n = 120 |
| | | 272 |

Further safety information is provided in the Safety Update Report (NDA vol 9.1) by a review of spontaneous reports to the "WCDSS" database maintained by Wyeth-Ayerst to identify serious adverse drug experiences from clinical trials and postmarketing exposure worldwide. This report includes all adverse events reported between December 6, 1983, and October 31, 1994. In addition, at the request of this reviewer, a search was conducted of the FDA Spontaneous Reporting System since 1975 for domestic adverse drug events for the drug combination Premarin - Provera and for Premarin alone.

Confidential Pursuant to Confidentiality Order

NDA   #20-303                                                            Page 56
MOR of Orig and Resubmitted NDA, 12/29/94


WARNINGS:

1.      Section on *Induction of malignant neoplasms*:

   A. Breast cancer section should be modified to read:

      (1) First paragraph, first sentence:  Some studies have reported a moderately
      increased risk of breast cancer (relative risks of 1.3 to 2.0) in those women on
      estrogen replacement therapy taking higher doses, or in those taking lower doses for
      prolonged periods of time, especially in excess of 10 years.

      (2) First paragraph, second sentence: The majority of studies, however, have not
      shown this association in women who have ever used estrogen replacement
      therapy.

      (3) Second paragraph, first sentence: The effect of added progestins on the risk of
      breast cancer is unknown, although a moderately increased risk in those taking
      combination estrogen/progestin therapy has been reported.

      (4) Second paragraph, second sentence should be added describing the NDA findings:
      "In a one year clinical trial of PREMPRO, PREMPHASE, and Premarin alone, 5
      new cases of breast cancer developed among 1377 women receiving the
      combination treatments, while no new cases developed among 347 women
      receiving Premarin alone."

      **N.B.:  Sponsor's 12/29/94 response, proposing alternate text ("were detected"
      instead of "developed") and an additional sentence ("The overall incidence of breast
      cancer in this clinical trial does not exceed that expected in the general
      population.") are acceptable.

      (5) Third paragraph, first sentence: Women on hormone replacement therapy should
      have regular breast examinations and should be instructed in breast self-examination,
      and women over the age of 50 should have regular mammograms.


   B. Endometrial cancer section should be modified to read:

      (1) First paragraph, first sentence: The reported endometrial cancer risk among users
      of unopposed estrogen was about 2 to 12-fold or greater than in nonusers and
      appears dependent on duration of treatment and on estrogen dose.

      (2) First paragraph, third sentence: The greatest risk appears associated with
      prolonged use, with increased risks of 15 to 24 fold for five years or more.

      (3) Second paragraph, first sentence: "A large clinical trial has demonstrated that ...

Breast cancer developed within 1 year following normal baseline exams and mammograms in five subjects during study drug treatment, with all cases occurring in the combination treatment groups (4 of 5 in the continuous regimens A and B). Although no statistically significant differences in breast cancer incidence were detected between treatment groups, the clustering of cases in the Premarin/MPA groups (especially in the continuous treatment regimen) raises concern that concomitant progestin may exacerbate the increased breast cancer risk reported with prolonged unopposed estrogen treatment. This concern should be addressed post-approval by the sponsor, by conducting a comprehensive Phase IV investigation of breast cancer risk in users and non-users of the NDA regimens. It is essential that this Phase IV study be designed with adequate statistical power to rule out relative risks close to 1.0 in the comparison of unopposed Premarin and Premarin/MPA-treated women, and it should be powered to evaluate differences between Premarin/MPA groups by treatment regimen (i.e., PREMPRO versus PREMPHASE).

### 13.   Recommendations

This NDA is recommended for approval under the following conditions:

1.      The sponsor will conduct a comprehensive Phase IV investigation of breast cancer risk in users and non-users of the NDA regimens.

> The most feasible approach appears to be a large-scale case-control study in areas of the U.S. where the NDA regimens are used extensively. It is essential that this Phase IV study be designed with adequate statistical power to rule out relative risks close to 1.0 in the comparison of unopposed Premarin and Premarin/MPA-treated women, and it should be powered to evaluate differences between Premarin/MPA groups by treatment regimen (i.e., PREMPRO versus PREMPHASE).

2.      The sponsor expeditiously conducts the Phase IV, dose-ranging clinical trial already proposed of lower doses of PREMPRO (containing Premarin/MPA @ 0.625 mg/2.5 mg, 0.45 mg/2.5 mg, 0.45 mg/1.25 mg, and 0.3 mg/1.25 mg) on bone mineral density and endometrial histology endpoints.

> As previously agreed with Wyeth-Ayerst, it remains to be determined whether concomitant MPA may reduce the lowest effective dose of Premarin at bone target tissue when administered to calcium replete women 365 days/year. If so, the long term PREMPRO/PREMPHASE safety profile could be substantially improved, especially with regard to breast cancer risk with chronic usage. Because American women are extensively exposed to these drugs, even subtle reductions in dosage requirements may yield significant reductions in attributable risk for long-term adverse treatment sequelae.

NDA   #20-303                                                                                    Page 67
MOR of Orig. and Resubmitted NDA, 12/29/94

3.      All required modifications to the labeling, as detailed in section 11 above and FAX'ed to the
        sponsor on 12/28/94, are made prior to launch of the new products.

        The approval letter should state that Wyeth-Ayerst's 12/29/94 FAX indicating agreement
        with these labeling changes is acceptable except for the following:

        A.      Since current Cycrin labeling states "A statistically significant association has been
                demonstrated  between use of estrogen-progestin combination drugs and the
                following serious adverse reactions:  thrombophlebitis; pulmonary embolism;
                and cerebral thrombosis and embolism.  For this reason, patients on progestin
                therapy should be carefully observed." (PDR, 48th edition, 1994, p 919), this
                entire statement must also be included in the PREMPRO and PREMPHASE
                labeling.

        B.      The *Gallbladder disease* section of the Warnings section should accurately describe
                the results of the clinical trial.  Wyeth-Ayerst should explain their statement that
                they found "only 4 cases of 1029, not 6 of 1029", given that the Integrated Safety
                Summary of the NDA states "seven (7) patients in the multicenter study, 5 in
                group A, 1 in group B and 1 in group E, developed cholecystitis with
                cholelithiasis that required cholecystectomy" (NDA vol 1.57 p 27).

4.      The sponsor agrees to enlarge the print size of the "Directions for Use" package labeling on
        Card 2 of the PREMPHASE blister package to match that on Card 1 within one year
        following approval of this NDA.


                                                    _____  12/29/94
                                                    Linda J. Golden, M.D., Medical Officer -        Date

                                                    _____ 12/30/94
Attachment:   Sponsor's Table 1, NDA vol 1.40 pp 137-145 (Investigators for Pivotal Trial)

                                                    _____ 12/30/94

                                                    _____ 12.30.94

# Exhibit 5

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA
CIRCUIT CIVIL NO. 05-1606-CI-13

RECEIVED

APR 15 2010

CARLTON FIELDS

PETER ESPOSITIO, individually and as
Personal Representative of the Estate of
LORETTA ESPOSITO,

      Plaintiff,

Vs.

WYETH, INC., and WYETH
PHARMACEUTICALS, INC., and
ESI LEDERLE; CAROL BANKS;
and MARY TATE,

      Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION IN LIMINE TO BAR THE "REASONABLE COMPANY" TESTIMONY OF DRS. CHERYL BLUME, SUZANNE PARISIAN, AND DONALD AUSTIN, AND DR. BLUME'S LABELING OPINIONS

THIS CAUSE came before the court upon Defendants' Motion in Limine to Bar the "Reasonable Company" Testimony of Drs. Cheryl Blume, Suzanne Parisian, and Donald Austin, and Dr. Blume's Labeling Opinions. After hearing from the parties and considering the submissions the court finds the motion should be granted in part.

The Defendants have objected to the testimony of three "expert" witnesses who are prepared to offer their opinions concerning the reasonableness of the conduct of the defendant pharmaceutical companies. The issue presented is not a Frye question since it involves an expression of pure opinion based upon purported facts. There is also no doubt that each of the three witnesses have some special education, training or experience which might qualify them to give some kind of opinion testimony.

The court's concern is that nothing in the presentation reveals the need for any expert to actually express their personal opinion about the reasonableness of the company conduct. It is the court's belief that the jury will be fully capable of listening to the facts which reveal what the conduct was, and to receive evidence relevant to the reasonableness of the conduct from which they may make their own reasoned judgment regarding the conduct. Although the law does permit experts to render opinions regarding an ultimate issue in a case, the court is mindful that experts should not be permitted to testify regarding a legal conclusion that the jury can reach independently from the facts. See: Estate of Murray ex rel. Murray v. Delta Health Group, Inc., 2010 WL 565657 (Fla. 2nd DCA 2010).

The Plaintiff has asserted that a number of courts in foreign jurisdictions have allowed the kind of testimony complained of here. In fact, they assert that no trial court has excluded such testimony or been reversed for allowing its admission. The undersigned judge notes that broad discretion is vested in the trial courts regarding such matters so the sustaining of admissibility on appeal is not indicative of the best ruling in every case. Similarly, the degree to which a trial court might reasonably function as a gate keeper for such opinions can vary depending upon the circumstances, the jurisdiction's own common law as well as the judge's evaluation of a lay person juror's ability to evaluate the facts without an expert's legal conclusion.

To be clear, this court will certainly allow the Plaintiff to present fact evidence and testimony which a juror can use to consider the reasonableness of the Defendants' conduct. It is perfectly appropriate to offer such relevant matters as industry standards, government regulations, statutes, internal policies, FDA standards for testing, industry recommendations, customs or practice, administrative rules, or other factors bearing upon a corporation's conduct.

On the other hand, it seems unnecessary and (to this court) inappropriate to have a witness go beyond testimony establishing such facts to express a personal conclusion that the defendants non-conformity or deviation constitutes negligence. The jury function is usurped when an expert is unnecessarily permitted to explain what is reasonable or unreasonable.

A homicide detective with years of experience and training may be able to evaluate the circumstantial evidence of a suspicious death, however the courts do not permit such an expert to explain to the jury the evidence and then render his opinion that it was premeditated murder. In automobile accident cases an accident reconstruction expert may testify to conclusions about the cause of the collision, the speed of a vehicle or other factors but we leave to the jury the decision of whether these facts combine to prove negligence.

In conclusion, the court is compelled to grant the motion in part and to limit the expert testimony. While the witnesses may discuss facts and opinions based on their special education, training and experience, their personal conclusions about the reasonableness or unreasonableness of the Defendants' conduct will not be permitted.

The Defendants also object to the testimony of the experts on the grounds that certain testing could have been done but was not. The court finds that such experts may be allowed to testify about tests, procedures, accepted methods, scientific discoveries and information which could be used by a manufacturer of similar products. Like all other witnesses the accuracy or validity of such testing is subject to cross-examination and rebuttal. This does not give license to the expert to opine that the company was negligent or unreasonable.

With regard to the specific objections to the opinions of Dr. Blume concerning the adequacy of the product label, the court concludes this testimony should be excluded. The Defendants correctly observe that generally a medical expert would be the appropriate witness

when the inadequacy of the manufacturer's warnings to physicians is at issue. If expert testimony is needed to explain to a lay person what prescribing physicians understand from specific words on a label only a similarly situated physician or medical witness could be qualified to do so. If the purported problems with the label are not specific to the doctors understanding of the language used then jurors do not need an expert on the subject of labels to review all the "facts" and express an opinion about adequacy. If there is evidence that the physician or pateint needs to be warned about a particular matter those facts should be presented by evidence. The jurors will be able to decide whether a particular hazard or problem indeed existed and whether the warning label was adequate without any need for an expert to tell them how to decide this ultimate issue.

DONE AND ORDERED in Chambers at St. Petersburg, Pinellas County, Florida, this _____ day of April, 2010.

_____
ANTHONY RONDOLINO, Circuit Judge

Copy furnished to:

Edward W. Gerecke, Esq.
James D. Clark, Esq.
Tobias Millrood, Esq.
Chen-Sen Wu, Esq.
Rebecca Moos, Esq.
George E. McDavid, Esq.
Robert K. Jenner, Esq.
James F. Szaller, Esq.

**TRUE COPY**
Original Signed
APR 1 4 2010
_Anthony Rondolino_

# Exhibit 6

1
2
3
4
5
6                          IN THE UNITED STATES DISTRICT COURT
7                            FOR THE DISTRICT OF ARIZONA
8
9   Jessica Lopez,                      )   No. CV 08-1063-PHX-SRB
                                         )
10          Plaintiff,                   )
                                         )   **ORDER**
11  vs.                                  )
                                         )
12  I-Flow Inc., a Delaware Corporation, et al., )
13                                       )
            Defendants.                  )
14                                       )
                                         )
15                                       )
                                         )
16  Cole D. Chapman,                     )   No. CV 08-1064-PHX-SRB
                                         )
17          Plaintiff,                   )
                                         )
18  vs.                                  )
                                         )
19  I-Flow Inc., a Delaware Corporation, et al., )
20                                       )
            Defendants.                  )
21                                       )
                                         )
22  Matthew B. Goldstein,                )   No. CV 08-1859-PHX-SRB
                                         )
23          Plaintiff,                   )
                                         )
24  vs.                                  )
                                         )
25                                       )
26  I-Flow Inc., a Delaware Corporation, et al., )
                                         )
27          Defendants.                  )
                                         )
28                                       )

1

2    Julie A. Eggler,                          )   No. CV 09-0040-PHX-SRB

3            Plaintiff,                         )

4    vs.                                        )

5    I-Flow Inc., a Delaware Corporation, et al.,)

6            Defendants.                        )

7    _____           )

8

9    Anthony B. Hannigan,                       )   No. CV 09-0042-PHX-SRB

10           Plaintiff,                         )

11   vs.                                        )

12   I-Flow Inc., a Delaware Corporation, et al.,)

13           Defendants.                        )

14   _____           )

15   Linda Relkin and Herb Relkin,             )   No. CV 09-0044-PHX-SRB

16           Plaintiffs,                        )

17   vs.                                        )

18   I-Flow Inc., a Delaware Corporation, et al.,)

19           Defendants.                        )

20   _____           )

21        Pending before the Court are 28 Motions to Exclude filed by Defendant I-Flow

22   Corporation ("I-Flow") in the above-captioned cases. I-Flow moves to exclude the following

23   experts disclosed by Plaintiffs:

24   • Dr. Stephen Badylak, general causation expert;

25   • Dr. Brian L. Shafer, general causation expert;
     • Dr. David S. Bailie, general causation expert;

26   • Dr. Warren R. Dunn, general causation expert; and
     • Dr. Suzanne Parisian, regulatory and labeling expert.

27

28                                        - 2 -

1    I-Flow also moves to exclude general causation expert Dr. Charles Beck, whom Plaintiffs

2    did not disclose as an expert witness in these actions but on whose work the disclosed general

3    causation experts purportedly rely.   In addition, I-Flow moves to exclude all four of

4    Plaintiffs' disclosed general causation experts in one separate, redundant motion in each case.

5         In this Order, the Court resolves all 28 of I-Flow's Motions to Exclude.  By case and

6    docket number, the motions resolved are as follows:

7    •   Case No. CV 08-1063-PHX-SRB, Docs. 237 (Parisian), 239 (Badylak), 240 (General
         Causation);
8
     •   Case No. CV 08-1064-PHX-SRB, Docs. 183 (Badylak), 184 (Parisian), 186 (Beck),
9        187 (General Causation);

10   •   Case No. CV 08-1859-PHX-SRB, Docs. 109 (Badylak), 110 (Parisian), 112 (General
         Causation);
11
     •   Case No. CV 09-0040-PHX-SRB, Docs. 145 (Badylak), 146 (Bailie), 149 (Parisian),
12       150 (Shafer), 152 (General Causation), 154 (Dunn);

13   •   Case No. CV 09-0042-PHX-SRB, Docs. 128 (Badylak), 129 (Bailie), 131 (Parisian),
         132 (Shafer), 133 (General Causation), 137 (Dunn); and
14
     •   Case No. CV 09-0044-PHX-SRB, Docs. 139 (Badylak), 143 (Shafer), 144 (Parisian),
15       145 (General Causation), 147 (Bailie), 148 (Dunn).

16
     I.     BACKGROUND
17
             In these actions, Plaintiffs make various claims against I-Flow and other Defendants
18
     related to the implantation of a pain pump manufactured by I-Flow in each Plaintiff's
19
     shoulder during surgery. (*E.g.*, Case No. CV 08-1063-PHX-SRB, Doc. 34, Am. Compl. ¶
20
     2.) The pain pump continuously injected an anesthetic into the shoulder following surgery.
21
     (*E.g., id.*) Plaintiffs claim that the continuous injection of certain amounts of anesthetic into
22
     their shoulders after surgery caused chondrolysis–rapid loss of articular cartilage–which
23
     resulted in injury. (*E.g., id.* ¶¶ 14-15.)
24
             As part of their cases, Plaintiffs have disclosed four general causation experts, Drs.
25
     Bailie, Shafer, Badylak and Dunn. (Case No. CV 08-1063-PHX-SRB, Doc. 248, Pls.' Resp.
26
     in Opp'n to Def. I-Flow's Mot. to Exclude Pl.'s Gen. Causation Experts ("Gen. Causation
27

28

                                            - 3 -

1  Resp.") at 6.)[1] Plaintiffs have also disclosed Dr. Parisian as an expert in FDA regulations and

2  labeling. (Parisian Resp. at 1.) I-Flow now moves to exclude all of these experts under Rule

3  702 of the Federal Rules of Evidence and the principles set forth in *Daubert v. Merrell Dow*

4  *Pharm., Inc.* ("*Daubert I*"), 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526

5

6  ─────────────────

7      [1] With respect to each particular expert, I-Flow's Motion to Exclude filed in one of
     the above-captioned cases is identical to the Motions I-Flow filed in the other above-
8      captioned cases. Plaintiffs together filed only one set of Responses to all 28 Motions under
     Case Number CV 08-1063-PHX-SRB. Likewise, I-Flow filed only one set of Replies under
9      the same Case Number. For the sake of convenience in this Order, the Court refers to just
     one set of Motions, Responses and Replies, as follows:
10  •      Motions:      Case No. CV 08-1063-PHX-SRB,
11                       Doc. 237 - "Parisian Mot."
                         Doc. 239 - "Badylak Mot."
12                       Doc. 240 - "Gen. Causation Mot."
13                       Case No. CV 08-1064-PHX-SRB,
                         Doc. 186 - "Beck Mot."
14                       Case No. CV 09-0040-PHX-SRB,
15                       Doc. 146 - "Bailie Mot."
                         Doc. 150 - "Shafer Mot."
16                       Doc. 154 - "Dunn Mot."

17  •      Responses:    Case No. CV 08-1063-PHX-SRB
18                       Doc. 246 - "Parisian Resp."
                         Doc. 248 - "Gen. Causation Resp."
19                       Doc. 249 - "Badylak Resp."
                         Doc. 250 - "Bailie Resp."
20                       Doc. 251 - "Dunn Resp."
                         Doc. 252 - "Shafer Resp."
21                       Doc. 253 - "Beck Resp."
22

23  •      Replies:      Case No. CV 08-1063-PHX-SRB
                         Doc. 264 - "Badylak Reply"
24                       Doc. 265 - "Beck Reply"
                         Doc. 266 - "Parisian Reply"
25                       Doc. 267 - "Bailie Reply"
26                       Doc. 268 - "Dunn Reply"
                         Doc. 269 - "Shafer Reply"
27                       Doc. 270 - "Gen. Causation Reply"

28

1  U.S. 137 (1999).  (*E.g.*, Bailie Mot. at 1.)  No party has requested a *Daubert* hearing, nor

2  does the Court find one necessary.  For the reasons set forth below, the Court grants I-Flow's

3  Motions to Exclude with respect to Drs. Dunn and Parisian and denies the balance of I-

4  Flow's Motions to Exclude.

5  **II.  LEGAL STANDARDS AND ANALYSIS**

6  Federal Rule of Evidence 702 provides:

7  If scientific, technical, or other specialized knowledge will assist the trier of
   fact to understand the evidence or to determine a fact in issue, a witness

8  qualified as an expert by knowledge, skill, experience, training, or education,
   may testify thereto in the form of an opinion or otherwise, if (1) the testimony

9  is based upon sufficient facts or data, (2) the testimony is the product of
   reliable principles and methods, and (3) the witness has applied the principles

10  and methods reliably to the facts of the case.

11  Under Rule 702, the trial court acts as a "gatekeeper" and ensures that the proferred

12  scientific testimony meets certain standards of both relevance and reliability before it is

13  admitted.  *Daubert I*, 509 U.S. at 595-97.  An expert opinion is reliable if it is based on

14  proper methods and procedures rather than "subjective belief or unsupported speculation."

15  *Id.* at 590.  The test for reliability "'is not the correctness of the expert's conclusions but the

16  soundness of his methodology.'"  *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th

17  Cir. 2007) (quoting *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1318

18  (9th Cir. 1995)).  Alternative or opposing opinions or tests do not "preclude the admission

19  of the expert's testimony–they go to the *weight*, not the admissibility." *Kennedy v. Collagen

20  Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998).  Furthermore, "'[d]isputes as to the strength of

21  [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual

22  authority for his opinion, go to the weight, not the admissibility, of his testimony.'"  *Id.*

23  (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

24  Under Rule 702, the party proffering expert testimony has the burden of showing the

25  admissibility of the testimony by a preponderance of the evidence.  *Daubert I*, 509 U.S. at

26  592 n.10.  The Ninth Circuit Court of Appeals has observed that the Supreme Court "heavily

27  emphasizes that judges are entitled to broad discretion when discharging their gatekeeping

28  function" related to the admission of expert testimony.  *United States v. Hankey*, 203 F.3d

- 5 -

1  1160, 1168 (9th Cir. 2000) (citing *Kumho Tire*, 526 U.S. at 152).  The court considers four

2  factors to determine if expert testimony will assist the trier of fact: "(i) whether the expert is

3  qualified; (ii) whether the subject matter of the testimony is proper for the jury's

4  consideration; (iii) whether the testimony conforms to a generally accepted explanatory

5  theory; and (iv) whether the probative value of the testimony outweighs its prejudicial

6  effect." *Scott v. Ross*, 140 F.3d 1275, 1285-86 (9th Cir. 1998) (citations omitted).

7       **A.   Dr. David S. Bailie, General Causation Expert**

8       In an effort to proffer evidence showing a causal link between the I-Flow pain pump

9  and Plaintiffs' injuries, Plaintiffs have disclosed Dr. Bailie as a general causation expert.

10  (Gen. Causation Resp. at 6.)  I-Flow asserts that Dr. Bailie should be excluded because,

11  under Rule 702, his anticipated testimony is not supported by sufficient facts or data, he did

12  not use reliable principles or methodologies in rendering his opinions, and he is not qualified

13  to testify regarding FDA regulations and pain pump advertising.  (Bailie Mot. at 2.)

14  Plaintiffs point out that Dr. Bailie has already testified at trial as a general causation expert

15  regarding I-Flow pain pumps and that he was the implanting surgeon in several of the above-

16  captioned actions.  (Bailie Resp. at 2.)

17       I-Flow first argues that Dr. Bailie's theory linking the pain pump to chondrolysis is

18  not widely accepted in the scientific community and conflicts with his own case series.

19  (Bailie Mot. at 2-7.)[2]  In support of this argument, I-Flow provides selected quotes from

20  various expert opinions that indicate that further study is warranted on the causes of shoulder

21  chondrolysis.  (*Id.* at 3.)  However, as Plaintiffs point out, I-Flow either quotes the experts'

22  opinions out of context (Lubowitz & Poehling, McNickle), quotes equivocal language in very

24       [2] I-Flow filed two separate motions requesting the same relief for each disclosed
25  expert.  (*E.g., compare* Gen. Causation Mot. *with* Bailie Mot.)  The Local Rules of this Court
    restrict the number of pages a moving party may file in support of a motion. LRCiv. 7.2. In
26  addition to being largely redundant, I-Flow's filing of two motions for the same request
    violates the Local Rules.  In any case, the Court notes that consideration of I-Flow's
27  arguments in its General Causation Motion does not in any way change the Court's
28  conclusions with respect to I-Flow's Motions to Exclude individual experts.

- 6 -

1  early chondrolysis studies (Petty, Beck & Hansen), quotes the conclusion for a different
2  inquiry (Coobs & LaPrade), or quotes a suspect review of other studies that concludes that
3  the causes of chondrolysis are "multifactorial" (Solomon). (*See* Bailie Resp. at 7-9, 12-13.)
4  In support of Dr. Bailie's explanatory theory, Plaintiffs identify studies by Chu, Bogatch,
5  McNickle, Gomoll and Dragoo as well as a review of studies in a text by Wei and Galatz.
6  (*Id.* at 6-18.) As other courts have found with respect to expert conclusions similar to Dr.
7  Bailie's, this Court finds that Plaintiffs have identified more than sufficient "objective,
8  verifiable" evidence in the form of cohort, animal and in vitro cartilage studies in addition
9  to the various case series to support Dr. Bailie's opinions.[3] *See, e.g., McClellan v. I-Flow*
10 *Corp.*, 710 F. Supp. 2d 1092, 1105, 1115, 1130-31 (D. Or. 2010); *Schott v. I-Flow Corp.*, 696
11 F. Supp. 2d 898, 905 (S.D. Ohio 2010); *Zink v. SMI Liquidating, Inc.*, Civil Action No. 08-95
12 (WOB), 2010 WL 1839907, at *2 (E.D. Ky. May 7, 2010). In addition, the studies and series
13 that Plaintiffs have cited have been published and adequately subjected to peer review. The
14 Court thus concludes that Dr. Bailie's explanatory theory is generally accepted by the
15 medical community for purposes of I-Flow's Rule 702 challenge. *See McClellan*, 710 F.
16 Supp. 2d at 1115-17.

17         The Court finds no merit in I-Flow's suggestion that Dr. Bailie's present conclusions
18 should be excluded because they conflict with his own 2009 case study. (*See* Bailie Mot. at
19 3-4.) In that study, Dr. Bailie cautioned against the use of "large doses of intra-articular
20 placement of local anesthetics" until more data research could be completed. (Am. O'Leary
21 Decl., Ex. 44, D. Bailie and T. Ellenbecker, *Severe Chondrolysis after Shoulder Arthroscopy:*
22 *A Case Series*, 1-6 J. SHOULDER & ELBOW SURGERY (2009).) Plaintiffs state that Dr.
23

24         [3] Plaintiffs' experts consistently state that the data that would be most reliable, those
25 from randomized controlled trials on human patients to study the effect on the shoulder of
   continuous infusion of anesthetic via pain pump, or "Level I studies," would be unethical to
26 obtain in light of the known possible adverse effects on the patients. (*See, e.g.*, Case No. CV
   08-1063-PHX-SRB, Docs. 254-61, Am. Decl. of Leslie W. O'Leary in Supp. of Pl.'s Resp.
27 in Opp'n to Def. I-Flow's Mot. to Exclude Pl.'s Experts ("Am. O'Leary Decl."), Ex. 78 at
28 73.)

1    Bailie's present conclusions are based upon additional research and data, and the evidence

2    bears that out. (Bailie Resp. at 4-5.) Dr. Bailie's present conclusions by no means fall below

3    the Rule 702 threshold. *See Primiano v. Cook*, No. 06-15563, 2010 WL 1660303, at *4 (9th

4    Cir. Apr. 27, 2010).

5            I-Flow next contends that Dr. Bailie's conclusions amount to guesses in view of the

6    lack of certainty in the medical evidence as to the cause of chondrolysis. (Bailie Mot. at 4-7.)

7    However, lack of certainty is not grounds for the Court to exclude Dr. Bailie's conclusions,

8    but instead goes to the weight of his anticipated testimony. *Primiano*, 2010 WL 1660303,

9    at *5 ("Lack of certainty is not, for a qualified expert, the same thing as guesswork.")

10   Likewise, the lack of certainty in the medical evidence as to the exact anesthetic dose that

11   causes chondrolysis does not make Dr. Bailie's conclusions unreliable under Rule 702,

12   contrary to I-Flow's contentions. (*See* Bailie Mot. at 11-12.) Plaintiffs have identified

13   reliable medical studies showing that the toxicity of anesthetics on cartilage is dose-

14   dependent. (Bailie Resp. at 15-18.) Dr. Bailie's conclusions are thus supported by the

15   findings in medical studies. *See McClellan*, 710 F. Supp. 2d at 1111, 1117. It was not

16   improper for Dr. Bailie to offer an opinion that continuous injection of anesthetics causes

17   chondrolysis, even if the exact amount of anesthetic required may be uncertain. *See Clausen

18   v. M/V New Carissa*, 339 F.3d 1049, 1060 (9th Cir. 2003).

19           The Court likewise disagrees with I-Flow's assertion that Dr. Bailie's conclusions

20   amount to *ipse dixit* because he did not sufficiently explain how he reached his conclusions,

21   relying instead on a "totality" of scientific literature. (Bailie Mot. at 7-12.) Rule 702

22   requires consideration of "the *overall* sufficiency of the underlying facts and data, and the

23   reliability of the methods, as well as the fit of the methods to the facts of the case." *United

24   States v. W.R. Grace*, 504 F.3d 745, 765 (9th Cir. 2007) (finding that the trial court erred

25   when it conducted "a document-by-document Rule 702 analysis that deconstructed the

26   experts' testimony in a manner not contemplated by Rule 702"). It was not improper for Dr.

27   Bailie to rely on the totality of the medical opinions to reach his conclusions. *See McClellan*,

28   710 F. Supp. 2d at 1115, 1130-31.

1    Finally, I-Flow argues that Dr. Bailie is not qualified to testify "that pain pumps were

2   not 'FDA approved, safe and efficacious for the uses being marketed to the orthopedic

3   surgeons,'" because Dr. Bailie has no FDA or related experience. (Bailie Mot. at 13-14

4   (quoting *id.*, Ex. 1 at 4).)  In making its argument, I-Flow refers to Dr. Bailie's Rule 26

5   expert report, in which he states:

6       [The use of intra-articular pain pumps] became ubiquitous in the orthopedic
        community across the country, thus creating a "standard of care" that was
7       acceptable.  It was assumed that the devices were FDA approved, safe and
        efficacious for the uses being marketed to the orthopedic surgeons.  In
8       addition, there was no concern in the medical community of problems
        associated with local anesthetic infusion.  In fact, device sales representatives
9       were often present in my operating room and assisted with instructing the staff
        in filling the reservoir and observed and encouraged placement of the catheter
10      in the "operative site", including the joint cavities.  At no time was I ever told
        or provided information that even suggested that this was an off-label use of
11      the device.  I was also never told that FDA approval for use in synovial
        cavities had been applied for and denied.  During this time, I was also a paid
12      consultant to Breg, who manufactured and sold pain pumps almost exclusively
        to orthopedic surgeons.

13
    (Bailie Mot., Ex. 1 at 4.)  Plaintiffs assert that Dr. Bailie was simply explaining the
14
    circumstances under which he began using pain pumps in his practice, and not whether I-
15
    Flow violated FDA regulations in the way that it marketed the pain pumps.  (Bailie Resp. at
16
    18.)  Plaintiffs further contend that Dr. Bailie's statements are relevant to the issue of
17
    proximate cause, because Dr. Bailie was the implanting surgeon for several of the above-
18
    captioned Plaintiffs.  (*Id.* at 19.)  Plaintiffs state that "Dr. Bailie will not offer any opinion
19
    testimony on the FDA regulatory scheme or whether [D]efendant's conduct violated any
20
    applicable standard of care."  (*Id.*)
21
        An expert must be qualified to offer the anticipated testimony.  Fed. R. Evid. 702;
22
    *Scott*, 140 F.3d at 1286.  While Plaintiffs have offered no evidence to show that Dr. Bailie
23
    is qualified to testify regarding FDA regulations and, in particular, the marketing of medical
24
    products, the Court agrees that Dr. Bailie's Rule 26 report does not indicate that Dr. Bailie
25
    plans to offer such testimony.  Under Rule 702, I-Flow has provided no basis upon which the
26
    Court should exclude Dr. Bailie's anticipated testimony, and Plaintiffs have met their burden
27

28
                                        - 9 -

1  of showing the admissibility of that testimony. The Court therefore denies I-Flow's Motion
2  to Exclude Dr. Bailie.
3      **B.**    **Dr. Stephen Badylak, General Causation Expert**
4       Plaintiffs have also disclosed Dr. Badylak as a general causation expert. (Gen.
5  Causation Resp. at 6.) I-Flow asks the Court to exclude Dr. Badylak's testimony because,
6  under Rule 702, it is not supported by sufficient facts or data, he did not use reliable
7  methodologies in rendering his opinions, and he is not qualified to testify regarding the cause
8  of chondrolysis because he is not an orthopedic surgeon.[4] (Badylak Mot. at 2, 8-9.) The
9  other district courts that have considered the same challenge to Dr. Badylak's testimony
10  under Rule 702 have found his testimony to be admissible. *See McClellan*, 710 F. Supp. 2d
11  at 1131; *Suhn v. Breg, Inc.*, No. Civ. 08-4190-KES (S.D.S.D. Nov. 2, 2010), *filed as* D. Ariz.
12  No. CV 08-1063-PHX-SRB, Doc. 282, Ex. A; *Koch v. Breg, Inc.*, No. Civ. 08-4193-KES
13  (S.D.S.D. Nov. 2, 2010), *filed as* D. Ariz. No. CV 08-1063-PHX-SRB, Doc. 282, Ex. B.
14       The Court has examined Dr. Badylak's anticipated testimony and finds that Plaintiffs
15  have met their burden of demonstrating its admissibility for general causation under Rule
16  702. I-Flow makes substantially the same arguments for inadmissibility with respect to Dr.
17  Badylak's opinions as it does for Dr. Bailie's opinions. As the Court found with respect to
18  Dr. Bailie's opinions, Plaintiffs have demonstrated that Dr. Badylak's opinions are supported
19  by reliable medical studies and generally accepted by the medical community for purposes
20  of I-Flow's Rule 702 challenge. (*See* Badylak Resp. at 3-4, 8-14.) Plaintiffs have also
21  shown that Dr. Badylak's testimony is the product of reliable methodologies. (*See id.* at 5-7,
22
23  _____
24      [4] I-Flow also argues that Dr. Badylak's proffered testimony regarding FDA
regulations and pain pump warnings, and particularly that "[t]he misrepresentation of FDA
25  sanctioned use of intra-articular application of pain pumps by industry representatives is
clearly and causally related to chondrolysis," is inadmissible. (Badylak Mot. at 2, 6, 18-19.)
26  In response, Plaintiffs state that they "will not be presenting Dr. Badylak to testify on FDA
regulatory issues or the adequacy of warnings. His testimony will be limited to medical
27  causation." (Badylak Resp. at 14.) This limitation on Dr. Badylak's testimony renders I-
28  Flow's argument moot.

1   13-14.)  The concerns I-Flow expresses, such as a lack of absolute certainty in the results of

2   the relied upon medical studies, (*see* Badylak Mot. at 12, 16), and a lack of certainty in the

3   anesthetic dose that causes chondrolysis, (*see id.* at 13-14), go to the weight of Dr. Badylak's

4   anticipated testimony, not its admissibility.  *See McClellan*, 710 F. Supp. 2d at 1130-31.

5          I-Flow also contends that Dr. Badylak does not have the requisite background and

6   expertise to offer his opinions regarding the relationship between the continuous injection

7   of certain amounts of anesthetic into the shoulder and chondrolysis.  (Badylak Mot. at 8-9.)

8   I-Flow's principal argument is that Dr. Badylak is not an orthopedic surgeon, so he does not

9   have personal experience with the administration of anesthetic into a shoulder after surgery.

10  (*Id.*)  Plaintiffs state that Dr. Badylak is more than qualified to testify by virtue of his vast

11  experience as a medical researcher who has focused on the restoration of cartilage and tissue

12  engineering and the fact that he was head team physician at Purdue University for 15 years.

13  (Badylak Resp. at 4-5.) Rule 702 "contemplates a broad conception of expert qualifications."

14  *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994) (permitting expert

15  testimony from a longshore worker with 29 years of experience on issue of the duties of

16  vessel owners related to unusual and hazardous conditions).  While Dr. Badylak may not

17  have experience conducting shoulder surgeries, he does have substantial experience as a

18  researcher in the relevant field and as a physician.  Plaintiffs have satisfied their burden of

19  showing that Dr. Badylak is qualified to offer his anticipated general causation testimony,

20  and the Court denies I-Flow's Motion to Exclude Dr. Badylak's testimony. *See McClellan*,

21  710 F. Supp. 2d at 1131.

22          **C.      Dr. Brian L. Shafer, General Causation Expert**

23          Plaintiffs have also disclosed Dr. Shafer as a general causation expert.  (Gen.

24  Causation Resp. at 6.)  I-Flow moves to exclude Dr. Shafer under Rule 702 on the same

25  grounds as Drs. Bailie and Badylak; I-Flow asserts that Dr. Shafer's anticipated testimony

26  is not supported by sufficient facts or data and that he did not use reliable methodologies in

27  rendering his opinions.  (Shafer Mot. at 2.)  I-Flow also contends that Dr. Shafer is not

28  qualified to testify because, although he is an orthopedic surgeon, he does not employ pain

1  pumps in his practice and has not conducted independent research on the cause of

2  chondrolysis. (*Id.*) Lastly, I-Flow argues that Dr. Shafer is not qualified to testify regarding

3  FDA regulations and warning requirements. (*Id.* at 9-11.)

4      While Plaintiffs have disclosed Dr. Shafer as a general causation expert, both

5  Plaintiffs and I-Flow rely on a Rule 26 report prepared by Dr. Shafer for just one of the

6  above-captioned Plaintiffs, Ms. Eggler. (*See id.*, Ex. 2.)  The Court notes the distinction

7  between general causation–a showing that "'exposure to a substance can cause a particular

8  disease'"–and specific causation–a showing that "'a given exposure is the cause' of a

9  particular individual's disease." *See Newkirk v. ConAgra Foods, Inc.*, 727 F. Supp. 2d 1006,

10  1030 (E.D. Wash. 2010) (quoting *Dunn v. Sandoz Pharmaceuticals Corp.*, 275 F. Supp. 2d

11  672, 676 (M.D.N.C. 2003); Reference Manual on Scientific Evidence 444 (2d Ed. 2000)).

12  The Shafer report that the parties provided to the Court appears aimed at showing specific

13  causation with respect to Ms. Eggler.  I-Flow does not object to the lack of general causation

14  conclusions in the Shafer report, and the Court therefore declines to consider excluding Dr.

15  Shafer as a general causation expert on this ground.   Moreover, a finding of specific

16  causation such as the one in the Shafer report can only be made if general causation is

17  established. *See id.* at 1030-31.

18      Plaintiffs state that I-Flow's objections to Dr. Shafer's opinions "are mainly a

19  reiteration of [I-Flow's] global attacks on the medical literature concerning pain pumps and

20  chondrolysis," and the Court agrees. (*See* Shafer Resp. at 3.) As the Court found above with

21  respect to Drs. Bailie and Badylak, Plaintiffs have demonstrated that Dr. Shafer's opinions

22  are supported by reliable medical studies, generally accepted by the medical community, and

23  the product of reliable methodologies for purposes of I-Flow's Rule 702 challenge. (*See id.*

24  at 4-9.)  Concerns that I-Flow has expressed with Dr. Shafer's anticipated testimony go to

25  its weight, not admissibility.

26      The Court also rejects I-Flow's challenge to Dr. Shafer's qualifications to testify as

27  to the cause of chondrolysis in Ms. Eggler's shoulder.  While Dr. Shafer has not used pain

28  pumps in his own practice, he is an experienced orthopedic surgeon who regularly conducts

1   arthroscopic shoulder procedures and assesses patients who have chondrolysis. He has also

2   observed the implantation of pain pumps by other surgeons. Dr. Shafer's qualifications are

3   sufficient to make his anticipated testimony reliable under Rule 702. *See Thomas*, 42 F.3d

4   at 1269. I-Flow's assertion that Dr. Shafer improperly opines on FDA regulations and

5   warnings likewise fails, because the Court finds no evidence that Dr. Shafer plans to offer

6   such opinions. In his report concerning Ms. Eggler, Dr. Shafer simply recounts the

7   circumstances surrounding her surgery by saying that "[p]ain pump catheters were marked

8   for 'intraoperative' and 'surgical' site use" and that "[t]here was no warning against

9   intraarticular use." (Shafer Mot., Ex. 2 at 11.) Furthermore, Plaintiffs state that they will not

10  offer Dr. Shafer to express opinions on FDA compliance and regulations. (Shafer Resp. at

11  10.) Plaintiffs have satisfied their burden of showing that Dr. Shafer is qualified to offer his

12  anticipated testimony, and the Court denies I-Flow's Motion to Exclude Dr. Shafer's

13  testimony. *See McClellan*, 710 F. Supp. 2d at 1131.

14          **D.      Dr. Warren R. Dunn, General Causation Expert**

15          Plaintiffs have also disclosed Dr. Dunn as a general causation expert. (Gen. Causation

16  Resp. at 6.) Specifically, Plaintiffs intend for Dr. Dunn to testify as to the statistical

17  correlation between intra-articular infusion of anesthetics in the shoulder and chondrolysis.

18  (Dunn Resp. at 9.) I-Flow asserts that Dr. Dunn should be excluded because, under Rule

19  702, his methodology is improper and his anticipated testimony is unreliable. (Dunn Mot.

20  at 4-5.) I-Flow argues that Dr. Dunn improperly converted the data he relied upon from

21  Level IV case series data into Level II retrospective cohort study data for purposes of pooling

22  the data to calculate a statistical correlation. (*Id.*)

23          The *McClellan* court summarized the levels of weight given to scientific evidence as

24  follows:

25          Scientific evidence is assessed on a scale of Level I to Level V, with Level I
            granted the most scientific weight and Level V the least. A randomized
26          controlled trial is an example of Level I evidence, prospective cohort studies
            are considered Level II evidence, retrospective cohort studies are examples of
27          Level III evidence, case series are Level IV, and expert opinion is Level V.

28

                                              - 13 -

1   710 F. Supp. 2d at 1107 n.10 (quoting *Introducing Levels of Evidence to the Journal*, 85 J.

2   BONE & JOINT SURGERY 1, 2 (Jan. 2003)).  The court noted that cohort studies involve

3   two populations, or cohorts, "to determine whether a population exposed to a particular agent

4   is more likely to develop disease than the population which was not exposed." *Id.* (citing

5   REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 340, 389 (Fed. Judicial Ctr. 2d ed.

6   2000)).  "The possibility of bias and error is generally minimized through study design,

7   usually developed before data is gathered, and involves selection of the study group under

8   defined criteria." *Id.* (citing REFERENCE MANUAL at 341, 364, 371).  A case series, on

9   the other hand, is simply a report describing the incidences and circumstances of a particular

10  disease in patients, and need not involve a control group or fixed time period.  (*See, e.g.*,

11  Dunn Reply, Ex. A at 29-30.)

12        In his Rule 26 report, Dr. Dunn conducts his statistical analysis by examining data

13  from three published, peer-reviewed case series known as the Anderson, Rapley, and

14  Hansen/Beck studies.  (Dunn Mot., Ex. 1 at 4-7.)  Dr. Dunn also relies on unpublished data

15  from a study by Wiater/Matsen.  (*Id.* at 6-7.)  In their Response, Plaintiffs state that "Dr.

16  Dunn will not offer any opinions in this litigation on his evaluation that includes the

17  Wiater/Matsen data" until the study that includes those data is peer-reviewed and published.

18  (Dunn Resp. at 3 n.1.)  The Court therefore evaluates the reliability of Dr. Dunn's anticipated

19  testimony without considering the Wiater/Matsen data.

20        To calculate the statistical association between intra-articular injection of anesthetic

21  by pain pump and chondrolysis, Dr. Dunn pooled the data from just two case series, the

22  Hansen/Beck and Anderson case series.[5]  While Dr. Dunn himself admits that pooling cannot

23  typically be done on the data from case series, he concluded that the Anderson and

24  Hansen/Beck series were actually retrospective cohort studies because they included

---

26        [5] Dr. Dunn states that he did not include the data from the Rapley Level III
27  retrospective comparative study because that study's "unexposed" group was not identical
    to the "unexposed" groups in the Hansen/Beck and Anderson studies.  (*See* Dunn Resp. at
28  3; Dunn Reply, Ex. A at 76.)

1   "unexposed," or control, groups. (Dunn Reply, Ex. A at 32-35, 154.) Dr. Dunn thus felt he

2   could pool the data to calculate a statistical correlation. (*Id.* at 154.) With regard to the level

3   of scientific evidence, Dr. Dunn explains, "You could call it whatever you'd like, but the data

4   are what they are. There is a control group and a denominator." (*Id.* at 29.)

5          Both the Anderson and Hansen/Beck reports identify themselves as Level IV case

6   series.  Dr. Beck himself testified that a Level IV case series such as his "is clinical

7   evidence[;] it is not any type of prospective matched series or any kind of attempt to make

8   a statement under certain criteria. It's basically a clinical series paper, and that's where it fits

9   into the level of evidence." (Dunn Mot., Ex. 3 at 445.)  Even if the Anderson and

10  Hansen/Beck case series included data on groups of "unexposed" patients, the groups were

11  not designed under defined criteria such that the data from the series would rise to a Level

12  II scientific weight. *See McClellan*, 710 F. Supp. 2d at 1108 ("It is undisputed that Dr. Beck

13  did not design the Hansen/Beck Study as a Level II retrospective cohort and did not account

14  for selection bias or confounding factors. . . . Rather, Dr. Beck reported on the occurrences

15  of chondrolysis in his patients and presented them for the review." (internal quotation

16  omitted)).  In his report, Dr. Dunn does not attempt to design such groups with the data, nor

17  does he sufficiently address the reliability concerns with the data before using them to

18  calculate a statistical association.  Moreover, Dr. Dunn himself admits that at least one peer

19  review of his report, by Dr. Hennekens, observes that the Hansen/Beck study Dr. Dunn relied

20  on "is not a retrospective cohort study" and that there could have been unaccounted for

21  selection bias in the study.  (Dunn Reply, Ex. A at 76-80.)  Plaintiffs have not met their

22  burden of showing that Dr. Dunn's methodology passes Rule 702 muster. *See McClellan*,

23  710 F. Supp. 2d at 1108. Because Dr. Dunn's conclusions rest on an improper methodology

24  for calculating the statistical likelihood of an association between the intra-articular infusion

25  of anesthetics in the shoulder and chondrolysis, the Court must exclude Dr. Dunn's

26  testimony.

27

28

- 15 -

### E.    Dr. Charles Beck, Relied Upon by General Causation Experts

1

2        Although Plaintiffs did not designate Dr. Beck as a general causation expert, (*see* Gen.

3   Causation Resp. at 6), I-Flow moves to exclude his testimony on Rule 702 grounds, (Beck

4   Mot. at 1).  Plaintiffs respond to I-Flow's arguments "because all of [Plaintiffs'] experts rely

5   on Dr. Beck's retrospective study as part of the foundation for their causation opinions."

6   (Beck Resp. at 2.)  Because Dr. Beck is not a disclosed general causation expert, the Court

7   denies I-Flow's Motion to Exclude Dr. Beck under Rule 702.

8        The proper analysis here is under Federal Rule of Evidence 703.[6]  Rule 703 provides

9   that, if facts or data are "of a type reasonably relied upon by experts in the particular field in

10  forming opinions or inferences upon the subject, the facts of data need not be admissible in

11  evidence in order for the opinion or inference to be admitted."  I-Flow does not contend that

12  Dr. Beck's work is not of a type reasonably relied upon by experts in the medical field, but

13  rather that, as a Level IV case series, it supports only a finding of an association between the

14  intra-articular infusion of anesthetics and chondrolysis, not causation.  (Beck Reply at 4.)

15  In addressing a very similar factual scenario, the Ninth Circuit Court of Appeals stated:

16         [T]he fact that a study is associational–rather than an epidemiological study
           intended to show causation–does not bar it from being used to inform an
17         expert's opinion about the dangers of asbestos releases, assuming the study is
           "of the type typically relied upon" by experts in the field. Fed. R. Evid. 703.
18         Of course, the expert's opinion testimony must satisfy the requirements of
           Rule 702–but that requires consideration of the *overall* sufficiency of the
19         underlying facts and data, and the reliability of the methods, as well as the fit
           of the methods to the facts of the case. Fed. R. Evid. 702. . . . The study's
20         failure to establish causation goes to the weight it should be accorded, but does
           not mean that an expert could not rely on it in forming an opinion.
21

22  *W.R. Grace*, 504 F.3d at 765, *accord McClellan*, 710 F. Supp. 2d at 1108 ("I find it

23  questionable whether the Hansen/Beck Study constitutes helpful or relevant epidemiological

24  evidence to support an opinion of general causation between continuous infusion and

25  chondrolysis," but "the lack of epidemiological evidence is not fatal to the admission of

26  plaintiffs' experts' testimony, particularly in a case where no epidemiology 'rules out'

27  _____

28         [6] I-Flow does not cite Rule 703 in either its Motion to Exclude Dr. Beck or its Reply.

- 16 -

1   continuous infusion as a cause for chondrolysis." (citations omitted)).   Plaintiffs have

2   demonstrated to the Court that it was proper for the disclosed general causation witnesses to

3   consider Dr. Beck's study.

4       **F.    Dr. Suzanne Parisian, FDA Regulatory and Labeling Expert**

5       Plaintiffs have disclosed Dr. Parisian as an FDA regulatory and labeling expert.

6   (Parisian Resp. at 1.)   I-Flow asks the Court to exclude Dr. Parisian's extensive anticipated

7   testimony in its entirety, because, under Rule 702, she is not qualified to testify as an expert

8   on FDA regulations and guidelines and her opinions are unreliable and unhelpful.   (Parisian

9   Mot. at 1-2.)   Dr. Parisian has been disclosed as an expert in numerous lawsuits prior to the

10  instant ones, and many courts have had the opportunity to review her qualifications and the

11  reliability and helpfulness of her opinions.   (*Id.* at 2.)   Indeed, the parties cite at least 14

12  decisions from different courts in which Dr. Parisian has been evaluated as an expert, which

13  the Court has reviewed.

14      By virtue of her experience as an officer at the FDA, the Court first finds that Dr.

15  Parisian is qualified to offer opinions with respect to FDA regulations and labeling.   The

16  Court is in agreement that Dr. Parisian is qualified

17          insofar as she seeks to testify concerning the matters which [Plaintiffs have]
            identified as the subject of her testimony, i.e., regulations governing the
18          approval, labeling, advertising and marketing of pharmaceutical and medical
            products; the process by which the FDA determines the efficacy and safety of
19          new drugs and new drug applications; the issues the FDA considers in the
            development of product labeling and marketing information; and a
20          manufacturer's responsibility within this system.   It is clear, however, . . . that
            Dr. Parisian seeks to offer testimony and opinions on matters that go well
21          beyond FDA procedures and regulations and her areas of expertise.

22  *Reece v. Astrazeneca Pharm., LP*, 500 F. Supp. 2d 736, 744 (S.D. Ohio 2007).   In other

23  words, Dr. Parisian may be qualified to testify as to FDA regulations and labeling, but the

24  Rule 702 inquiry does not end there.

25      The Court has reviewed Dr. Parisian's 209-page Rule 26 report for the above-

26  captioned cases, which includes 10 overarching opinions.   (*See* Case No. CV 08-1063-PHX-

27  SRB, Doc. 247, Decl. of Leslie W. O'Leary in Supp. of Pl.'s Resp. in Opp'n to Def. I-Flow's

28

- 17 -

1    Mot. to Exclude Pl.'s Expert Dr. Suzanne Parisian, Ex. 1 ("Parisian Report") at 12-14.)[7]   I-

2    Flow argues to exclude Dr. Parisian on an opinion-by-opinion basis. (Parisian Mot. at 3-6.)

3    The Court intended to follow the same structure in evaluating the Rule 702 admissibility of

4    Dr. Parisian's anticipated testimony but finds that the same problems exist for each of Dr.

5    Parisian's proffered opinions.

6         For example, Dr. Parisian first opines that I-Flow and other Defendants "disregarded

7    their duties and obligations to protect public safety and ensure compliance with regulatory

8    safeguards" of the FDA by failing to "adequately design, test and obtain appropriate

9    premarketing clearance from [the] FDA to begin marketing its infusion pain pump legally

10   for a new and unapproved indication. Such negligent actions directly contributed to the pain,

11   suffering and permanent injuries of patients." (Parisian Report at 13.) I-Flow objects to this

12   opinion because it fails to satisfy Rule 702, improperly expresses legal conclusions, and lacks

13   foundation and improperly opines as to the state of mind of I-Flow and whether I-Flow's

14   actions contributed to Plaintiffs' injuries. (Parisian Mot. at 3.)  The Court agrees in all

15   respects.

16        Under Rule 26, an expert's written report must include an explanation of the basis and

17   reasons for each expressed opinion. Fed. R. Civ. P. 26(a)(2)(B)(i). Dr. Parisian's report is

18   a labyrinth that the Court cannot navigate.  Under the heading "Bases for Opinions #1 - #3,"

19   for example, Dr. Parisian spends 37 pages citing FDA regulations and guidelines but offers

20   no analysis whatsoever to support her opinions. (Parisian Report at 14-51.) Courts have

21   observed this issue with Dr. Parisian's reports in other cases. *See, e.g., In re Trasylol Prods.*

22   *Liab. Litig.*, 709 F. Supp. 2d 1323, 1346, 1349 (S.D. Fla. 2010) (noting that "Dr. Parisian

23   does not analyze the facts; she, in the words of the *Prempro* court, regurgitates them and

24   reaches conclusory opinions that are purportedly based on these facts," and that, "[d]espite

25   the heading, the section in no way provides an adequate basis for the opinions it is intended

26   to support"). In other sections, Dr. Parisian's report simply presents a narrative of selected

27   _____

28        [7] Dr. Parisian's 10 opinions are numbered 1-2 and 4-11. (*See id.*)

- 18 -

1    regulatory and corporate events and quotations and then leaps to a conclusion without

2    sufficient explanation.  (*See* Parisian Report at 78-103 (presenting a narrative of facts with

3    regard to I-Flow and the FDA that purportedly support Opinions 4 through 7, although no

4    analysis is provided).)  This deficiency has also been noted by other courts in excluding such

5    testimony from Dr. Parisian.  *See, e.g., id.* at 1347 (citing *Gen .Elec. Co. v. Joiner*, 522 U.S.

6    136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a

7    district court to admit opinion evidence that is connected to existing data only by the *ipse*

8    *dixit* of the expert.  A court may conclude that there is simply too great an analytical gap

9    between the data and the opinion proffered."); *In re Fosamax Prods. Liab. Litig.*, 645 F.

10   Supp. 2d 164, 192 (S.D.N.Y. 2009) (holding that Dr. Parisian "will not be permitted to

11   merely read, selectively quote from, or 'regurgitate' the evidence" (citing *In re Prempro*

12   *Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 880, 886 (E.D. Ark. 2008) (overturning a punitive

13   damages award based on Dr. Parisian's testimony in part because "she did not explain the

14   documents, provide summaries, or tie them in to her proposed regulatory testimony" and "did

15   not provide analysis, opinion, or expertise"))).  As a result, none of Dr. Parisian's anticipated

16   testimony is either helpful or reliable under Rule 702.

17         Dr. Parisian's report lacks reliability and helpfulness to the jury in other ways as well.

18   In many instances, Dr. Parisian opines as to the knowledge, state of mind, intent or

19   motivations of I-Flow, other Defendants or the FDA itself.  (*See* Parisian Mot. at 3-6, 14-15.)

20   For example, Dr. Parisian concludes that, "[b]esides promoting their own pumps in violation

21   of FDA regulations, [Defendants] engaged in conduct intended to misbrand the other

22   manufacturers' products."[8]  (Parisian Report at 10.)  Dr. Parisian has no knowledge of the

23   state of mind, intent or motivations of Defendants or the FDA, and such testimony is

24   improper under Rule 702 as well as Federal Rules of Evidence 104 and 403.  Myriad other

25   courts have observed and excluded this type of testimony in Dr. Parisian's reports in the past.

26   _____

27       [8] Dr. Parisian's report is replete with such statements, so the Court does not endeavor

28   to list them all here.

1   *Trasylol*, 709 F. Supp. 2d at 1338, 1346; *In re Gadolinium-Based Contrast Agents Prods.*

2   *Liab. Litig.*, No. 1:08 GD 50000, MDL No. 1909, 2010 WL 1796334, at *13 (N.D. Ohio May

3   4, 2010); *Fosamax*, 645 F. Supp. 2d at 192; *In re Guidant Corp. Implantable Defibrillators*

4   *Prods. Liab. Litig.*, Civil Nos. 06-25 (DWF/AJB), 05-2596 (DWF/AJB), MDL No. 05-1708

5   (DWF/AJB), 2007 WL 1964337, at *8 (D. Minn. June 29, 2007).

6        I-Flow also contends, and the Court agrees, that many of Dr. Parisian's opinions are

7   beyond her expertise, speculative or too conclusory. (*See* Parisian Mot. at 3-6, 16-17.) For

8   example, Dr. Parisian concludes that Defendants "failed to voluntarily and adequately warn

9   health care providers, sales representatives, distributors and patients," but Dr. Parisian is not

10  qualified to offer such an opinion. *See Fosamax*, 645 F. Supp. 2d at 191-92; *Guidant*, 2007

11  WL 1964337, at *7.

12       Because the proffered report does not allow the Court to glean any admissible

13  opinions, Plaintiffs have failed to meet their burden of demonstrating the admissibility of any

14  of Dr. Parisian's anticipated testimony under Rule 702. The Court therefore excludes Dr.

15  Parisian's anticipated testimony in its entirety. *See Trasylol*, 709 F. Supp. 2d at 1350.

16       **IT IS THEREFORE ORDERED** denying the following motions filed by Defendant

17  I-Flow Corporation:

18  • Case No. CV 08-1063-PHX-SRB, Docs. 239 (Badylak), 240 (General Causation);
    • Case No. CV 08-1064-PHX-SRB, Docs. 183 (Badylak), 186 (Beck), 187 (General
19    Causation);
    • Case No. CV 08-1859-PHX-SRB, Docs. 109 (Badylak), 112 (General Causation);
20  • Case No. CV 09-0040-PHX-SRB, Docs. 145 (Badylak), 146 (Bailie), 150 (Shafer),
      152 (General Causation);
21  • Case No. CV 09-0042-PHX-SRB, Docs. 128 (Badylak), 129 (Bailie), 132 (Shafer),
      133 (General Causation); and
22  • Case No. CV 09-0044-PHX-SRB, Docs. 139 (Badylak), 143 (Shafer), 145 (General
      Causation), 147 (Bailie).

23       **IT IS FURTHER ORDERED** granting the following motions filed by Defendant I-

24  Flow Corporation:

25  • Case No. CV 08-1063-PHX-SRB, Doc. 237 (Parisian);
    • Case No. CV 08-1064-PHX-SRB, Doc. 184 (Parisian);
26  • Case No. CV 08-1859-PHX-SRB, Doc. 110 (Parisian);
    • Case No. CV 09-0040-PHX-SRB, Docs. 149 (Parisian), 154 (Dunn);
27  • Case No. CV 09-0042-PHX-SRB, Docs. 131 (Parisian), 137 (Dunn); and
    • Case No. CV 09-0044-PHX-SRB, Docs. 144 (Parisian), 148 (Dunn).
28

- 20 -

1

**IT IS FURTHER ORDERED** that the Rule 702 admissibility decisions contained

2

herein apply to all of the above-captioned cases.

3

4

DATED this 26th day of January, 2011.

5

6

7

8

Susan R. Bolton
United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28